















JPP   3/29/04    14:02

3:04-CV-00613   HEWLETT PACKARD V. GATEWAY INC

*1*

*CMP.*

1 | John Allcock (Bar No. 098895)
Cathy Ann Bencivengo (Bar No. 138791)
2 | John E. Giust (Bar No. 196337)
Barry K. Shelton (Bar No. 199307)
3 | **GRAY CARY WARE & FREIDENRICH LLP**
401 B Street, Suite 2000
4 | San Diego, California 92101-4240
Tel: 619-699-2828
5 | Fax: 619-699-2701
6 | Attorneys for Plaintiff
Hewlett-Packard Development Company,
7 |
8 |

FILED

MAR 2 4 2004

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

9 |
10 |          UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

'04 CV 00613 JM (AJB)

12 | Hewlett-Packard Development      CV No.
13 | Company, L.P.,
                                 Complaint for
14 |          Plaintiff            Patent Infringement
                                 and Jury Demand
15 |     v.
16 | Gateway, Inc.,
17 |          Defendant.
18 |
19 |                      JURISDICTION
20 |     1.   This is an action for patent infringement.  This Court
21 | has jurisdiction under 28 U.S.C. §§ 1331, 1338, and pursuant to
22 | the patent laws of the United States of America, 35 U.S.C. § 100,
23 | *et seq.*
24 |                         VENUE
25 |     2.   Venue properly lies within the Southern District of
26 | California pursuant to the provisions of 28 U.S.C. §§ 1391 (b),
27 | (c) and 1400(b).
28 |

GRAY CARY WARE
& FREIDENRICH LLP

SD\1594746.1
100818-86

-1-

THE PARTIES

3.   Hewlett-Packard Development Company, L.P. ("HPDC") is a limited partnership formed under the laws of Texas and has its principal place of business at 2055 S.H. 249, Houston, Texas 77070.

4.   Gateway, Inc. ("Gateway") on information and belief, is a Delaware corporation and has its principal place of business at 14303 Gateway Place, Poway, CA 92064.

5.   Upon information and belief, Gateway transacts business in this judicial district, including the sale and offering for sale of its products, and Gateway has sufficient contacts with this judicial district to subject Gateway to the jurisdiction of this Court.

FACTUAL BACKGROUND

6.   Hewlett-Packard ("HP") is an industry leader in innovation in the personal computer and server product development areas.  HP, including its acquired companies, has made major investments in its intellectual property.  HP protects its inventions and requires fair and appropriate value when other companies use its intellectual property.  HP is informed and believes that Gateway's products infringe certain HP patents and that Gateway has refused to properly compensate HP for their use.

7.   HPDC is a limited partnership and wholly-owned subsidiary of Hewlett-Packard Company, USA.  HPDC is a holding company for Hewlett-Packard intellectual property rights and is the intellectual property licensing entity for Hewlett-Packard worldwide.

-2-

1    8.   On July 17, 1990, United States Patent No. 4,942,606

2 ("the '606 Patent"), titled *Computer with Improved Keyboard*

3 *Password Functions*, was duly and legally issued.  A true and

4 correct copy of the '606 Patent is attached hereto as Exhibit A.

5    9.   HPDC is the assignee and the owner of all right, title

6 and interest in and to the '606 Patent.  Accordingly, HPDC has

7 the right to bring this suit for damages and injunctive relief.

8    10.  On October 29, 1996, United States Patent No. 5,570,107

9 ("the '107 Patent"), titled *Circuitry and Method for High*

10 *Visibility Cursor Generation in a Graphics Display*, was duly and

11 legally issued.  A true and correct copy of the '107 Patent is

12 attached hereto as Exhibit B.

13    11.  HPDC is the assignee and the owner of all right, title

14 and interest in and to the '107 Patent.  Accordingly, HPDC has

15 the right to bring this suit for damages and injunctive relief.

16    12.  On September 26, 2000, United States Patent No.

17 6,125,031 ("the '031 Patent"), titled *Plastic Computer*

18 *Housing/Access Door Apparatus with Integrally Molded Dual*

19 *Function Hinge Assembly*, was duly and legally issued.  A true and

20 correct copy of the '031 Patent is attached hereto as Exhibit C.

21    13.  HPDC is the assignee and the owner of all right, title

22 and interest in and to the '031 Patent.  Accordingly, HPDC has

23 the right to bring this suit for damages and injunctive relief.

24    14.  On October 23, 2001, United States Patent No. 6,307,740

25 B1 ("the '740 Patent"), titled *One Inch Notebook Computer*, was

26 duly and legally issued.  A true and correct copy of the '740

27 Patent is attached hereto as Exhibit D.

28

-3-

GRAY CARY WARE
& FREIDENRICH LLP

SD\1594746.1
100818-86

15.   HPDC is the assignee and the owner of all right, title and interest in and to the '740 Patent.  Accordingly, HPDC has the right to bring this suit for damages and injunctive relief.

16.   On July 30, 2002, United States Patent No. 6,426,871 B2 ("the '871 Patent"), titled *One Inch Notebook Computer*, was duly and legally issued.  A true and correct copy of the '871 Patent is attached hereto as Exhibit E.

17.   HPDC is the assignee and the owner of all right, title and interest in and to the '871 Patent.  Accordingly, HPDC has the right to bring this suit for damages and injunctive relief.

18.   On August 19, 2003, United States Patent No. 6,609,211 B2 ("the '211 Patent"), titled *Utilization-Based Power Management of a Clocked Device*, was duly and legally issued.  A true and correct copy of the '211 Patent is attached hereto as Exhibit F.

19.   HPDC is the assignee and the owner of all right, title and interest in and to the '211 Patent.  Accordingly, HPDC has the right to bring this suit for damages and injunctive relief.

<u>COUNT I</u>

(INFRINGEMENT OF '606 PATENT)

20.   HPDC incorporates by reference the allegations set forth in paragraphs 1 through 19.

21.   HPDC is informed and believes, and on that basis alleges, that Gateway is infringing the '606 Patent by making, using, offering for sale, and/or selling within the United States devices that embody the inventions disclosed and claimed in the '606 Patent, and/or by importing into the United States devices that embody the inventions disclosed and claimed in said patent.

-4-

1  Such devices include but are not limited to the Gateway 860 NAS
2  (network attached storage) and Gateway 310S desktop computer, and
3  on information and belief include Gateway 310 series of desktop
4  computers, Gateway 860 series of network attached storage, and
5  other functionally equivalent devices.

6      22.   In addition to direct infringement, HPDC is informed
7  and believes, and on that basis alleges, that Gateway has induced
8  and contributed to infringement by others of the '606 Patent.

9      23.   Based upon information and belief, Gateway has notice
10 that it is manufacturing and selling products that infringe the
11 '606 Patent.  Despite such notice, Gateway has continued to
12 willfully infringe said patents by making, using, offering to
13 sell, and/or selling within the United States products that
14 embody the inventions disclosed and claimed in said patent,
15 and/or by importing such products into the United States.

16     24.   HPDC has been irreparably harmed by Gateway's acts of
17 infringement, and will continue to be harmed unless and until
18 Gateway's acts of infringement are enjoined and restrained by
19 order of this Court.  HPDC has no adequate remedy of law.

20     25.   As a result of Gateway's acts of infringement, HPDC has
21 suffered and will continue to suffer damages in an amount to be
22 proven at trial.

23     26.   This case is an "exceptional" case within the meaning
24 of 35 U.S.C. § 285.

25 /////

26 /////

27 /////

28

-5-

GRAY CARY WARE
& FREIDENRICH LLP

SD\1594746.1
100818-86

1

2

3

4

COUNT II

(INFRINGEMENT OF '107 PATENT)

27.  HPDC incorporates by reference the allegations set forth in paragraphs 1 through 26.

28.  HPDC is informed and believes, and on that basis alleges, that Gateway is infringing the '107 Patent by making, using, offering for sale, and/or selling within the United States devices that embody the inventions disclosed and claimed in the '107 Patent, and/or by importing into the United States devices that embody the inventions disclosed and claimed in said patent. Such devices include but are not limited to the Gateway M505 notebook computer, and on information and belief include Gateway M505 series of notebook computers, and other functionally equivalent devices.

29.  In addition to direct infringement, HPDC is informed and believes, and on that basis alleges, that Gateway has induced and contributed to infringement by others of the '107 Patent.

30.  Based upon information and belief, Gateway has notice that it is manufacturing and selling products that infringe the '107 Patent.  Despite such notice, Gateway has continued to willfully infringe said patents by making, using, offering to sell, and/or selling within the United States products that embody the inventions disclosed and claimed in said patent, and/or by importing such products into the United States.

/////

/////

/////

-6-

GRAY CARY WARE
& FREIDENRICH LLP

SD\1594746.1
100818-86

1    31.  HPDC has been irreparably harmed by Gateway's acts of

2  infringement, and will continue to be harmed unless and until

3  Gateway's acts of infringement are enjoined and restrained by

4  order of this Court.  HPDC has no adequate remedy of law.

5    32.  As a result of Gateway's acts of infringement, HPDC has

6  suffered and will continue to suffer damages in an amount to be

7  proven at trial.

8    33.  This case is an "exceptional" case within the meaning

9  of 35 U.S.C. § 285.

10                            COUNT III

11                  (INFRINGEMENT OF '031 PATENT)

12    34.  HPDC incorporates by reference the allegations set

13  forth in paragraphs 1 through 33.

14    35.  HPDC is informed and believes, and on that basis

15  alleges, that Gateway is infringing the '031 Patent by making,

16  using, offering for sale, and/or selling within the United States

17  devices that embody the inventions disclosed and claimed in the

18  '031 Patent, and/or by importing into the United States devices

19  that embody the inventions disclosed and claimed in said patent.

20  Such devices include but are not limited to the Gateway 310

21  series of desktop computers and other functionally equivalent

22  devices.

23    36.  In addition to direct infringement, HPDC is informed

24  and believes, and on that basis alleges, that Gateway has induced

25  and contributed to infringement by others of the '031 Patent.

26  /////

27  /////

28                                -7-

GRAY CARY WARE      SD\1594746.1
& FREIDENRICH LLP   100818-86

1    37.   Based upon information and belief, Gateway has notice

2 that it is manufacturing and selling products that infringe the

3 '031 Patent.  Despite such notice, Gateway has continued to

4 willfully infringe said patents by making, using, offering to

5 sell, and/or selling within the United States products that

6 embody the inventions disclosed and claimed in said patent,

7 and/or by importing such products into the United States.

8    38.   HPDC has been irreparably harmed by Gateway's acts of

9 infringement, and will continue to be harmed unless and until

10 Gateway's acts of infringement are enjoined and restrained by

11 order of this Court.  HPDC has no adequate remedy of law.

12    39.   As a result of Gateway's acts of infringement, HPDC has

13 suffered and will continue to suffer damages in an amount to be

14 proven at trial.

15    40.   This case is an "exceptional" case within the meaning

16 of 35 U.S.C. § 285.

17                            COUNT IV

18                (INFRINGEMENT OF '740 PATENT)

19    41.   HPDC incorporates by reference the allegations set

20 forth in paragraphs 1 through 40.

21    42.   HPDC is informed and believes, and on that basis

22 alleges, that Gateway is infringing the '740 Patent by making,

23 using, offering for sale, and/or selling within the United States

24 devices that embody the inventions disclosed and claimed in the

25 '740 Patent, and/or by importing into the United States devices

26 that embody the inventions disclosed and claimed in said patent.

27 Such devices include but are not limited to the Gateway M305CRV

28                              -8-

GRAY CARY WARE      SD\1594746.1
& FREIDENRICH LLP   100818-86

1   notebook computer, and on information and belief include the

2   Gateway M305 series of notebook computers and other functionally

3   equivalent devices.

4       43.   In addition to direct infringement, HPDC is informed

5   and believes, and on that basis alleges, that Gateway has induced

6   and contributed to infringement by others of the '740 Patent.

7       44.   Based upon information and belief, Gateway has notice

8   that it is manufacturing and selling products that infringe the

9   '740 Patent.  Despite such notice, Gateway has continued to

10  willfully infringe said patents by making, using, offering to

11  sell, and/or selling within the United States products that

12  embody the inventions disclosed and claimed in said patent,

13  and/or by importing such products into the United States.

14      45.   HPDC has been irreparably harmed by Gateway's acts of

15  infringement, and will continue to be harmed unless and until

16  Gateway's acts of infringement are enjoined and restrained by

17  order of this Court.  HPDC has no adequate remedy of law.

18      46.   As a result of Gateway's acts of infringement, HPDC has

19  suffered and will continue to suffer damages in an amount to be

20  proven at trial.

21      47.   This case is an "exceptional" case within the meaning

22  of 35 U.S.C. § 285.

23                      COUNT V

24            (INFRINGEMENT OF '871 PATENT)

25      48.   HPDC incorporates by reference the allegations set

26  forth in paragraphs 1 through 47.

27

28                                          -9-

GRAY CARY WARE     SD\1594746.1
& FREIDENRICH LLP   100818-86

1      49.  HPDC is informed and believes, and on that basis

2  alleges, that Gateway is infringing the '871 Patent by making,

3  using, offering for sale, and/or selling within the United States

4  devices that embody the inventions disclosed and claimed in the

5  '871 Patent, and/or by importing into the United States devices

6  that embody the inventions disclosed and claimed in said patent.

7  Such devices include but are not limited to the Gateway M305CRV

8  notebook computer, and on information and belief include the

9  Gateway M305 series of notebook computers and other functionally

10  equivalent devices.

11      50.  In addition to direct infringement, HPDC is informed

12  and believes, and on that basis alleges, that Gateway has induced

13  and contributed to infringement by others of the '871 Patent.

14      51.  Based upon information and belief, Gateway has notice

15  that it is manufacturing and selling products that infringe the

16  '871 Patent.  Despite such notice, Gateway has continued to

17  willfully infringe said patents by making, using, offering to

18  sell, and/or selling within the United States products that

19  embody the inventions disclosed and claimed in said patent,

20  and/or by importing such products into the United States.

21      52.  HPDC has been irreparably harmed by Gateway's acts of

22  infringement, and will continue to be harmed unless and until

23  Gateway's acts of infringement are enjoined and restrained by

24  order of this Court.  HPDC has no adequate remedy of law.

25      53.  As a result of Gateway's acts of infringement, HPDC has

26  suffered and will continue to suffer damages in an amount to be

27  proven at trial.

28

-10-

1    54.   This case is an "exceptional" case within the meaning

2  of 35 U.S.C. § 285.

3                              COUNT VI

4                   (INFRINGEMENT OF '211 PATENT)

5    55.   HPDC incorporates by reference the allegations set

6  forth in paragraphs 1 through 54.

7    56.   HPDC is informed and believes, and on that basis

8  alleges, that Gateway is infringing the '211 Patent by making,

9  using, offering for sale, and/or selling within the United States

10  devices that embody the inventions disclosed and claimed in the

11  '211 Patent, and/or by importing into the United States devices

12  that embody the inventions disclosed and claimed in said patent.

13  Such devices include but are not limited to the Gateway M505B2

14  notebook computer, and on information and belief include the

15  Gateway M505 series of notebook computers and other functionally

16  equivalent devices.

17    57.   In addition to direct infringement, HPDC is informed

18  and believes, and on that basis alleges, that Gateway has induced

19  and contributed to infringement by others of the '211 Patent.

20    58.   Based upon information and belief, Gateway has notice

21  that it is manufacturing and selling products that infringe the

22  '211 Patent.   Despite such notice, Gateway has continued to

23  willfully infringe said patents by making, using, offering to

24  sell, and/or selling within the United States products that

25  embody the inventions disclosed and claimed in said patent,

26  and/or by importing such products into the United States.

27

28                              -11-

GRAY CARY WARE      SD\1594746.1
& FREIDENRICH LLP   100818-86

1    59.    HPDC has been irreparably harmed by Gateway's acts of

2    infringement, and will continue to be harmed unless and until

3    Gateway's acts of infringement are enjoined and restrained by

4    order of this Court.    HPDC has no adequate remedy of law.

5    60.    As a result of Gateway's acts of infringement, HPDC has

6    suffered and will continue to suffer damages in an amount to be

7    proven at trial.

8    61.    This case is an "exceptional" case within the meaning

9    of 35 U.S.C. § 285.

10    WHEREFORE, HPDC prays:

11    1.    That HPDC be adjudged the owner of the '606

12    Patent, the '107 Patent, the '031 Patent, the '740 Patent, the

13    '871 Patent and the '211 Patent and entitled to all rights of

14    recovery thereunder, and that such patents are valid and

15    enforceable;

16    2.    That Gateway be adjudged to have infringed,

17    induced infringement and contributed to infringement of the '606

18    Patent, the '107 Patent, the '031 Patent, the '740 Patent, the

19    '871 Patent and the '211 Patent;

20    3.    That Gateway, its officers, principals, agents,

21    attorneys, servants, employees and all others acting by or under

22    their direction and authority, and their successors and assigns,

23    be enjoined by preliminary and permanent injunctions from

24    making, using, offering to sell or selling in the United States

25    any infringing products or any other product substantially

26    equivalent thereto which is also within the scope of any claim of

27    the '606 Patent, the '107 Patent, the '031 Patent, the '740

28                                                -12-

GRAY CARY WARE
& FREIDENRICH LLP

SD\1594746.1
100818-86

1  Patent, the '871 Patent and the '211 Patent, and from importing

2  into the United States any infringing products or any other

3  product substantially equivalent thereto which is also within the

4  scope of any claim of the '606 Patent, the '107 Patent, the '031

5  Patent, the '740 Patent, the '871 Patent and the '211 Patent;

6          4.    That HPDC be awarded an accounting for and

7  recovery of damages under 35 U.S.C. § 284 adequate to fully

8  compensate it for infringement by Gateway of the '606 Patent, the

9  '107 Patent, the '031 Patent, the '740 Patent, the '871 Patent

10 and the '211 Patent, in an amount to be proven at trial;

11         5.    That HPDC be awarded treble damages in view of the

12 reckless, willful and deliberate nature of Gateway's

13 infringement, pursuant to 35 U.S.C. § 284;

14         6.    For costs and attorneys' fees pursuant to 35

15 U.S.C. § 285;

16         7.    For interest thereon at the legal rate; and

17         8.    For such other and further relief as the Court may

18 deem just and proper.

19 Dated:   March 24, 2004

20                       By _____
                              JOHN ALLCOCK
21                            CATHY ANN BENCIVENGO
                              JOHN E. GIUST
22                            BARRY K. SHELTON
                              GRAY CARY WARE & FREIDENRICH LLP
23                            Attorneys for Plaintiff
                              HEWLETT-PACKARD DEVELOPMENT
24                            COMPANY, L.P.

25

26

27

28

GRAY CARY WARE          SD\1594746.1
& FREIDENRICH LLP       100818-86

                              -13-

1

DEMAND FOR JURY TRIAL

2

Plaintiff Hewlett-Packard Development Company, L.P. hereby

3

demands a jury trial.

4

Dated:   March 24, 2004

5

6          By_____

            JOHN ALLCOCK

7          CATHY ANN BENCIVENGO
            JOHN E. GIUST

8          BARRY K. SHELTON
            GRAY CARY WARE & FREIDENRICH LLP

9          Attorneys for Plaintiff
            HEWLETT-PACKARD DEVELOPMENT

10         COMPANY, L.P.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-14-

# United States Patent [19]

## Kaiser et al.

[11] Patent Number: **4,942,606**

[45] Date of Patent: **Jul. 17, 1990**

[54] **COMPUTER WITH IMPROVED KEYBOARD PASSWORD FUNCTIONS**

[75] Inventors: Roger A. Kaiser; James H. Nuckols; Theodore F. Emerson; Gary L. Brasher, all of Houston, Tex.

[73] Assignee: Compaq Computer Corporation, Del.

[21] Appl. No.: 307,404

[22] Filed: Feb. 7, 1989

[51] Int. Cl.⁵ ........................................ H04L 9/32
[52] U.S. Cl. ........................................ 380/4; 380/25; 380/50; 340/825.31; 340/825.34
[58] Field of Search ..................... 364/200, 900, 231.5, 364/234, 234.1, 234.2, 234.3, 234.4, 237.9, 246.6, 246.8, 926.9–926.93, 940, 940.1, 940.6, 942.3, 942.6, 969, 969.2, 969.3, 969.4, 971.1; 380/3–5, 23–25, 50; 340/825.31, 825.34

[56]                    **References Cited**

**U.S. PATENT DOCUMENTS**

4,529,870  7/1985  Chaum .......................... 380/25 X

4,536,647  8/1985  Atalla et al. ..................... 380/24
4,697,072  9/1987  Kawana ...................... 380/24 X
4,882,752  11/1989  Lindman et al. .............. 380/25
4,891,838  1/1990  Faber ........................... 380/25

*Primary Examiner*—Stephen C. Buczinski
*Assistant Examiner*—Bernarr Earl Gregory
*Attorney, Agent, or Firm*—Arnold, White & Durkee

[57]                      **ABSTRACT**

A computer having an improved keyboard/auxiliary device interface controller which supports the selective restriction of user interaction with the computer system, while maintaining the full internal functionality of the host/peripheral interface. A "password lock mode" of the improved controller prevents users from gaining unauthorized access to the computer system, but still application and operating system software can continue to issue commands to and receive responses from the otherwise disabled peripheral devices. The improved controller does not require modification to the conventional keyboard/auxiliary device hardware.

**20 Claims, 6 Drawing Sheets**





**U.S. Patent**    Jul. 17, 1990    Sheet 1 of 6    **4,942,606**



*FIG.1*

EXHIBIT A    PAGE 16



FIG.2



FIG. 3

## FIG.4





FIG.6



4,942,606

**1**

# COMPUTER WITH IMPROVED KEYBOARD PASSWORD FUNCTIONS

## BACKGROUND OF THE INVENTION

The present invention relates to digital computer systems, and more particularly relates to control of a computer input/output device.

A computer usually contains valuable, confidential or otherwise restricted information in its memory and/or external storage devices, so it is accordingly desirable to control access to this information to prevent unauthorized use. Such controlled access to computer data may be realized either by providing physical (hardware) means for preventing the use of I/O devices on a computer system, or by providing software means for restricting access, such as a routine that confirms a user's knowledge of a password before granting that user access to information contained in the computer system.

It is also necessary to restrict user input to a computer from a keyboard is when the computer is functioning as a "network server", coordinating communication between multiple computers, terminals and/or or devices by a local area network (LAN). When functioning as a network server, a computer is dedicated at the execution of network software, in order to provide efficient, uninterrupted service to numerous network devices. If the keyboard of a network server is not disabled when the network operator is not present, an unrestricted user could potentially gain access to normally restricted files, or cause network communication to be disrupted.

One commonly-used method for restricting user interaction with a computer is to provide a "password lock" function in the keyboard or auxiliary device controller which can prevent communication between the external devices and the computer. Typically, when a controller is in "password lock mode", no communication between external input devices and the computer is allowed unless a password is first entered to remove the controller from "password lock mode". One type of computer having this password lock function is the IBM PS/2 desktop models. If such a function is implemented in a peripheral device controller of a computer, however, it may prevent proper execution of software which requires communication with the locked-out external devices. For example, operating system software may require information about which devices are present in a computer system in order to determine the current system configuration. Other software that requires application-specific hardware, such as a "mouse", a digitizing tablet, or some other specialized data acquisition device, may not function properly if it cannot determine whether such devices are actually present in the system.

It is accordingly an object of present invention to provide improved functions for an auxiliary device controller, particularly a mode of operation which selectively allows or restricts communication between a computer and auxiliary devices. Another object is to provide an improved lock-out mode of operation for a computer, but nevertheless allow selected functions to be performed while in this lock-out mode.

Typically, the interface between the CPU of a computer and a peripheral I/O device is implemented using a standard controller or microprocessor device for the buffering, translation, or formatting of data as it is exchanged between the CPU and peripheral devices. One

**2**

such controller device is a part number 8042, Universal Peripheral Interface 8-bit Slave Microcontroller, manufactured by Intel Corporation, Santa Clara, CA. This microprocessor or microcontroller includes a ROM or EPROM storage area (e.g., two-kilobyte) for holding customized machine language instruction routines that enable the controller to support various commands that it can receive from either the controlled device (i.e. a keyboard, a mouse or the like) or from the main computer processor (CPU). That is, in typical desk-top computers, the controller device (such as the 8042 device) is itself a processor, executing the machine language instructions to define a command sequence, although the same functions could be performed by a state machine or the like. Use of the 8042 type of device is much less costly and easier to design, however.

## SUMMARY OF THE INVENTION

In a "password lock mode", as implemented in standard desk-top computers marketed today, a peripheral controller device (such as the 8042 type) does not allow any communication between the main processor and the controlled I/O devices. According to one embodiment of the present invention, however, the controller (via its ROM or EPROM code) is programmed to recognize certain commands and responses that should be allowed to pass between the main processor and a controlled device, even when the controller is in "password lock mode". Normal user input from the controlled devices is still restricted however, except for the case of these selected command/response sequences. In this way, a user is still prevented from gaining unauthorized access to files or from disrupting the operation of a network server, but software which requires communication with external devices can still operate properly.

Accordingly, an important feature of the invention is for a central processor to be able to communicate with "disabled" peripheral devices on a discriminate basis. That is, to distinguish between solicited and unsolicited responses when a peripheral device sends asynchronous streams of data. In the example embodiment, the peripheral device or controller is an 8042 device, but the feature is useful as well in systems employing peripheral circuitry constructed of logic using gate arrays or the like.

## BRIEF DESCRIPTION OF THE DRAWINGS

The novel features characteristic of the invention are set forth in the appended claims. The invention itself, however, as well as other features and advantages thereof, will be best understood by reference to a detailed description of a specific embodiment, when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is an electrical diagram in block form of a computer system which uses features of the invention;

FIG. 2 is an electrical diagram in block form of the CPU of the system of FIG. 1;

FIG. 3 is a schematic representation of the memory management scheme used in the CPU of FIG. 2;

FIG. 4 is an electrical diagram in block form of internal details of a controller chip which may be used in the system of FIGS. 1 and 2;

FIG. 5 is a timing diagram of voltage or events vs. time for read and write cycles performed by the CPU to access the controller 11 of FIGS. 1, 2 and 4; and

EXHIBIT A PAGE 22

4,942,606

**3**

FIG. 6 is a logic flow chart of a program for keyboard input and keyboard lock-out in the system of FIGS. 1–4 according to an embodiment of the invention.

DETAILED DESCRIPTION OF SPECIFIC EMBODIMENT

Referring to FIG. 1, a digital computer system which may use features of the invention is illustrated. This system includes a CPU 10 which is a preferred embodiment in an Intel 80386 32-bit microprocessor, or an Intel 80386SX 32-bit microprocessor with 16-bit external data bus; according to the invention, a peripheral controller device 11 is used to interface the CPU with a keyboard or mouse. The microprocessor or CPU 10 is connected by a local bus 12 to a system bus 13 which logically connects the various components of the system, including the peripheral controller and CPU. If a 80386 CPU chip is used, the local bus 12 and the system bus 13 include thirty-two address lines 12a or 13a, thirty-two data lines 12b or 13b and a number of control lines 12c or 13c. On the other hand, if an 80386SX device is used, the address busses 12a and 13a are 24-bits, and the data busses 12b and 13b are 16-bits wide. Also present in the system is a main memory module 14 which is in a logical address space of 4-gigabytes for an 80386 or 16-Mbytes for an 80386SX, although usually about 1- or 2-Mbyte is physically present. The system also includes a plurality of other input/output (I/O) devices 16, such as video display devices, network adapters or modems, and disk drives, for providing facilities for user interaction with the system, or for providing additional bulk-storage facilities for the system. The busses 12 and 13 can be controlled by different devices, at the same time; the processor 10 can be accessing a cache controller or numeric coprocessor (not shown) on the local bus 12, while a disk drive operated by one of the controllers 16 is transferring data to the main memory 14 using DMA. Although an 80386 microprocessor is given as the preferred CPU device, it is understood that other microprocessor devices may make use of the features of the invention, such as Motorola's 68020 type devices, or later generations of 80386 or 68029 devices; the class of processor devices known as RISC microprocessors may also employ the concepts herein set forth.

The local bus 12 is separated from the system bus 13 by buffers or latches 17 for the addresses and data and a bus controller 18 for the control lines. In this manner, addresses and data are not applied to the system bus, even though present at the CPU output, unless the controller 18 has received the proper commands and has ownership of the system bus. Likewise, data on the system bus is not allowed onto the local CPU bus until the controller sees the proper commands from the CPU. In this manner, the CPU 10 can communicate with other devices on the local bus 12 without tying up the system bus 13.

Referring to FIG. 2, the CPU 10 of the 80386 or 80386SX type used in the illustrative embodiment is a high performance microprocessor including an on-chip memory management unit providing virtual memory support. The microprocessor is of the microcoded type, using "pipelining" or overlapped instruction execution, and generally includes an execution unit 20, an instruction unit 21, a memory management unit 22, and a bus interface unit 23. The internal data paths are 32-bit for either device, but the 80386SX has a 16-bit external data

**4**

bus 12b while the 80386 has a 32-bit external data bus 12a.

The execution unit 20 performs arithmetic and logic operations on operands and addresses fetched from memory 14. The execution unit includes a register file 24 containing a number of general purpose 32-bit registers for holding operands, results or addresses, a 32-bit wide ALU 25 for performing the arithmetic or logic operation defined by an instruction, a multiply/divide circuit 26 for executing instructions using multiply or divide, and a barrel shifter 27 for executing 0-to-64 bit shifts on data inputted to the ALU. Microinstructions stored in a control ROM 28 define the operations performed in the execution unit. The microinstruction routines are selected by an entry point derived from the current instruction and applied to an input 29, and the microcode sequence within a routine is determined by a sequencer 30, based upon a microaddress produced by the last microinstruction and conditions within the processor. Control signals produced by a microinstruction are applied to the execution unit 20 via bus 31, and to the other units of the CPU chip via internal control bus 32.

The instruction unit 21 functions to fetch and decode instructions of the instruction stream. A prefetch unit 33 outputs addresses via bus 34 through the memory management unit 22 to the external address bus 12a, and receives instructions back via external data bus 12b and bus 35, to fill an instruction queue 36 with the next sixteen bytes in the instruction stream, based upon an instruction pointer in the register file 24. An instruction consists of an opcode of one or two bytes, usually followed by one or more bytes of mode specifiers, address displacements and/or immediate data, so an instruction can be from one byte to six or eight or more bytes in length. A decode unit 37 receives instructions from the queue 36, decodes the opcode to generate entry point addresses for the control ROM 28, and determines what bytes are specifiers, displacements or immediate data and transfers the appropriate information to other units of the processor; this decode is three-deep, i.e., the next three decoded instructions are being processed at one time. This instruction unit is where the I/O instructions used to access the peripheral controller 11 are recognized upon being initially decoded.

The memory management unit 22 of the CPU 10 of FIG. 2 includes a segmentation unit 38 and a paging unit 39. A 32-bit logical address produced on bus 40 by the execution unit 20 is translated by the segmentation unit 38 into a 38-bit linear address on bus 41, and then translated into a 32-bit physical address on bus 42 by the paging unit 39. Referring to FIG. 3, the segmentation unit 38 adds the logical address on bus 40 to a base address from segment descriptor registers 43; one of the descriptor registers 43 is selected by the contents of a segment register 44. The segment descriptors contain not only the base address for the segment, but also the limits of the segment (its size) and the level of protection. The sum of the logical address on bus 40 and the base address for the segment, if the limit and attribute checker 45 in the segmentation unit finds the address to be proper, becomes the linear address on bus 41. If paging is disabled, this linear address passes through the paging unit 39 without change and becomes the physical address on bus 42. If paging is enabled, the linear address is first tested to see if the page address is found in a page cache 46 (a set associative translation lookaside buffer); bits 13–31 of the 32-bit linear address are

4,942,606

5

compared to the thirty-two most recently used page addresses stored in the cache 46, and if a match is found the page address for this entry is forwarded to an adder 47 which produces the physical address on bus 42 using the page address and the lower 12-bit offset from the linear address. If the page is not found in the cache 46 (the hit rate is perhaps 98%), the page must be looked up in a page directory 48 and a page table 49 which are stored in memory 14. The upper 10-bit part of the 32-bit linear address is used to select 1-of-1024 entries in the page directory 48, producing the base address of the page table 49, then the next 10-bit part of the linear address is used to select 1-of-1024 of the entries of this page table, producing the translated page address used as an input to the adder 47 as before. The page entries have protection bits, similar to the segment entries, so several modes of protection are available. The segmentation and paging units 38 and 39 are used to translate addresses to memory 14, but not I/O addresses, however, so when the peripheral controller 11 is addressed to transfer commands or operands it is always at a fixed physical address in the I/O space.

The bus interface unit 23 includes an address driver 51 functioning to generate the 24-bit or 32-bit address on external bus 12a along with the byte-enable bits BE0–BE3 (for 80386 devices, not 80386SX) which are part of the control bus 12c. When a new valid address is driven onto the bus 12a, an address status line ADS# is asserted in the control bus 12c. The outgoing addresses may be pipelined if a next-address signal NA# is asserted in control bus 12c by an external device; instead of waiting until a Ready line is asserted to produce the next address, a pipeline control circuit 52 produces a new address every cycle from the driver 51 if it has received the NA# signal. All incoming and outgoing data is controlled by multiplexer/transceivers 53 connected to the external data bus 12A. Data to or from the execution unit 20 is coupled to the transceiver 53 via bus 54, or instruction stream data to fill the queue 36 is coupled from transceiver 53 via bus 35. Interrupts and bus arbitration are handled by a request prioritizer 55 which receives HLDA, INTR, NMI, ERROR# and BUSY# signals from the control bus 12c, and generates HOLD signals to the control bus 12c. Definitions of these control bus signals are contained in Table A.

The microprocessor of FIG. 2 is pipelined in that during a given machine cycle several instructions are executing at various stages at the same time. An instruction loaded to the prefetch queue 36 in one machine cycle will be decoded in the unit 37 in the next machine cycle, generating a microinstruction output from the control ROM 28 in a third cycle, causing the execution unit 20 to perform some operation in a fourth cycle, then the result is written to a register of the file 24 in a fifth cycle. Of course, execution of other instructions overlap this instruction.

In the embodiment of FIG. 1, the interface with the keyboard or auxiliary device uses a peripheral controller which is an Intel 8042 Universal Peripheral Interface, a microprocessor device commercially available from Intel Corporation. This controller is used to implement the interface between the host processor 10 and two external devices, namely an alphanumeric keyboard 57, and a mouse 58. The interface between the keyboard 57 and the microprocessor or controller 11 consists of lines 59 which include a serial data line and a single control line called TEST0 which is an input to the controller 11 indicating when the keyboard has data

6

to send. Likewise, the interface between the mouse 58 and the microprocessor 11 consists of a similar set of lines including a serial data line and a TEST1 line which indicates when the mouse has data to send.

The peripheral interface microprocessor 11 has 8-bit data in and data-out registers, and certain control lines, connected to the shared system bus 13. The host processor 10 communicates with the keyboard 57 via an I/O port; that is, a specified address in the I/O address space of the processor 10 is reserved as a data port used for communication between the CPU 10 and with the keyboard 57. When the host processor 10 executes an I/O read or write instruction to the keyboard's I/O address, a decoder detects this address on the system address bus 13a and causes the microprocessor 11 to be selected and activated, sending or receiving commands or data on data bus 13b via the 8-bit data-in and data-out registers of the microprocessor 11. For example, the command from the host processor 10 which causes the microprocessor or controller 11 to enter "password lock mode" is issued via the data-in register. An applications program executed by the CPU 10 initially asks the user to select a password, and this password is stored by the CPU 10 in RAM, so thereafter upon entering a proper keycode sequence the user can place the system in lockout mode, at which time the CPU 10 sends the command to the controller 11 via a data-in register.

Referring to FIG. 1, the keyboard 57 includes a key matrix 60 consisting of rows and columns of keyswitches 61. In a typical desktop computer there would be perhaps 101 keys on the keyboard. A keyboard controller device 62 performs the function of determining when a key is depressed and which key is depressed. The column lines of the matrix are connected to one set of ports 63 of the controller 62, and the row lines are connected to another port 64; a definition of which key is down is available from the row and column information at these ports 63 and 64. The controller 62 is a microprocessor device having a program stored in ROM or EPROM, like the controller 11; usually a microprocessor device such as commercially available under the part numbers 8051 or 8048, manufactured by Intel Corporation, is used for this controller 62. The stored program performs the function of scanning or polling the keyboard matrix 60 and generating an 8-bit keycode for each key as it is depressed. These keycodes are buffered in a 128-byte RAM within the controller 62, and are transferred to the peripheral controller 11 upon request, and thus to the CPU 10. The controller 62 generates a TEST0 input to the controller 11, then the controller 11 sends a command back to the controller 62 when ready to receive keycode data. The keyscan or polling thus goes on independently of and transparent to the CPU 10 and the peripheral controller 11, but when a key is depressed and a keycode is ready to be sent from the controller 62, the controller 11 and then the CPU 10 are in control of the transfer.

Referring now to FIG. 4, the peripheral controller 11 is shown in more detail. This device is a processor executing instruction code stored in an internal ROM or EPROM 65 of about 1K- or 2K-byte, and has a 128- or 256-byte internal RAM 66, an 8-bit wide ALU 67 and an 8-bit internal bus 68. Instructions are fetched from ROM 65 using a program counter 69 for addressing, and loaded into an instruction register 70 then decoded by instruction decoder 71 which generates control signals to define the operation of the device. The two inputs of the ALU are loaded from an accumulator register 72

4,942,606

7

and a temporary register 73, both coupled to the internal bus 68. The RAM 66 contains a register file, stack and data storage, and is addressed by a decoder 74 and a multiplexer 75, also coupled to the internal bus 68. Two 8-bit I/O ports 76 and 77 connected to output terminals of the device are coupled to the internal bus 68, and are loaded and unloaded under instruction control. The interface to the CPU 10 uses a pair of data buffers 78 and 79 and a status register 80, all three of which are coupled to an 8-bit data I/O port 81 which is connected to the system data bus 13b. The data bus buffer registers 78 and 79, referred to as DBBOUT and DBBIN, are loaded or read by the controller 11 from the internal bus 68, by executing instructions from ROM 65; loading or reading these data bus buffers from the CPU 10 is controlled by lines of the control bus 13c connected to controller 82. These control lines include a writer control WR, a read control RD, chip select CS and address line A0, as defined below. The TEST0 and TEST1 input 83 and 84 to the chip are connected to conditional branch logic circuitry 85, which produces an input to the decode and control circuitry 71 and 82 when a conditional branch instruction is executed. The conditional branch logic 85 also receives inputs representing ALU operation such as carry, contents of accumulator 72 equal zero, etc., as well as the condition of the data bus input and output buffers 78 and 79. An 8-bit timer or event counter circuit 86 is connected to count clock cycles (divided by thirty-two), or to count external events by an input from the Test1 pin, and also produces an output to set a timer flag which is testable by the conditional branch logic 85 so that a branch instruction can be conditional upon overflow of the counter 86. Also, overflow of the counter 86 generates an interrupt by input to the decode and control circuitry 71, 82, which is enabled or disabled under program control. The counter register 86 may be loaded from or to the accumulator 72 via the internal bus 68. The processor 11 is synched to the host CPU 10 by clock inputs 87 to a timing circuit 88, and produces a synch output 89 to the keyboard controller 62, so both of these peripheral processors 11 and 62 are synched by inputs from the main processor 10. The controller 11 of FIG. 4 executes the instruction set of Table B (as well as other instructions not material to the present invention).

Referring to FIG. 5, a bus cycle is illustrated in which the CPU 10 writes a command or data to the data input register 78 of the controller 11. During the first Clk cycle, t0, the address strobe ADS# is asserted on bus 12c by the CPU 10 along with the control signals M/IO# and W/R# indicating this to be a write to I/O space, and certain other address bits are driven high by the CPU 10 on bus 12a and detected at an address decoder for the controller 11 at input CS#, indicating the address of the register 78 in I/O space. Data is driven onto bus 12b by the CPU 10 during the period t1-t2. Assuming the system bus is free, this write request is asserted or "posted" onto the system bus 13; the CPU 10 does not wait for any acknowledge that the write operation was completed, but instead continues with another cycle. Also shown in FIG. 5 is a read cycle, where the CPU performs a read of the I/O address where the data bus buffer 79 is defined to reside. During t5, the ADS#, M/IO#, A0, and chip select CS# are the same as for a write, but the W/R# signal on bus 12c is low, initiating a read operation. By external logic (not shown) the W/R# signal on control bus 12c and 13c is converted to separate W# and R# controls for the

8

controller 11. Again, assuming the bus 13 is free, this read request is asserted onto bus 13 at the same time as it reaches bus 12. In t6, the I/O control 82 in the controller 11 recognizes the read request and drives the data onto the output 81 during t7 and t8. The logic circuit which generates the separate R# and W# controls also generates a Ready# response to the CPU 10, since the controller 11 does not produce this signal.

Referring to FIG. 6, a logic flow chart, in simplified form, of a part of an example of a program which may be stored in the ROM 65 and executed by the controller 11 is illustrated. In an idle state, the controller 11 polls the TEST0 and TEST1 inputs 83 and 84 and the status register 80 in a loop to see if there is a keyboard or other auxiliary device (such as a pointing device, typically a mouse) input, or if the CPU 10 has written to the data bus input buffer 79, as represented by the decision points 91, 92 and 93 of the flow chart; this loop is implemented using the instruction set of Table B, in known manner. If the TEST0 input is active at point 91, the program checks to see if the lock-out mode is activated at decision point 94, and if yes the sequence returns to the original loop at point 92, since the keyboard is to be ignored. If lock-out is not activated, then the controller 11 enters a loop where it reads its port P10 (one bit of the ports 76 and 77) for a count of eight and loads and shifts these bits to a register of RAM 66 as represented by the elements 95 of the flow chart. A table look-up is performed at point 96 to see if the 8-bit word read in is a valid key code; if not, the original polling loop is re-entered, or if so then a code conversion is done at point 97 to produce the key codes used by the CPU 10, and the status of the data bus output buffer 79 is checked at point 98, and if empty this buffer 79 is loaded at point 99, and port terminal P24 (of I/O ports 76, 77) is set at point 100 to produce an interrupt INTR input to the CPU 10, by way of a standard interrupt controller chip, not shown. This interrupt will cause the CPU 10 to enter a routine to read the buffer 79 using a cycle as in FIG. 5. Although not illustrated here, the controller 11 can buffer several key codes in RAM 66 if the CPU 10 does not immediately respond to the interrupt; in some cases the CPU program will mask the keyboard interrupt while another task is being performed, e.g., refresh of the DRAM chips of main memory. After signaling the interrupt, the controller 11 returnes to the polling loop at point 91. The polling loop has a similar input routine for the mouse input TEST1 as indicated at points 92 and 101. Data input to buffer 78 is found by checking status at point 93, and if true then at point 102 the data is moved to RAM 66 and the status of the lock-out mode is checked at point 103; if not in lock-out mode then the data is interpreted to see what action is needed as indicated by point 104, so if the input from the CPU 10 is a command then the required action is taken before return to the polling loop at point 105. If in lock-out mode, however, the input word is checked at point 106 to see if it is an allowed activity in lock-out. If not, the input is ignored and the polling loop is re-entered at point 105; if so then the usual interpretation and execution are performed.

Whenever a command is sent to the controller 11 via its I/O data buffer 78, the controller program will respond by sending either an "acknowledge" code (ACK) or a "resend" code (RESEND) to the CPU via buffer 79, and possibly more data, depending on the command that was sent. When in the conventional "password lock mode", however, the controller 11 would not respond

4,942,606

9

to any command, nor would it allow any communication to or from the keyboard 57 or mouse 58. Such complete disabling of auxiliary device communication prevented application software running on a computer in "password lock mode" from determining what type of keyboard or auxiliary devices were attached, or even whether the keyboard or auxiliary devices were present or functioning properly.

With the keyboard/auxiliary device controller of the present invention, however, the following classifications of information transfer are allowed, even when the computer is in "password lock mode":

—commands from the host processor 10 to the interface controller 11;

—commands from the host processor 10 to the keyboard 57 via the interface controller 11;

—commands from the host processor 10 to the auxiliary device 58 via the interface controller 11;

—solicited responses (only) from the microprocessor or controller 11 to host processor 10;

—solicited responses (only) from the keyboard 57 to the host processor 10 via the interface controller 11; or

—solicited responses (only) from the auxiliary device 58 to the host processor 10 via the interface controller 11.

In the preceding list, which is implemented in a table in the ROM 65 reference at point 106 of the flow chart of FIG. 6, notice that unsolicited or user-initiated information transfer from the keyboard 57, auxiliary device 58, or the processor 11 are not permitted when "password lock mode" has been enabled. By limiting the transfer of information to the classes listed above, user interaction with the system 10 is restricted as in conventional "password lock mode", while internal system activity can proceed as if "password lock mode" were not enabled.

A keyboard/auxiliary device controller with functions in accordance with features of the present invention is defined by the machine-language code stored in the internal one- or two-kilobyte ROM or EPROM memory 65 of the microprocessor 11. These features reflect modifications of the code which has previously been used for keyboard functions in systems using the hardware elements of FIGS. 1, 2 and 4. The features can be grouped into three general areas: (1) modifications to the support of controller 11 commands sent from the host processor 10, (2) modifications to the support of communication between the controller 11 and the keyboard 57, and (3) modifications to the support of communication between the controller 11 and the mouse 58.

(1) Modifications to controller 11 command support: According to one embodiment of the present invention, commands sent from the host processor 10 to the controller 11 operating in the improved "password lock mode" are executed exactly as they would be when the controller 11 is not operating in "password lock mode", with the following exceptions:

(a) —LOAD PASSWORD COMMAND: If the controller 11 is already operating in "password lock mode", the loading of another password is not permitted. Issuance of this command by the host processor 10 is typically followed by the transfer of password bytes from the processor 10 to the controller 11. In "password lock mode", however, these bytes are transferred from the CPU 10 to the controller 11 and acknowledged by the controller

10

11, but then discarded, i.e., not used to overwrite the password bytes already in the RAM 66.

(b) —ENABLE SECURITY COMMAND: If the controller 11 is already operating in "password lock mode", re-entering this mode is not useful and is therefore not permitted.

(c) —AUXILIARY DEVICE AND KEYBOARD INTERFACE TEST COMMANDS: Since the auxiliary device (mouse) 58 and keyboard 57 are effectively disabled when the controller 11 is operating in "password lock mode", issuance of either the Auxiliary Device Test or Keyboard Test Command causes a code to be returned to the host processor 10 which indicates that the tests have passed successfully, even though no such test is made, so the host processor 10 will not hang up by waiting indefinitely for a response.

(2) Modifications to support of communication with the keyboard 57:

As noted above, the keyboard is accessed by the host processor via I/O reads and writes to the address reserved as the keyboard I/O port. According to the example embodiment of the present invention, commands can be issued by the CPU 10 to the keyboard 57 (via controller 11), and corresponding responses are returned to the host processor 10, but keystrokes typed on the keyboard 57 are not transferred via controller 11 to the host processor 10. This is accomplished by providing the controller 11 with information (in its ROM code) regarding the keyboard command structure, so that only the correct number of response bytes are permitted to be transferred from the keyboard 57 through the controller 11 to the host processor 10. This is done by testing input commands against a table of permitted commands. Furthermore, a time limit is placed on the response from the keyboard, and no additional bytes are passed after this time. The following examples illustrate how these techniques are used to prevent user-initiated information transfer between the keyboard 57 and the host processor 10:

(a) —READ KEYBOARD ID COMMAND: The controller 11 excepts a three-byte response from the keyboard 57 when this command is issued by the host processor 10: the ACK byte, followed by S(AB), followed by S(83). No more than three bytes are permitted to be transferred to the host processor 10 after issuance of this command.

(b) —RESET KEYBOARD COMMAND: The controller 11 expects a two-byte response from the keyboard 57 when this command is issued by the host processor 10. Since resetting the keyboard 57 can take up to one second, (longer than the typical response time limit accepted by the controller 11), the controller 11 will wait for an appropriate amount of time for this response.

(c) —SELECT MODE COMMAND: This command is issued in two bytes, and can be used in two different ways. The host processor 10 can issue this command to the controller 11 to cause the keyboard 57 to enter one of three different operating modes, or it can issue this command to determine which mode the keyboard is currently in. When the controller 11 receives the first byte of a SELECT MODE command destined for the keyboard 57, it forwards the byte to the keyboard 57, then waits for the second byte of the command. If this second byte is a zero, indicating a mode query, then the controller 11 expects and permits a two-byte re-

4,942,606

**11**

sponse, consisting of an ACK byte, and a current mode byte. If the next command byte is non-zero, however, indicating a "change mode command", then only one response byte, an ACK byte, is expected and permitted.

All other commands issued by the processor 10 to the keyboard 57 are assumed to have a one-byte response, and the controller 11 permits only a single byte to be transferred from the keyboard 57 to the processor 10, and only if it is sent within the required time limit. Otherwise, the controller 11 generates an error byte to the host processor 10 as it would in "non-password lock mode".

(3) Modifications to support of communication with auxiliary device: Like the keyboard 57, the auxiliary device 58 can response with either an ACK or RESEND byte for each command sent to it. The number of additional response bytes sent from the auxiliary device 58, however, cannot be predicted as with the keyboard responses, since a variety of auxiliary devices may be attached to the controller 11. In order to allow communication with the auxiliary device 58, yet not allow the device to initiate the communication on its own, the controller 11 depends upon the "packetization" of responses from the auxiliary device. When a command is issued to the auxiliary device 58 from the host processor 10, the controller 11 is programmed to expect the response bytes to be sent continuously until the auxiliary device 58 has completely replied to the command. The "packet" of response bytes is thus accepted by the controller 11 until a pause is encountered, at which time the controller 11 stops allowing bytes to be transferred to the host processor 10. In this embodiment of the invention, a pause is defined as an interval of perhaps about a millisecond in which no bytes are sent from the auxiliary device. As with the KEYBOARD RESET COMMAND, the AUXILIARY RESET COMMAND can require additional time (up to several seconds, for example) before making a response. The controller 11 accordingly waits an appropriate amount of time for responses from AUXILIARY RESET commands, although any other command to the auxiliary device 58 is allotted the normal command response timeout interval in which to make responses. After this interval, the controller 11 stops accepting response bytes, and generates an error code to the host processor, as it would if "password lock mode" were not enabled.

The modified behavior of the peripheral controller 11 is realized, as noted above, by changing the ROM-based code in the controller 11 itself. No additional variation from the conventional hardware implementation of keyboard/auxiliary device is necessary in order to realize a controller 11 which conforms to the above-described embodiment of the present invention. Alternate or additional command/response patterns for the keyboard or for various auxiliary devices ROM-based code for the controller 11 may be employed; the foregoing are merely examples.

From the above detailed description of a specific embodiment of the present invention, it will be evident that improvements to the conventionally used keyboard/auxiliary device controller have been disclosed which provide for restriction of user interaction with a computer system while simultaneously maintaining non-interference with certain internal system activities which require communication through a controller in "password lock mode".

**12**

While this invention has been described with reference to a specific embodiment, this description is not meant to be construed in a limiting sense. Various modifications of the disclosed embodiment, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to this description. It is therefore contemplated that the appended claims will cover any such modifications or embodiments as fall within the true scope of the invention.

**TABLE A—CONTROL BUS**

M/IO#, D/C#, W/R# and LOCK# are cycle definition signals, setting forth the type of cycle the CPU 10 is executing on the bus 12. M/IO# selects a memory reference if high, or an I/O reference if low. D/C# says whether the access is for data (if high) or for code (if low); this signal can be used to differentiate between accessing instructions and accessing data. W/R# is the write/read control, specifying a write operation if high or a read operation if low. Lock# forces a condition where the CPU 10 maintains control of the bus 12 and cannot be interrupted by another master.

ADS# is an address status signal, and indicates that new address and cycle definition information is available on the bus 12a and 12c; this signal begins every external access by the CPU 10.

READY# is a transfer acknowledge input to the CPU and terminates a cycle on the local bus 12 by signalling to the CPU 10 for a read cycle that the data on the bus 12b is ready to be latched into the CPU or that a write has been completed or posted. Every CPU bus cycle must end with READY# asserted.

NA# is the next-address request, used to initiate address pipelining by indicating that the system is prepared to accept new values of address, byte enable, and cycle definition, even if the end of the current cycle has not been acknowledged on READY#.

HOLD AND HLDA are bus arbitration signals, where HOLD is asserted as an input to the CPU 10 when another device requires control of the bus, and the CPU 10 asserts hold-acknowledge HLDA when it relinquishes control of the bus in response to HOLD.

INTR is a maskable interrupt request input to the CPU, and when asserted the CPU executes an interrupt acknowledge cycle in which an interrupt vector is latched into the CPU from the data bus 12b.

Clock Clk2 is the same clock for both the CPU 10 and the controller 11, and is divided by two internally to produce the internal clock Clk. In the example, the Clk frequency is perhaps 20-MHz, so the Clk2 frequency is 40-MHz.

BE0#—BE3# are Byte Enable signals defining which ones of the four bytes in the 32-bit doubleword on data bus 12b being accessed are wanted by the CPU 10. These signals are used in the 80386, but not in the 80386SX.

**TABLE B—The Instruction Set:**

The controller 11 of FIG. 4 executes the following instruction set: ADD: There are three types of ADD instructions—ADD A,Rr=add one of the registers Rr of the register set in the RAM 66 to the contents of A, the accumulator 72; ADD A,@Rr=add the contents of a location in the data memory part of the RAM 66 selected by register Rr to contents of the accumulator 72; ADD A,#data=add an immediate value in the instruction itself to the contents of the accumulator 72.

4,942,606

13

All three of these ADD instructions also can be with a carry when the mnemonic is ADDC.

ANL: There are three types of AND instructions, like the ADD instructions—ANL A,Rr=perform an "AND" function of a register Rr with the contents of the accumulator 72, result to accumulator; ANL A,@Rr=same for a data memory location, and ANL A,#data=same for immediate value.

ORL: Again, three types of OR instructions—ORL A,Rr=OR the contents of a register with the contents of the accumulator, result to accumulator; ORL A,@Rr=same for a data memory location, and ORL A,#data=same for an immediate value.

XRL: Exclusive OR instructions are of three types just like the ORL instructions—XRL A,Rr=Register, XRL A,@Rr=data memory, and XRL A,#data=immediate.

INC A: Increment the accumulator 72. Also, INC Rr is increment the register Rr, and INC @ Rr is increment the data memory location pointed to by the contents of register Rr.

DEC A: Decrement the accumulator 72. Likewise, DEC Rr is decrement the register Rr.

CLR A: Clear the accumulator 72.

CPL A: Complement the accumulator.

SWAP A: Swap 4-bit nibbles contained in accumulator.

RL A: Rotate accumulator left; also there are rotate right, and rotate left and right through carry, instructions.

IN A,Pp: Input Pp, a selected one of the ports 76 or 77, to A, the accumulator 72.

OUT A,Pp: Output the accumulator A to a selected one of the ports 76 or 77, Pp.

ANL Pp,#data: Perform an AND function between immediate data and a selected one of the ports 76 or 77, result to the port.

ORL Pp,#data: Perform an OR function between immediate data and a selected one of the ports 76 or 77, result to the port.

IN A,DBB: Input the data bus buffer 79 to the accumulator 72 and clear the input buffer flag IBF in register 80.

OUT DBB,A: Output the contents of the accumulator 72 to the data bus buffer 78 and set the output buffer flag OBF.

MOV STS,A: Move the contents of bits 4-7 of the accumulator to bits 4-7 of the status register 80.

MOV A,Rr: Move the contents of register Rr of the RAM 66 to the accumulator 72. MOV Rr,A is the reverse.

MOV A,@Rr: Move the contents of the data memory 66 as addressed by the contents of register Rr to the accumulator. Similarly, MOV @Rr,A is the reverse.

MOV A,#data: Move the immediate data in the instruction to the accumulator.

MOV Rr,#data: Move immediate data to register Rr.

MOV @Rr,#data: More immediate data to memory location.

MOV A,PSW: Move immediate data to program status word. The reverse is provided by the MOV PSW,A instruction.

XCH A,Rr: Exchange the accumulator with the register Rr.

XCH A,@Rr: Exchange the accumulator with the memory location which is addressed by the contents of Rr.

14

MOVP A,@A: Move the contents of the location in the current page of ROM 65 addressed by the contents of the accumulator to the accumulator.

MOVP3 A,@A: Same as MOVP but uses page-3 of ROM instead of current page.

MOV A,T: Read the contents of the timer/counter register 86, load to accumulator.

MOV T,A: Load the contents of the accumulator to the timer/counter register 86.

STRT: Start timer 86, counting clock cycles/32.

STRT CNT: Start counter register 86 counting inputs to Test1 pin 84.

STOP TCNT: Stop timer or counter.

EN I and DIS I: Enable and Disable the input buffer full IBF interrupt (not used in this example).

SEL RB0: Select register bank 0, bytes 0-7 of RAM 66 are used as registers 0-7.

SEL RB1: Select register bank 1, bytes 24-31 of RAM 66 are used as registers. 0-7.

NOP: No operation.

CALL addr: Jump to subroutine starting at address "addr" in the ROM 65.

RET: Return to instruction following last CALL.

RETR: Return and restore status.

CLR C: Clear the carry flag. Similarly, CLR F0 is clear flag-O and CLR F1 is clear flag-1.

CPL C: Complement the carry flag. Similarly CPL F0 or CLR F1 means clear the flag-0 or flag-1.

JMP addr: Jump unconditionally to the address "addr" in ROM 65. Similarly, JMPP @A is jump indirect, jump unconditionally to address contained in accumulator.

JC addr: conditional jump on carry=1. Similarly, JNC addr is jump to address "addr" in ROM 65 if carry=0.

JZ addr: conditional jump to address "addr" in ROM 65 if accumulator contents are zero. "JNZ addr" means same, but if accumulator content is not zero.

JT0 addr: Jump to address "addr" if Test0=1.

JNT0 addr: Jump to address "addr" if Test0=0.

JT1 addr: Jump to address "addr" if Test1=1.

JNT1 addr: Jump to address "addr" if Test1=0.

JF0 addr: Jump to address "addr" if F0 flag=1.

JF1 addr: Jump to address "addr" if F1 flag=1.

JTF addr: Jump to address "addr" if timer flag=1.

JNIBF addr: Jump to address "addr" if IBF flag=0, input buffer 79 is empty.

JOBF addr: Jump to address "addr" if OBF=1, output buffer 78 has been loaded.

What is claimed is:

1. A method of operating a computer system of the type having a CPU and memory associated therewith and a peripheral controller device coupled to said CPU, comprising the steps of:

(a) switching said peripheral controller device between

(i) a normal operating mode wherein said peripheral controller device sends unsolicited information to said CPU and said CPU sends unsolicited information to said peripheral controller device without reference to password data, and

(ii) a lock-out mode wherein said peripheral controller device cannot send information to said CPU unless password data previously stored in said memory associated with said CPU is first entered to cause a switch back to said normal operating mode, but said CPU can send information to said peripheral controller device;

4,942,606

**15**

(b) monitoring unsolicited information transferred from said CPU to said peripheral controller device when said peripheral controller device is in said lock-out mode, and selectively allowing only preselected information transferred to said peripheral controller device by said CPU to activate said peripheral controller device for selected functions without switching from said lock-out mode.

2. A method according to claim 1 wherein said peripheral controller device includes a peripheral control processor and a keyboard coupled to said peripheral control processor.

3. A method according to claim 2 wherein said keyboard includes a keyboard control processor.

4. A method according to claim 1 wherein said selected functions include transfer of preselected bytes of information from said peripheral controller device to said CPU.

5. A method according to claim 1 wherein said peripheral controller device includes a keyboard and said keyboard cannot send any information created by manual activation of the keyboard to the CPU when in said lockout mode.

6. A method according to claim 1 wherein said system includes at least two peripheral input devices coupled to said CPU through said peripheral controller device.

7. A method according to claim 6 wherein said two peripheral input devices are a keyboard and a hand-operated "mouse" device.

8. A method according to claim 1 wherein said step of monitoring includes detecting when said CPU sends a request to said controller device when in said lock-out mode and allowing response information to be sent by the controller device to said CPU until a delay occurs in said response information then preventing any further information from being sent to the CPU.

9. A method of operating a computer system of the type having a CPU and memory associated therewith, and having a peripheral controller coupling a peripheral device to said CPU, comprising the steps of:

(a) switching said peripheral controller between a normal operating mode wherein said peripheral device exchanges unsolicited commands and data with said CPU without reference to password data, and a lock-out mode wherein said peripheral device cannot send commands and data to said CPU until password data has been entered to cause a switch back to said normal operating mode;

(b) monitoring unsolicited commands and data transferred from said CPU to said peripheral controller for transfer to said peripheral device when said peripheral controller is in said lock-out mode, and selectively allowing only preselected commands and data to be transferred to said CPU from said

**16**

peripheral device in response to requests from said CPU directed to said peripheral device.

10. A method according to claim 9 wherein said system includes two of said peripheral devices coupled to said CPU through said peripheral controller.

11. A method according to claim 10 wherein said two peripheral devices are a keyboard and a hand-operated "mouse" device.

12. A method according to claim 9 wherein said step of monitoring includes counting bytes of data being transferred and detecting said preselected commands.

13. A method according to claim 9 wherein said step of monitoring includes detecting the time delay between bytes of said preselected commands or data being coupled from said peripheral device to said CPU and halting any coupling when a given delay is detected.

14. A computer system comprising:

(a) a CPU accessing memory via a system bus, and executing instructions fetched from said memory to perform operations on data stored in and recalled from said memory;

(b) a peripheral controller device coupled to said system bus and accessed by said CPU, the peripheral controller transferring data and commands to and from said CPU according to a control sequence;

(c) at least one peripheral device coupled to said peripheral controller, said peripheral device generating data and commands for transferring to said CPU via said peripheral controller;

(d) said control sequence including a lock-out mode preventing said peripheral controller from transferring said data and commands from said peripheral device to said CPU but allowing said CPU to transfer selected commands from the CPU to the peripheral device.

15. A system according to claim 14 wherein said peripheral controller is a microprocessor executing instructions stored in local memory for said controller.

16. A system according to claim 15 wherein said at least one peripheral device includes a keyboard.

17. A system according to claim 16 wherein said selected commands include a status inquiry command.

18. A system according to claim 16 wherein said at least one peripheral device includes a keyboard device and a hand-operated "mouse" input device.

19. A system according to claim 18 wherein selected commands include status inquiry commands from said CPU to said "mouse" device requiring response by said mouse device to said CPU.

20. A system according to claim 19 wherein said control sequence includes detecting the time between bytes of said response and preventing any further bytes after a selected time delay has occurred between bytes, to thereby block any manually-generated response.

* * * * *

EXHIBIT A PAGE 29

US005570107A

# United States Patent [19]

## Wood et al.

[11] Patent Number: **5,570,107**

[45] Date of Patent: **Oct. 29, 1996**

[54] **CIRCUITRY AND METHOD FOR HIGH VISIBILITY CURSOR GENERATION IN A GRAPHICS DISPLAY**

[75] Inventors: **Paul B. Wood**, Spring; **Thomas M. Albers**, Houston; **Stephen B. Preston**, Spring, all of Tex.

[73] Assignee: **Compaq Computer Corporation**, Houston, Tex.

[21] Appl. No.: **388,331**

[22] Filed: **Feb. 14, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 26,207, Mar. 2, 1993, Pat. No. 5,389,947, which is a continuation of Ser. No. 696,355, May 6, 1991, abandoned.

[51] Int. Cl.[6] .................................................. G09G 1/28

[52] U.S. Cl. ................... 345/145; 345/162; 345/200

[58] Field of Search .............................. 345/145, 132, 345/133, 200, 147, 185, 199, 162, 114

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 31,200 | 4/1983 | Sukonick et al. | 345/24 |
| 4,467,322 | 8/1984 | Bell et al. | 345/145 |
| 4,626,835 | 12/1986 | Nienaber et al. | 345/153 |
| 4,668,947 | 5/1987 | Clarke, Jr. et al. | 345/145 |
| 4,686,649 | 8/1987 | Rush et al. | 345/129 |
| 4,808,989 | 2/1989 | Tabata et al. | 345/190 |
| 4,835,526 | 5/1989 | Ishii et al. | 345/145 |
| 4,870,406 | 9/1989 | Gupta et al. | 345/199 |
| 5,140,312 | 8/1992 | Ishii | 345/186 |
| 5,146,211 | 9/1992 | Adams et al. | 345/145 |
| 5,185,597 | 2/1993 | Pappas et al. | 345/145 |

### OTHER PUBLICATIONS

Hamacher, et al., "Computer Organization," (McGraw–Hill 1978), pp. 432 and 434.

*Product Selection Guide (Brooktree Corporation*, 1991), pp. 11, 13, 14, 16.

*Primary Examiner*—Richard Hjerpe
*Assistant Examiner*—Lun-Yi Lao
*Attorney, Agent, or Firm*—Vinson & Elkins L.l.P.

[57] **ABSTRACT**

A graphics subsystem, including a video digital-to-analog converter, is disclosed. A high speed oscillator generates a pixel clock signal at the frequency at which pixels are to be displayed. Included in the video DAC is a frequency divider which presents an output pixel clock signal having a period which is a multiple of the pixel clock signal, the multiple corresponding to the level of multiplexing of pixel data to be provided by the video DAC; this multiple can equal unity. The video controller in the system receives the output clock signal, and generates clock signals to control the serial port of the frame memory, and also to control the latching of the first stage in the video DAC. The first stage latch in the video DAC latches in the multiple pixel data from the frame memory, and the multiplexer in the video DAC presents the data to the color palette RAM, or around the color palette RAM in true-color non-multiplexed mode, according to the pixel clock signal. Highlighted pixels in a cursor are displayed by inverting the output of the color palette RAM at cursor locations, for example by way of an exclusive-OR function of the color palette RAM output and a bit corresponding to the comparison of the display location and the desired cursor location. Inversion of the output of the color palette RAM results in higher contrast pixels within the cursor.

**4 Claims, 3 Drawing Sheets**





FIG. 1





FIG. 3a

FIG. 3b

5,570,107

**1**

CIRCUITRY AND METHOD FOR HIGH
VISIBILITY CURSOR GENERATION IN A
GRAPHICS DISPLAY

This is a continuation of application Ser. No. 08/026,207, filed Mar. 2, 1993, now U.S. Pat. No. 5,389,947, issued Feb. 14, 1995, which is a continuation of U.S. patent application Ser. No. 07/696,355, filed May 6, 1991 now abandoned.

This invention is in the field of data processing equipment, and is more specifically directed to circuitry for generating a video display image.

This application is related to application Ser. No. 07/695,963 (Attorneys' Docket No. P-301), filed contemporaneously herewith and assigned to Compaq Computer Corporation.

BACKGROUND OF THE INVENTION

High resolution video displays are becoming more prevalent for modern data processing systems such as personal computer workstations and the like. As is well known, video displays achieve such higher resolution by increasing the density of picture elements ("pixels") within the screen area. Higher pixel density correlates to smaller pixel sizes, such that the resolution of the displayed image is increased. As a result, the display output of the workstation may be more accurate and lifelike, presenting the output of the computer or workstation in more useful and illustrative forms to the user.

As is well known not only in the art, but also to any user of modern personal computers and workstations, a cursor is a block of pixels for indicating a particular location in the display area. Cursors are generally used to indicate the "location" at which an input is desired from the user. When used in conjunction with a displayed image, such as a graphics image, the location of the cursor in the image communicates to the user the context of the desired input. The cursor must contrast with its surroundings to be visible when located within a displayed image. The displayed cursor may consist of an entire pixel block contrasting with the surroundings, such that a rectangular block appears at the pixel location. Alternatively, the cursor may be a character or other displayed image which is contained within the cursor block, for example an arrow or other icon, with bits outside of the cursor image within the cursor block appearing as though the cursor were not present. Timing features may also be included in cursor generation, for example by causing the cursor to blink on the display, further contrasting it with the surroundings.

When the display technology is purely monochromatic, as is the case with older and lower-end computer products, the generation of a cursor image which contrasts with its surroundings is relatively easy, as only two colors need be considered. U.S. Pat. No. Re 31,200, reissued Apr. 5, 1983, describes the generation of a cursor in a monochromatic display at column 21, lines 30 through 38, where control memories provide inputs to logic which develops synchronized pulses mixed with the video data for display of a cursor.

In recent years, however, many advanced personal computers and workstations use a large number of colors and patterns to display graphics images. In such polychromatic systems, the generation of the cursor image is such a manner as to provide high visibility is a more complicated task, because multiple bits of data are necessary to communicate the color and attributes of each pixel in the displayed image.

**2**

Generation of a contrasting cursor thus requires consideration of a multiple-bit word which may not be directly representative of the image displayed.

For example, conventional polychromatic display systems use color palette memories in generating the graphics image. As is well known in the art, color palette RAMs are addressable memories which, for each addressable location, store digital data corresponding to the color and intensity for the pixel to be displayed. As such, the color palette RAM is a look-up table, such that the bit-mapped graphics data stored in the frame memory of the system consists of a series of color palette RAM addresses, or indices, for each pixel in the image. The image is generated by presenting the data for each pixel as an address to the color palette RAM; the color palette RAM will then present the addressed contents to a digital-to-analog converter to drive the display device accordingly. The actual colors displayed thus depend not only on the graphics data stored in the frame memory (upon which graphics instructions and other processes have been performed by the system processors), but also upon the contents of the color palette RAM.

The generation of a cursor in such a system is thus further complicated by the use of the color palette RAM and the indexed mode of color selection. A first prior technique for cursor generation is the storage of a limited set of cursor colors (e.g., two or three) in a portion of the color palette; at such pixel locations at which the cursor is to be displayed, the cursor color is generated from the cursor portion of the palette, rather than from the color palette RAM itself. This method may not necessarily present a contrasting cursor, however, as the cursor color is not selected considering the surrounding image, or considering the color which would be presented if the cursor were not enabled.

A second prior method for cursor generation in such systems is to logically invert the pixel data presented to the color palette RAM, i.e., the color index. This method uses the data of the pixel which would otherwise be displayed if the cursor were not displayed in determining the cursor color. As such, a contrasting cursor color is more likely than if a color is merely selected without regard to the pixel data. However, the cursor color in this method depends upon the contents of the color palette RAM. Only by careful design of the color palette RAM contents, such that complementary indices generate contrasting colors, can a contrasting cursor be guaranteed. Failing such efforts, the cursor color will be substantially random according to this method.

By way of further background, the above-cited U.S. patent describes the use of an exclusive-OR function to generate a contrasting color for a pixel. Attention is directed to column 12, lines 25 through 40, and to column 13, line 23 through column 14, line 18, for discussion of the XOR feature in a line-drawing and erasing context for a monochromatic display system. Column 26, line 48 through column 27, line 39, describes a color display system by analogy.

It is therefore an object of this invention to provide a graphics display system which generates a cursor image having a high likelihood that it will significantly contrast with its surroundings.

It is a further object of this invention to provide such a system which is particularly useful in a color display system.

It is a further object of this invention to provide such a system which may be used in conjunction with a color palette RAM.

It is a further object of this invention to provide such a system which may be used in a high resolution display environment.

5,570,107

| 3 | 4 |
|---|---|

It is a further object of this invention to provide such a system which may operate upon pixel data which is either a color index value, or a color component intensity value.

Other objects and advantages of the invention will be apparent to those of ordinary skill in the art having reference to the following specification together with the drawings.

## SUMMARY OF THE INVENTION

The invention may be incorporated into a graphics sub-system including frame memory and a video digital-to-analog converter (VDAC). The VDAC includes circuitry for generating display data for driving the display device. An example of the circuitry for generating display data is a color palette RAM; alternatively, the display data may be directly provided from the frame memory. In either case, the display data corresponds to the intensity of the components (e.g., RGB) of the image for each pixel. Cursor generation hardware is included which inverts the display data at cursor locations. As a result, the contrast between the cursor image and its surroundings is increased, improving cursor visibility.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an electrical diagram, in block form, of a video DAC according to the present invention.

FIG. 2 is an electrical diagram, in block form, of a system according to the present invention including the video DAC of FIG. 1.

FIGS. 3a and 3b are timing diagrams illustrating the operation of the system of FIG. 2 in multiplexed mode and non-multiplexed mode, respectively.

FIG. 4 is an electrical diagram, in block schematic form, of the cursor logic in the video DAC of FIG. 1.

FIG. 5 is a representation of the display driven by the system of FIG. 2, including the position of a cursor therein.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to FIG. 1, VDAC 30 according to the preferred embodiment of the invention will now be described in detail. VDAC 30 is a multiplexed video DAC, preferably formed as a single integrated circuit, and including color palette RAM, hardware cursor, and other functions useful in the generation of analog RGB signals corresponding to digital pixel data supplied thereto.

As will be apparent from the following description, according to this embodiment of the invention, the clocking of the input latch is performed independently from the multiplexing and output of video data according to the high-speed pixel clock signal. Due to this separate clocking, the pixel clock frequency is not limited by the propagation delay of the output clock signal OUTCLK elsewhere in the graphics subsystem. Higher speed system operation is thus achieved, so that higher density displays can be driven according to the present invention.

VDAC 30 includes first stage latch 32 having an input for receiving digital data from bus VDATA. Another terminal of VDAC 30 receives a clock signal LCLK from external to VDAC 30. Clock signal LCLK is received by first stage latch 32 to control the latching of data therein. Bus VDATA communicates pixel data from frame memory to the display driver; in this example, bus VDATA includes at least thirty-two lines upon which thirty-two bits of graphics data are communicated to VDAC 30. As will be described in detail

hereinbelow, these thirty-two bits can represent eight, four, two or one pixel for display, depending upon the number of colors desired. It should also be noted that, for systems such as the well-known VGA configuration, eight additional lines may be provided in bus VDATA for display in so-called "VGA" mode; if such is the case, a port select signal may also be presented to first stage latch 32 for selection of the "port" corresponding to the thirty-two pixel data lines or the eight-line VGA text port.

Pixel clock signal PCLK is also received at a terminal of VDAC 30 from an off-chip clock source, such as a phase-locked loop or oscillator, and is coupled to divide-by-N circuit 38 via buffer 35. Divide-by-N circuit 38 is controlled by command register 40 to set the multiple N by which the frequency of pixel clock signal PCLK is to be divided. In this example, N may be selected from the values 1, 2, 4, or 8, corresponding to the level of multiplexing in VDAC 30 (i.e., the number of pixels received at a time from bus VDATA). Buffer 37 receives the output of divide-by-N circuit 38, and drives clock signal OUTCLK at a terminal of VDAC 30.

According to this embodiment of the invention, and as will be described hereinbelow relative to the operation of VDAC 30, the clock signal received at LCLK controls the receipt of pixel data by VDAC 30 (in first stage latch 32), rather than the output clock signal OUTCLK controlling such receipt as used in prior conventional VDACs. In such prior systems, the use of the output clock signal OUTCLK to latch video data into the VDAC required that the propagation delay, access time and setup time all occur within one cycle of the output clock signal OUTCLK, which limited the video data rate through the VDAC. This limitation is overcome in this embodiment of the invention.

High speed pixel clock signal PCLK controls the application of the pixel data to the "back-end" processing of VDAC 30, including the digital-to-analog conversion for driving the display device. For proper operation, however, synchronization of the pixel data received by VDAC 30 to the pixel clock signal PCLK is necessary. In this example, such synchronization is implemented by way of second stage latch 34, having an input coupled to the output of first stage latch 32 in a master-slave configuration (latch 32 being the master and latch 34 the slave). The clocking of data into second stage latch 34 is controlled by clock multiplexer 36, in this example, due to the different operating modes desired for VDAC 30. Clock multiplexer 36 receives pixel clock signal PCLK at one input and output clock signal OUTCLK at a second input. Clock multiplexer 36 selects either clock signal LCLK or clock signal OUTCLK for application to the clock input of second stage latch 34, under control of command registers 40, according to the multiplexing mode selected for VDAC 30.

Command registers 40 are loaded by signals on bus REGn, presented by a video controller or other circuit in the system. The contents of command registers 40 control the selection of 8:1, 4:1, 2:1, or 1:1 multiplexing, as well as other modes of operation for VDAC 30 including hardware cursor mode selection and control. The various multiplexing modes selectable for VDAC 30 allow it to drive display devices of various sizes and resolution by selecting the desired mode. As a result, neither substitution of a different video DAC nor reconfiguration of the system hardware is necessary to efficiently drive different displays. In this embodiment, the multiple of the pixel clock PCLK frequency which is applied to the second stage latch 36 is selected by command registers 40 corresponds to the desired level of multiplexing.

5,570,107

5

The output of second stage latch 34 is connected to the input of multiplexer 42. Multiplexer 42 is controlled by multiplexer control circuit 44, which receives information indicative of the level of multiplexing desired from command registers 40. Multiplexer control circuit 44 also receives pixel clock signal PCLK after buffering by buffer 35, and applies it to multiplexer 42 via line MUXCLK, phase shifted by a desired amount consistent with delay through latches 32 and 34, as necessary. Multiplexer control circuit 42 also receives latch clock signal LCLK as an input, which it will apply to line MUXCLK in non-multiplexed mode, as will be described hereinbelow. Multiplexer 42 provides j bits at its output, j being determined by the multiplexing level desired, and indicated by command registers 40 and multiplexer control circuit 44. In this embodiment of the invention, where 8:1, 4:1, 2:1, and 1:1 multiplexing is available, j may equal 4, 8, 16 or 24 bits (24 being sufficient for "true color" output for a pixel and selected in non-multiplexed mode).

It should be noted that the above-described arrangement of master-slave latches 32, 34 is only one contemplated implementation of circuitry for synchronizing the pixel data to the pixel clock signal PCLK. Such synchronization may also be implemented with a single latch stage 32, by inserting a fixed phase relationship between pixel clock signal PCLK (as applied to multiplexer 42 on line MUX-CLK) relative to clock signal LCLK (i.e., relative to the output clock signal OUTCLK generated from pixel clock signal PCLK). Proper timing between latch clock signal LCLK and multiplexer clock MUXCLK, when based on pixel clock signal PCLK, will allow such synchronization without requiring two latches. Further in the alternative, a FIFO buffer may alternatively be used, with the input of such a buffer coupled to the output of first stage latch 32, and with its contents shifted according to pixel clock signal PCLK. It is now contemplated that other synchronization circuits and techniques for accomplishing this function will now also be apparent to those of ordinary skill in the art having reference to this description.

The output of multiplexer 42 is applied to the input of processor 46. Processor 46 includes such conventional functions as a pixel mask register for masking pixel data in the conventional fashion; in addition, processor 46 can provide a formatting function, either by way of a look-up table or by logical operation, to receive the pixel data from multiplexer 42 for proper application to color palette RAM 48, the input of which receives the output of processor 46. Processor 46 may, in addition, be capable of performing graphics operations on the data that it receives from multiplexer 42, such operations including color processing.

In conventional display systems, the data communicated from the frame memory for a pixel is generally a color index. This color index corresponds to an address in color palette RAM 48, which serves as a color look-up table. In this embodiment of the invention, color palette RAM 48 stores 256 displayable color combinations, each being twenty-four bits wide. Color palette RAM 48 generates the twenty-four bit output addressed by the color index presented to its input. Eight bits of the twenty-four bit output correspond to the desired intensity for the red portion of the RGB analog output, eight bits for green, and eight bits for blue. The combination of the intensities for the three "guns" of the RGB monitor corresponds to the desired display color. In VDAC 30 according to this embodiment of the invention, the three sets of eight-bit outputs from color palette RAM 48 are applied to eight-bit inputs of highlight logic 50R, 50G, 50B, respectively.

6

For communication of true color information in non-multiplexed mode, where up to twenty-four bits are used for each pixel, the communicated from multiplexer 42 to color palette RAM 48 are grouped according to the display components driven by VDAC 30, and correspond to the intensity level of each component to be driven to the display device. In this example where the display device is a CRT, driven by RGB (red-green-blue) components, twenty-four bits from multiplexer 42 include eight intensity bits for the red component, eight intensity bits for the green component, and eight intensity bits for the blue component. As a result, the data communicated for each pixel is not limited to the 256 colors in color palette RAM 48, but directly communicates the eight-bit digital value corresponding to the intensities of the red, green and blue guns of the monitor. Accordingly, each gun can receive 256 intensity values from the frame memory, thus allowing generation of $256^3$, or 16,777,216 possible colors from the twenty-four bits of information. Alternatively, fewer bits (for example sixteen bits, grouped as five-six-five for the three color components) may be used to communicate the intensity of each component to be driven to the display device.

It should be noted that this true color data could be communicated directly to DACs 52, so that the analog intensity output therefrom would be a direct digital-to-analog conversion of the pixel data from frame memory 14. Color palette RAM 48 preferably assists in the accuracy of the displayed color, however, by providing a look-up function for each of the three components of pixel data it receives. According to this preferred embodiment, as shown in FIG. 1, color palette RAM 48 is segmented into three 256 by 8 portions, and includes three address decoders, each independently operating on a group of bits from multiplexer 42 in the true color mode. The segmented contents provide an output for each component (e.g., RGB) which corresponds to an intensity value designated by the pixel data presented thereto in the associated group of input bits. Use of the color palette RAM 48 in this mode allows for adjustment of the linearity of the analog output generated by each digital value; this adjustment may be done considering the responsive of a particular display device to be driven by VDAC 30, or according to other characteristics of the system.

It should also be noted that a portion, or mode, of color palette RAM is also preferably available by which it considers the output of processor 46 not as three separate eight-bit addresses, but considers it as a twenty-four bit address. In this mode, controlled for example by control registers 40, color palette RAM 48 operates as a 256 by 24 memory device, rather than as a set of three 256 by 8 memory segments. It is contemplated that a designer of ordinary skill in the art will be able to readily construct such a segmented memory, based on this specification.

There is also a need to communicate pixel data directly to DACs 52 without correction by color palette RAM 48. Accordingly, VDAC 30 further includes bypass logic 43 which, under control of command registers 40, couples the output of processor 46 to highlight logic 50 when an alternative display mode is selected, for example a VGA display mode, or other modes in which use of color palette RAM 48 is not desired. When enabled, bypass logic 43 communicates the output of processor 46 to the three sets of eight-bit inputs to highlight logic 50R, 50G, 50B.

Highlight logic 50R, 50G, 50R, have eight-bit outputs connected to the inputs of digital-to-analog converters (DACs) 52R, 52G, 52B, respectively. DACs 52R, 52G, 52B generate analog values corresponding to the digital value at

5,570,107

7

their inputs in conventional DAC fashion; these analog values are communicated to the system monitor, and drive the corresponding red, green and blue electron guns in the monitor. While the present invention is described for conventional RGB display systems, other types of monitors and display systems may also benefit from the present invention.

VDAC 30 also includes both a conventional hardware cursor function, as well as a highlight mode function according to the preferred embodiment of the invention. As is well known, a cursor is a block of pixels, for example thirty-two pixels on a side in a high density display, which contrasts with and is displayed instead of the graphical output at a location of the screen, for example corresponding to a location at which a user input is requested. The displayed cursor may consist of the entire pixel block contrasting with the surroundings, such that a rectangular block appears at the pixel location. Alternatively, the cursor may be a character or other displayed image which is contained within the cursor block, for example an arrow or other icon, with bits outside of the cursor image within the cursor block appearing as though the cursor were not present. Timing features may also be included in cursor generation, for example by causing the cursor to blink on the display, further contrasting it with the surroundings.

As illustrated in FIG. 1, VDAC 30 includes certain elements which are conventional for generation of a cursor. These elements include cursor color RAM 47, selectable by way of cursor logic 45 under control of command registers 40. Cursor logic 45 includes a cursor image RAM which communicates a cursor color selection to cursor color RAM 47 at times corresponding to the pixel within the cursor block. Cursor color RAM 47 in turn presents the selected cursor color on the twenty-four output lines coupled to highlight logic 50 for application to DACs 52.

Other prior cursor display systems perform an exclusive-OR function between a cursor on value ("1") and the video data; in these prior display systems, however, the exclusive-OR function is done on the color index value, i.e., the input to color palette RAM 48. Because this prior arrangement results in a cursor color index value which is the logical complement of the non-cursor value, the contrast in colors depends upon the arrangement of colors in the color palette RAM, particularly the difference in colors having complementary index values. If similar colors have complementary index values, the displayed cursor may not significantly contrast with the surrounding color, and have poor visibility relative to its surroundings.

According to the present invention, however, a highlight cursor mode may be selected by a value loaded into command registers 40. In this mode, for those pixels within the cursor area which are to be "highlighted", the output from color palette RAM 48, or from bypass logic 43, depending on the mode, is logically inverted prior to application to DACs 52. As a result, it is much more likely that the displayed cursor will significantly contrast with the color which would otherwise be displayed (and thus with the surrounding colors, as it is likely that the surrounding colors are similar), than in prior cursor highlight implementations where the color index value was inverted to highlight pixels in the cursor.

According to the present invention, VDAC 30 includes a highlight mode, generated by highlight logic 50R, 50G, 50B, which ensures that the cursor color contrasts as much as possible with the color it is replacing in the display. Referring now to FIG. 4, highlight logic 50n for one bit will be described in detail in combination with cursor logic 45.

8

Cursor logic 45 includes cursor image RAM 64, as noted hereinabove. Cursor image RAM 64 includes an addressable location for each pixel within the desired cursor block. For example, if the size of the displayed cursor block is 32 pixels by 32 pixels, cursor image RAM will have $3^{22}$ addressable locations. Each addressable location in cursor image RAM 64 consists of a digital code corresponding to the image to be displayed for that pixel. For example, for simple cursor generation schemes, cursor image RAM 45 would have one bit of storage for each address, with the value of the bit corresponding to "on" or "off" for that pixel in the cursor. In the present embodiment, cursor image RAM 64 is 32 by 32 by 2, with four modes selectable for each pixel in the cursor block; these four modes are "color 1", "color 2", "transparent" and "highlight", which will be described hereinbelow.

Cursor logic 45 further includes X and Y position registers 60x and 60y, respectively, for storing the X and Y coordinates of the desired position of the cursor in the displayed image. As will be noted hereinbelow, the stored value in registers 60 will be one corner of the cursor image, for example the lower right hand corner. Cursor logic 45 further includes cursor position counters 58, having both X and Y components therein, for keeping track of the current pixel position being displayed. Cursor position counters 58 receive a reset signal on line CDE which, as is well known, is the composite display enable signal indicating the beginning of the display area, and also receive pixel clock signal PCLK for incrementing its contents for each pixel displayed.

Comparators 62x, 62y are also located within cursor logic 45, for comparing the contents of cursor position counters 58 with the values stored in X and Y position registers 60x and 60y. The output of comparators 62x, 62y is communicated to cursor position counters 58. The output of cursor position counters 58 is an address value communicated to cursor image RAM 64, presenting either an address which corresponds to a null value when the current pixel being displayed is outside of the cursor block, or which corresponds to the position of the current pixel within the pixel block when such is the case. Cursor position counters 58 also present a control signal on line SELn to highlight logic 50, for controlling the selection of a cursor color data for pixels located within the cursor block, as will be further noted hereinbelow.

Cursor image RAM 64, in this example, presents a two-bit value (RAM 64 having two bits per address) to cursor color, or palette, RAM 47, and to decoder 68. As noted hereinabove, the contents of cursor image RAM 64 indicates the desired display mode for a pixel in the cursor block. Two of the modes available in this example of the invention correspond to two pre-assigned colors, color 1 and color 2. Cursor palette RAM 47 is thus addressable by the output of cursor image RAM 45 to present the selected color (color 1 or color 2) to highlight logic 50.

Decoder 68 also receives the output of cursor image RAM 64, and controls the transparent and highlight modes according to this embodiment of the invention. Decoder 68 receives signals on lines CURSEN and CURSMODE from command registers 40, indicating whether the cursor function is to be enabled, and the modes available for display of the cursor; command registers 40 thus can disable the generation of any cursor (or particular cursor modes) by these signals. Decoder 68, in this example, presents control signals to highlight logic 50 on lines ME and HL.

Referring still to FIG. 1, a single bit 50n of highlight logic 50 is illustrated; it is of course understood that each of the twenty-four bits of highlight logic 50 will be similarly

5,570,107

9

constructed. Included within highlight logic 50n is multiplexer 54n, which receives line TCn from bypass logic 43, line PCn from color palette RAM 48, and line CCn from cursor color RAM 47. Multiplexer 54n also receives control inputs on line SELn from command registers 40. In addition, on line BYPEN from command registers 40. In addition, decoder 68 generates a line Th, for transparent mode, which is also connected to a control input of multiplexer 54n so that, in a cursor location when transparent or highlight cursor pixels are to be displayed, multiplexer 54n will not select line CCn. Multiplexer 54n is thus able to select one of the three inputs for application to its output, dependent upon whether or not bypass logic 43 is enabled, and depending upon whether or not the current pixel is within the cursor block, or is to be transparent or highlighted.

The output of multiplexer 54n is coupled to an input of AND gate 66n, which receives line MEn from decoder 68 in cursor logic 45. The output of AND gate 66n is coupled to a first input of exclusive-OR gate 56n, which receives line HLn from decoder 68 at its other input. The output of exclusive-OR 56n is connected to its associated DAC 52.

The operation of cursor logic 45 and highlight logic 50n will now be described relative to FIG. 5. FIG. 5 illustrates display area 67, having its origin O in the upper left-hand corner, for purposes of this example, it is assumed that the entire display area 67 is of the same color. Cursor block 65 is illustrated as near the center of the display area in this example. For purposes of description, this example of the desired image for cursor block 65 is an area 65C of "color 1" at its center, surrounded by a highlighted area 65H, further surrounded by a "transparent" area 65T, in which the color which would otherwise be displayed will appear (the color being transparent in area 65T).

In operation, display area 67 will be generated for each pixel outside of cursor 65, by color palette RAM 48 presenting the display color to highlight logic 50 on lines PCn (as shown in FIG. 4), beginning from origin O when line CDE reads the values in cursor position counters 58. Prior to this time, the desired cursor position values have been loaded into cursor position registers 60, 62. As the display data is generated, so long as the pixel position is outside of cursor 65, the result of comparators 58. The null value will be communicated to cursor position counters 62x, 62y will indicate the same to cursor position registers. In addition, line SELn will indicate to to decoder 68. In addition, line CCn for output; either line multiplexer 54n to not select line TCn from bypass PCn from color palette RAM 48 or line TCn from bypass logic 43 will be applied to the output of multiplexer 54n for these locations, depending upon the state of line BYPEN. For pixels outside of cursor 65, decoder 68 will also drive line MEn high and line HLn low, so that the output of multiplexer 54n is communicated to DAC 52.

As display area 67 is scanned, pixel clock signal PCLK increments cursor position counters 58 until such time as cursor 65 is reached, and indicated by comparators 62x, 62y. Cursor position counters 58 will then present an address value to cursor image RAM 64, within which is stored the image shown in the blown-up portion of FIG. 5.

For those pixels within color area 65C, the output of cursor image RAM 64 will communicate the value to cursor image RAM 47 which will address color 1 for application on line CCn to multiplexer 54n. Cursor position counters 58 will also indicate to multiplexer 54n, by way of line SELn, that line CCn is to be selected for application to its output. This result will also cause decoder 68 and to AND gate 66. This result will also cause decoder 68 to drive line MEn high and line HLn low, so that the output

10

of multiplexer 54n, which is cursor color 1 data on line CCn, is to be applied to DAC 52 for pixels in area 65C. It should be noted that other pre-assigned cursor colors will be similarly generated.

For pixels within transparent area 65T, however, the output of cursor image RAM 64 will present a code which causes decoder 68 to indicate on line Tn that a transparent pixel is to be generated. Line Tn will override the state of line SELn from cursor position counters 58, and cause the otherwise selected line PCn or TCn to be applied to the output of multiplexer 54n, as though the pixel were not within cursor 65. Lines MEn and HLn are held high and low, respectively, so that the state of the output of multiplexer 54n will be communicated directly to DAC 52.

Within highlighted area 65H according to the invention, cursor image RAM 64 will indicate to decoder 68 that the highlight function is to be applied. In this mode, decoder 68 will drive line Tn to multiplexer 54n so that the otherwise selected line PCn or TCn is applied to the output of multiplexer 54n, as though the pixel were not within cursor 65. In addition, decoder 68 will drive both lines MEn and HLn to high states. This will cause the output of multiplexer 54n to be applied to exclusive-OR gate 56n, but will cause exclusive-OR gate 56n to invert the value of multiplexer 54n prior to its application to DAC 52. As a result, for pixels in area 65H, the color displayed will be generated from DACs 52 from the logical complement of the color that would otherwise be displayed were the pixel not within cursor 65.

According to this embodiment of the invention, the exclusive-OR function of highlight logic 50, controlled according to the comparison of the display location to the desired cursor location and the desired cursor image, presents the logical complement of the digital color value at the cursor index color, rather than the logical complement of the color index value as used in conventional video DACs and systems. The value is used according to the present invention is therefore improved over a larger set of colors, and is not dependent upon the organization of colors within color palette RAM 48, according to this embodiment of the invention.

Referring still to FIG. 4, it should be noted that other cursor modes are available. For example, decoder 68 may drive line MEn low, forcing the output of AND gate 66n low regardless of the output of multiplexer 54n. The state of line HLn will then determine whether a "1" or a "0" is applied to DAC 52 for that bit. As a result, a forced color (e.g., pure white, or pure black) can be generated for pixels in the cursor, without requiring the color to be stored in cursor palette 47.

Referring now to FIG. 2, the implementation of VDAC 30 into a graphics subsystem, and its operation in connection therewith, will now be described. The system includes a video controller 70 which is connected via host bus HBUS to a host processor (not shown). Video controller 70 is also connected to VRAM 14 via random access bus RDATA and control lines CTRL, for controlling access to and refresh of VRAM 14. VRAM 14 is a dual-port memory subsystem, preferably including multiple video DRAM devices as are readily available, each video DRAM device having a random access port for communication via bus RDATA to video controller 70, and also a serial access port for output of data to VDAC 30 on bus VDATA. The serial output from VRAM 14 is controlled by clock signal VCLK generated by video controller 70.

Video controller 70 may be a microprocessor, including graphics-specific microprocessors such as the TMS 34020 manufactured and sold by Texas Instruments Incorporated.

EXHIBIT B PAGE 38

5,570,107

**11**

Alternatively, and preferably for many high volume graphics subsystems, video controller 70 may be a custom integrated circuit, such as an ASIC, constructed to perform the particular graphics functions and operations desired. Via buffer 71, clock logic 72 in video controller 70 receives a output clock signal OUTCLK from VDAC 30, generates clock signal VCLK for application to VRAM 14 and clock signal LCLK for application to VDAC 30, both driven by buffer 73. As noted above, clock signal VCLK controls the output of serial data from the serial port of VRAM 14. Clock logic 72 includes the necessary and desired delay and other circuitry for generating clock signal LCLK at the appropriate phase delay from clock signal OUTCLK for system optimization. In this example, clock signals LCLK and VCLK are phase synchronous since they are generated at the same terminal of video controller 70; clock signals LCLK and VCLK may be alternatively be separately generated from clock signal OUTCLK, and may have a phase difference.

In this example, clock signal LCLK is also connected to the LCLK input of VDAC 30 which, as shown in FIG. 1, controls the latching of data from bus VDATA into first stage latch 32 of VDAC 30. Also as noted hereinabove, clock source 18 (for example, a PLL or oscillator) provides pixel clock signal PCLK to VDAC 30; pixel clock signal PCLK is at the frequency at which pixels of data are to be applied to the monitor receiving the analog output of VDAC 30. This frequency depends upon the refresh rate of the monitor (e.g., 60 Hz), and the display size in number of pixels. For example, if the display size is 1024 by 768 pixels, the frequency of pixel clock signal PCLK must be at least 47 MHz in order for each pixel to be displayed within the refresh time. It is contemplated that the present invention will be applicable to pixel clock signal PCLK frequencies at least as high as 80 to 100 MHz.

Referring now to FIG. 3a, the operation of VDAC 30 in the system of FIG. 2 will now be described in detail, relative to a 2:1 multiplexed mode. As noted hereinabove, the multiplexing modes available in VDAC 30 according to this embodiment of the invention include 8:1, 4:1, 2:1, and 1:1 (or non-multiplexed mode); for ease of description, the 2:1 multiplexed mode will be described relative to FIG. 3a.

Pixel clock signal PCLK from high speed oscillator 18 is applied to divide-by-N circuit 38 to produce output clock signal OUTCLK. In this example of the 2:1 multiplexing mode, command register 40 contains the appropriate code for 2:1 multiplexing, and controls divide-by-N circuit 38 to produce clock signal OUTCLK at twice the period of pixel clock signal PCLK (i.e., N equals 2). It should be noted that, according to the present invention, the phase relationship between pixel clock signal PCLK and clock signal OUTCLK is not important.

Clock signal OUTCLK is communicated to video processor 70 which, via buffers 71, 73 and clock logic 72, generates clock signals VCLK for application to VRAM 14, and LCLK for application to VDAC 30. As noted hereinabove, clock signal VCLK controls the serial port of VRAM 14 and, accordingly, a serial access of VRAM 14 commences upon each rising edge of clock signal VCLK. After the access time $t_{ac}$ from the rising edge of clock signal VCLK, data will be presented on bus VDATA from the serial port of VRAM 14.

According to this example, clock signals VCLK and LCLK are generated at the same terminal of video processor 70, and hence not only have the same frequency as one another (and as output clock signal OUTCLK from which

**12**

they are generated), but are also phase synchronous with one another (with neither one phase synchronous with output clock signal OUTCLK). As noted hereinabove, it is not necessary for clock signals VCLK and LCLK to be phase synchronous, but use of the same output terminal of video processor 70 is preferred for convenience. Common clock signals VCLK and LCLK require, however, that access time $t_{ac}$ from VRAM 14 is short enough that data is presented on bus VDATA prior to the necessary setup time $t_{su}$ before the next rising edge of clock signal LCLK, as this rising edge latches the data on bus VDATA into first stage latch 32 of VDAC 30. Of course, if the access time $t_{ac}$ is not that fast, generation by video processor 70 of a separate clock signal LCLK, delayed in phase from clock signal VCLK, would allow for proper operation of the system.

As noted hereinabove, the rising edge of clock signal LCLK latches the video data on bus VDATA from VRAM 14 into latch 32 of VDAC 30. After a short propagation delay, the latched data appears at the output of first stage latch 32, shown as line $OUT_{32}$ in FIG. 3a. Referring to FIG. 3a, such operation is evident where pixels n, n+1 are accessed from the first rising edge of clock signal VCLK, and appear at least as early as access time $t_{ac}$ thereafter. The next rising edge of clock signal LCLK after this access latches data for pixels n, n+1 into first stage latch 32, and presents the data at the output of first stage latch 32 (line $OUT_{32}$) after a short propagation delay.

Command registers 40 contain the code to enable 2:1 multiplexing in VDAC 30 in this example, and thus communicate to clock multiplexer 36 that clock signal OUTCLK is to control the latching of second stage latch 34 (instead of pixel clock signal LCLK as will be used in the non-multiplexed mode described hereinbelow). Accordingly, upon the next rising edge of clock signal OUTCLK, second stage latch 34 receives and stores the output of first stage latch 32, and presents this data at its output after propagation through second stage latch 34. FIG. 3a illustrates this latching by line $OUT_{34}$ presenting pixels n, n+1 shortly after the first rising edge of clock signal OUTCLK after data for pixels n, n+1 has appeared at line $OUT_{32}$.

As noted hereinabove, the synchronization of the pixel data received by VDAC 30 and latched into first stage latch 32 is accomplished by way of the master-slave configuration of first and second stage latches 32, 34. Using this latch configuration, proper control of the phase relationship between clock signals OUTCLK and LCLK is important to ensure proper operation during multiplexed mode. This is due to the requirement that the data at the output of first stage latch 32 must be stable prior to the next rising edge of clock signal OUTCLK (as applied to second stage latch 34), which latches this data into second stage latch 34. Accordingly, setup and hold times of the data at the output of first stage latch 32 relative to the rising edge of clock signal OUTCLK must be obeyed for reliable operation. Referring to FIG. 3a, this is illustrated by time window $t_{su}$ on either side of the rising edge of clock signal OUTCLK, during which no transition of clock signal LCLK is allowed. Since in this case the rising edge of clock signal LCLK precedes time window $t_{su}$, the data for pixels n, n+1 is safely at the output of second stage latch 34 prior to the rising edge of clock signal OUTCLK.

It should be noted that this timing window will not be a significant limitation in the design and operation of VDAC 30, and thus the relatively easy implementation of second stage latch 34 to achieve synchronization is preferred in this embodiment. Alternative synchronization techniques, such as controlling the internal phase relationship between the

5,570,107

13

high speed pixel clock signal and the latch clock signal, will not present this limitation on the system timing, and may thus be advantageous in some cases.

Command registers 40 also control multiplexer control circuit 44 to cause multiplexer 42 to select the appropriate bits at its input for application at its output. In the 2:1 multiplexing mode, with thirty-two bits presented at the output of second stage latch 34, sixteen bits will be selected by multiplexer 42 responsive to each rising edge of pixel clock signal PCLK. Therefore, upon the first rising edge of pixel clock signal PCLK after data for pixels n, n+1 appear at the output of second stage latch 34, multiplexer 42 applies the data for pixel n at its output (shown as line OUT$_{42}$ in FIG. 3a). Upon the next rising edge of pixel clock signal PCLK thereafter, data for pixel n+1 will be selected by multiplexer 42 and presented at its output.

As discussed hereinabove, in multiplexed mode the output of multiplexer 42 will be applied, via processor 46 in the conventional manner, to color palette RAM 48. The output of color palette RAM 48 corresponding to the pixel data presented thereto will then be passed through highlight logic 50 (assuming no cursor at this location), for application to DACs 52 and control of the monitor. It should be noted that the delays of the pixel data through this back-end processing in VDAC 30 are easily accounted for in synchronizing the operation of VDAC 30 with the monitor; in effect, a certain amount of "pipelining" is present within the data path of VDAC 30 between first stage latch 32 and the analog RGB output.

As a result of this operation in multiplexed mode, it should be noted that significant cycle time limitations of prior systems are overcome. Particularly, it should be noted that the propagation delay t$_{pw}$ between corresponding edges of clock signal OUTCLK and clock signals VCLK and LCLK is no longer a factor in the operation of the system. This is due primarily to the decoupling of clock signal OUTCLK from first stage latch 32, and to the additional stage of pipelining within VDAC 30. In the system of FIG. 2, the following relationship must be maintained:

$$t_{cyc} \geq t_{su} + t_{su}$$

with

$$N(t_{pxsu})t_{cyc}$$

where N is the multiplexing coefficient. For example, if N equals 2, with t$_{su}$ on the order of 25 nsec, and t$_{su}$ on the order of 4 nsec, t$_{pxsu}$ must be only 14.5 nsec or greater in order for the system to operate. Removal of the propagation delay time through video controller 70 thus greatly improves the data rate of VDAC 30 compared to prior configurations.

This improvement in the data rate, which allows for a faster t$_{pxcyc}$ to be used, enables non-multiplexed modes, such as twenty-four bit true color mode, to be used with relatively high density displays. As described hereinabove relative to its construction VDAC 30 allows for such a non-multiplexed (or 1:1 multiplexed) mode. Referring now to FIG. 3b, the operation of such a mode will now be described.

As in the case of the multiplexed mode, VDAC 30 receives pixel clock signal PCLK from high speed oscillator 18, and generates clock signal OUTCLK therefrom by way of divide-by-N circuit 38. In this mode, however, command registers 40 control divide-by-N circuit such that clock signal OUTCLK is at the same frequency as pixel clock signal PCLK (i.e., N equals 1). Also as in the prior case, video processor 70 receives clock signal OUTCLK and generates clock signals VCLK and LCLK therefrom.

14

Responsive to the rising edge of clock signal VCLK, the serial port of VRAM 14 will present pixel data on bus VDATA, at least as early as the access time t$_{sc}$ thereof. In this mode, however, each pixel is represented by twenty-four bits, in three groups of eight bits representative of the desired intensity for each of the red, green and blue guns in the CRT monitor. Accordingly, data for only one pixel is obtained by each access of the serial port of VRAM 14 in this mode.

Upon the next rising edge of clock signal LCLK after data for a pixel (e.g., pixel n) appears on bus VDATA, first stage latch 32 will latch in the pixel data. In this non-multiplexed mode, command registers 40 control clock multiplexer 36 to select clock signal LCLK to also control the latching of second stage latch 34, so that the prior contents of first stage latch 32 are latched into second stage latch 34, in master-slave fashion. Accordingly, upon the next rising edge of clock signal LCLK after data for pixel n appears on bus VDATA, first stage latch 32 stores and presents data for pixel n, and second stage latch 34 stores and presents data for pixel n−1 (the prior contents of first stage latch 32 in non-multiplexed mode). The outputs of latches 32 and 34 are shown in FIG. 3b relative to lines OUT$_{32}$ and OUT$_{34}$, respectively.

Command registers 40 also indicate to multiplexer control circuit 44 that non-multiplexed mode is enabled. As a result, all twenty-four bits communicated to the input of multiplexer 42 are presented at its output responsive to each rising edge of clock signal LCLK, which multiplexer control circuit 44 selects for application to line MUXCLK to multiplexer 42. Upon the first rising edge of clock signal MUXCLK after second stage latch 34 has latched in the data for pixel n−1, multiplexer 42 will present this data for pixel n−1 at its output. Upon completion of the next successive clock cycle of clock signal MUXCLK (and clock signals OUTCLK and LCLK), data for pixel n will appear at the output of multiplexer 42.

Also in non-multiplexed mode, color palette RAM 48 operates in a segmented fashion, so that it considers the output of multiplexer 42 in groups of eight bits (for example), each group presenting a digital intensity value for a corresponding DAC 52. The output of color palette RAM 48, corresponding to an adjusted intensity value depending upon the particularly display system, is communicated to highlight logic 50. True color data stored in and presented by VRAM 14 to VDAC 30 is thus converted by DACs 52 to the proper analog form for application to the display device.

Similarly as in the example described hereinabove relative to FIG. 3a, the cycle time t$_{cyc}$ (which is the same as the cycle time of pixel clock signal PCLK, and clock signal LCLK) does not include the propagation delay through video processor 70. As a result, using the same access times as noted hereinabove for the example of FIG. 3a, the pixel clock rate for the non-multiplexed mode need be 34 nsec or greater in order to allow for the access and setup times of the system. True color data can thus be driven to a relatively high density display (on the order of 700 pixels on a side) by this embodiment of the invention, even where the access and setup times are modest.

While the invention has been described herein relative to its preferred embodiment, it is of course contemplated that modifications of, and alternatives to, this embodiment, such modifications and alternatives obtaining the advantages and benefits of this invention, will be apparent to those of ordinary skill in the art having reference to this specification and its drawings. It is contemplated that such modifications and alternatives are within the scope of this invention as subsequently claimed herein.

5,570,107

15

We claim:

1. A data processing apparatus, comprising:

a frame memory, having an output connected to a pixel bus, for presenting pixel data corresponding to locations in a displayed image;

processing circuitry having an input coupled to the output of said frame memory, for converting said pixel data into a digital form corresponding to display intensity;

inverting circuitry, for receiving the converted pixel data from said processing circuitry and for inverting the converted pixel data responsive to a cursor control signal;

a cursor enable circuit coupled to said inverting circuitry, for generating said cursor control signal responsive to a current display location corresponding to a cursor location in the displayed image;

output circuitry, coupled to said inverting circuitry, for presenting the output of said inverting circuitry to a display device;

a video processor, coupled to said frame memory, for accessing said frame memory and for storing data therein corresponding to an image to be displayed;

a host processor, coupled to said video processor by way of a host bus; and

16

a display device, coupled to said output circuitry.

2. The system of claim 1, wherein said processing circuitry comprises:

a color palette memory for storing intensity data corresponding to the intensity of display components and for presenting the same responsive to an address value;

and wherein said pixel data corresponds to address values of said color palette memory.

3. The system of claim 2, wherein said output circuitry comprises:

first, second and third digital-to-analog converters, each for receiving a portion of the output of said color palette memory, each for converting said pixel data to an analog signal corresponding to the intensity of a display color.

4. The system of claim 1, wherein said inverting circuitry comprises:

an exclusive-OR function having a first input coupled to an output of a color palette memory, and having a second input for receiving said cursor control signal.

* * * * *

EXHIBIT B PAGE 41

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :     5,570,107

DATED       :     October 29, 1996

INVENTOR(S) :     Paul B. Wood, Thomas M. Albers, Stephen B. Preston

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Col. 8, ln. 5, delete "$3^{22}$", insert --$32^2$--.

Signed and Sealed this

Twenty-fourth Day of December, 1996

Attest:

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

EXHIBIT ___B___ PAGE ___42___



US006125031A

# United States Patent [19]

## Della Fiora et al.

[11] Patent Number: 6,125,031

[45] Date of Patent: Sep. 26, 2000

[54] **PLASTIC COMPUTER HOUSING/ACCESS DOOR APPARATUS WITH INTEGRALLY MOLDED DUAL FUNCTION HINGE ASSEMBLY**

[75] Inventors: **Troy A. Della Fiora**, Spring; **Daniel J. Riecio, Jr.**, The Woodlands; **Ian Kung**, Houston, all of Tex.

[73] Assignee: **Compaq Computer Corporation**, Houston, Tex.

[21] Appl. No.: **09/083,836**

[22] Filed: **May 22, 1998**

[51] Int. Cl.[7] .......................... G06F 1/16; H05K 5/02

[52] U.S. Cl. ............................ 361/683; 220/341

[58] Field of Search ...................... 361/683; 312/223.2, 312/327, 328, 265.5, 265.6; 220/334, 337, 341, 342

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,076,461 | 12/1991 | Nichols | 220/352 |
| 5,116,261 | 5/1992 | Lan et al. | 312/292 |
| 5,165,790 | 2/1993 | Mischenko | 379/433 |
| 5,199,888 | 4/1993 | Condra et al. | 439/142 |
| 5,513,068 | 4/1996 | Girard | 361/685 |
| 5,542,757 | 8/1996 | Chang | 312/223.2 |
| 5,557,499 | 9/1996 | Reiter et al. | 361/685 |
| 5,574,625 | 11/1996 | Ohgami et al. | 361/684 |
| 5,586,003 | 12/1996 | Schmitt et al. | 361/683 |
| 5,593,220 | 1/1997 | Seid et al. | 312/265.6 |
| 5,724,226 | 3/1998 | Ruch et al. | 361/683 |
| 5,745,342 | 4/1998 | Jeffries et al. | 361/683 |
| 5,755,497 | 5/1998 | Chang | 312/223.2 |
| 5,768,097 | 6/1998 | Jelinger | 361/683 |
| 5,815,379 | 9/1998 | Mundt | 361/683 |

*Primary Examiner*—Lynn D. Feild

[57] **ABSTRACT**

A tower computer housing has a molded plastic exterior wall portion with an access opening therein, a molded plastic access door, and a specially designed hinge structure that supports the access door on the housing for pivotal movement relative thereto between closed and open positions in which the door respectively covers and uncovers the access opening. The hinge structure includes spaced pairs of hinge pins and cam arms molded integrally on opposite ends of the access door, and spaced apart first and second resilient mounting and spring tab sets molded integrally with the housing exterior wall portion. Each of these sets includes a resilient mounting tab having a mounting hole therein and positioned between an opposed pair of resilient spring tabs. The door pins are removably snap-fitted into the mounting tab holes, and each of the door cam arms is positioned between and slidingly engages a pair of the spring tabs. When the door is manually pivoted through an initial arc toward a selected one of its closed and open positions, the spring tabs are deflected and function to automatically drive the door through a final arc to its selected position.

42 Claims, 4 Drawing Sheets



EXHIBIT _C_ PAGE _43_



FIG.1

FIG.2

FIG.3

EXHIBIT C  PAGE 44

U.S. Patent          Sep. 26, 2000     Sheet 2 of 4          6,125,031



FIG.2A

FIG.2B

FIG.3A

EXHIBIT C PAGE 45

U.S. Patent          Sep. 26, 2000          Sheet 3 of 4          6,125,031

*FIG.4*





*FIG.5*

EXHIBIT _C_ PAGE _46_

FIG.6



FIG.7A



FIG.7B



EXHIBIT___C___ PAGE__47__

6,125,031

**1**

PLASTIC COMPUTER HOUSING/ACCESS
DOOR APPARATUS WITH INTEGRALLY
MOLDED DUAL FUNCTION HINGE
ASSEMBLY

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention generally relates to electronic apparatus and, in a preferred embodiment thereof, more particularly relates to mounting apparatus for computer housing access doors.

2. Description of Related Art

A particularly useful and convenient construction for a pivotally mounted access door on an electronic apparatus, such as a computer, is typically referred to as a "single action" mounting structure. When an access door is mounted to provide this type of action, it may be simply pushed to open it an initial amount, at which point a built-in spring action opens it the rest of the way to a fully open position, and then later pushed part of the way toward its closed position, at which point the built-in spring action automatically takes over to automatically return the door the rest of the way to its closed position.

While this single action mounting action is relatively easy to describe, as conventionally constructed it can be surprisingly complex, thereby undesirably increasing its fabrication and installation/removal costs. For example, one previously utilized access door provided with a conventional "single action" pivotal mounting structure had a parts list that included metal mounting brackets, attachment screws, a metal load spring, a metal hinge pin, a plastic door tray, a spring load governing gear train, and a metal spring retainer structure.

In view of this well known, relatively high cost and complexity associated with single action access door mounting structures, it can be readily seen that a need exists for a simpler, less complicated single action access door mounting structure. It is to this need that the present invention is directed.

SUMMARY OF THE INVENTION

In carrying out principles of the present invention, in accordance with a preferred embodiment thereof, an electronic apparatus is provided which is representatively a tower type CPU unit of a computer system and includes a housing having a wall opening therein and an access door supported on the housing for pivotal movement relative thereto between closed and open positions in which the door respectively covers and uncovers the wall opening.

According to a key aspect of the invention, the access door is supported in this manner on the housing by a specially designed dual function hinge structure that is of a uniquely simple and inexpensive construction. Preferably, both the housing wall portion in which the opening is formed and the access door are plastic moldings, and the hinge structure is entirely defined by first and second interengageable portions which are respectively molded integrally with the housing wall portion and the access door. In addition to pivotally supporting the access door on the housing, the hinge structure also automatically functions, in response to a manual movement of the access door through an initial distance toward a selected one of its closed and open positions, to forcibly move the access door through a final distance to, and then releasably retain the access door in, the selected position.

**2**

In a preferred configuration of the dual function hinge structure, the first hinge portion includes a spaced pair of resiliently deflectable mounting plates, having circular holes therein, and first and second pairs of opposing, resiliently deflectable spring plates positioned adjacent the mounting plates in perpendicular relationships therewith. The second hinge portion includes a pair of cam arms positioned at opposite ends of the access door, and a pair of hinge pins projecting outwardly from the cam arms.

The access door may be quickly and easily mounted on the housing by simply pushing the hinge pins against the mounting plates in a manner deflecting them in opposite directions and causing the hinge pins to snap into place rotatably within the mounting plate holes. With the access door removably snapped into place in this manner, each of the cam arms is positioned between one of the opposing pairs of spring plates in a manner such that opposite outer edges of the cam arm slidingly engage the opposing spring plates.

When the access door is manually pivoted an initial distance away from either of its closed and open positions towards its other position, the cam arms initially deflect the spring plates in each opposed pair thereof away from one another until the cam arms are rotated to over-center positions relative to the resiliently deflected spring plates. At this point the deflected spring plates automatically drive the access door a final distance to its new position while snapping back to their original undeflected orientations to releasably retain the pivoted access door in its new position.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram of a computer system having incorporated therein a tower type CPU unit with a specially designed integrally formed access door hinge structure embodying principles of the present invention;

FIG. 2 is a partially phantomed perspective view of a bottom front side portion of the CPU unit with its illustrated access door in its closed orientation;

FIG. 2A is a rear side perspective view of the front housing bezel portion shown in FIG. 2, with the access door closed;

FIG. 2B is a view similar to that in FIG. 2A, but with the access door removed from the bezel portion;

FIG. 3 is a partially phantomed perspective view similar to that in FIG. 2, but with the access door pivoted upwardly to its open orientation;

FIG. 3A is a rear side perspective view of the bezel portion similar to that in FIG. 2A, but with the access door opened;

FIG. 4 is an enlarged scale perspective detail view of the dashed circle area "4" of the access door shown in FIG. 2B;

FIG. 5 is an enlarged scale perspective detail view of the bezel hinge structure portion within the dashed circle area "5" in FIG. 2B;

FIG. 6 is an enlarged scale simplified rear side elevational view of a portion of the assembled hinge structure taken generally along line 6—6 of FIG. 2A; and

FIGS. 7A and 7B are cross-sectional views through a portion of the assembled hinge structure, taken along line 7—7 of FIG. 6, and sequentially illustrate the operation of the hinge structure as the mounted access door is pivoted from its closed position to its open position.

DETAILED DESCRIPTION

Schematically illustrated in FIG. 1 is a representative computer system **10**, the components of which are intercon-

EXHIBIT __C__ PAGE __48__

6,125,031

**3**

nected as shown and include a computer, illustratively in the form of a tower type CPU unit 12; a monitor 14; a keyboard 16; and a pointing device, representatively in the form of a mouse 18. In addition to various other components disposed therein, the CPU unit 12 has a data storage device, representatively a disk drive 20, for storing data that may be retrieved by a microprocessor 22 within the CPU unit 12.

As illustrated in FIGS. 2 and 3, the CPU unit 12 has a generally rectangular housing portion 24 with a vertical front side portion being defined by a molded plastic bezel structure 26. Formed in a lower portion of the bezel 26 is a generally rectangular opening, representatively a front I/O port opening 28 disposed within a molded plastic frame structure 30. TO selectively cover and uncover the opening 28, a horizontally elongated molded plastic access door 32 is provided. Access door 32 is removably secured to the bezel 26 by specially designed molded plastic hinge structures 34 (see FIGS. 2A and 3A) disposed at the opposite ends of the mounted access door 32 and embodying principles of the present invention.

Hinge structures 34 are positioned on the rear or inner side of the front bezel structure 26 and function to removably mount the access door 32 on the front bezel structure 26 for pivotal motion relative thereto, representatively about a horizontal axis 35 (see FIG. 2A), between a closed position in which the access door 32 is downwardly pivoted and covers the housing wall structure opening 28 (see FIGS. 2 and 2A), and an open position (see FIGS. 3 and 3A) in which the access door 32 is upwardly pivoted and uncovers the opening 28.

Although the access door 32 could be provided with a variety of shapes, it is representatively of a horizontally elongated configuration, having a front panel portion 36, a transverse top panel portion 38 extending rearwardly from the top side of the front panel 36, and a pair of end tab portions 40 projecting rearwardly from opposite ends of the front panel portion 36 (see FIGS. 2B, 4 and 6).

Each of the specially designed hinge structures 34 of the present invention is positioned at opposite ends of the housing wall opening 28 and includes two simple and inexpensive releasably interengageable molded plastic portions—a first portion 34a molded onto the rear side of the bezel structure 26 adjacent the opposite ends of the wall opening 28 (see FIGS. 2B and 5), and a second portion 34b molded onto the opposite end tabs 40 of the access door 32 (see FIGS. 2B and 4).

Turning now to FIGS. 5 and 6, each of the hinge portions 34a formed integrally with the bezel structure 26 projects inwardly beyond the front side of the bezel structure 26 and includes a horizontally elongated resilient mounting plate 42 positioned between horizontally elongated resilient top and bottom spring plates 44 and 46. Mounting plate 42 has a rear or outer end portion having a ramped deflection surface 48 and a circular hinge pin opening 50.

As best illustrated in FIGS. 4 and 6, each of the hinge portions 34b formed integrally with the access door 32 includes a generally rectangular cam arm 52 projecting outwardly from the outer side of one of the access door end tabs 40, and a hinge pin 54. Each of the cam arms 52 has an opposite rounded outer side edges 56, and a flat outer end surface 58. Each hinge pin 54 longitudinally projects outwardly beyond one of the outer cam arm end surfaces 58 and has a domed outer end 54a.

The access door 32 may be easily, quickly and removably installed on the bezel structure 26 simply by snapping the integral door hinge structure (i.e., the hinge portions 34b)

**4**

onto the integral bezel hinge structure (i.e., the hinge portions 34a). This is accomplished by placing the domed outer hinge pin ends 54a against the ramped outer end portions 48 of the opposing resilient mounting plates 42 and then pushing the access door 32 generally forwardly. This causes the domed pin ends 54a to slide along the ramped mounting plate surfaces 48, and cam the mounting plates 42 outwardly as indicated by the arrows 60 in FIGS. 5 and 6, to permit the hinge pins 54 to snap into the mounting plate pin openings 50 as shown for one of the pins 54 in FIG. 6.

This snap-on installation of the access door 32 places its cam arms 52 between the opposing pairs of resilient top and bottom spring plates 44,46 with the rounded outer side edges 56 of each cam arm 52 slidingly engaging the opposing side surfaces of its associated top and bottom spring plates 44,46 as shown in FIG. 7A in which one of the cam arms 52, in its indicated solid line position, is schematically shown in the position that it assumes when the access door 32 is in its closed position. With the access door 32 in its closed position, the cam arms 52 are downwardly and rearwardly canted, with their rounded opposite side edges 56 slidingly engaging the vertically facing side surfaces of the opposing top and bottom spring plates 44,46.

As can be seen in FIG. 7A, when the access door 32 is in its closed position, the opposing pairs of spring plates 44,46 resiliently retain the door in such closed position against pivotal movement toward its open position. Representatively, with the door in its closed position, a portion of the door abuts a suitable facing portion of the bezel (not shown) to prevent the door from pivoting forwardly and downwardly past its closed position. If the door is rotated rearwardly and upwardly toward its open position, as indicated by the arrow 62 in FIG. 7A, the plates 44,46 resiliently resist such pivotal movement of the door as the plates 44,46 are deflected outwardly toward their dotted line positions, as indicated by the arrows 64, by the sliding engagement of the plates 44,46 by the rounded outer side edges 56 of the cam arms 52.

The access door 32 may, however, be forcibly pivoted from its closed position to its open position by manually pushing upwardly on the bottom side edge 36a of the front door panel 36 (see FIG. 2). This causes the cam arms 52 to be pivoted to and somewhat past their dotted line FIG. 7A upright orientations at which point the opposing spring plate pairs 44,46 have been moved to their fully deflected dotted line positions shown in FIG. 7 and then snap back to their FIG. 7B solid line positions as indicated by the arrows 66 in FIG. 7B. This, in turn, pivots the cam arms 52 through a final distance to their solid line FIG. 7B position, as indicated by the arrow 68, to open the door and resiliently retain it in its open position. A suitable abutment (not shown) between the opened door and the bezel prevents the door from being pivoted rearwardly past its open position. With the door resiliently held in its open position by the interengagement between the cam arms 52 and the opposing spring plate pairs 44 and 46, the cam arms 52 are in upwardly and rearwardly canted orientations as shown in FIG. 7B. When the access door 32 is subsequently closed, the spring plate pairs 44,46 are resiliently deflected outwardly and yieldingly resist an initial counterclockwise rotation of the cam arms 52 (as viewed in FIG. 7B), and then snap back to their original positions and pivotally drive the door to and then resiliently retain it in its closed orientation.

The overall hinge structure 34 of the present invention, as can be readily be seen from the foregoing, provides a simple and inexpensive apparatus for (1) releasably holding the access door 32 on the bezel 26 for pivotal motion between

EXHIBIT C PAGE 49

6,125,031

5

open and closed positions, and (2) resiliently retaining the door in such open and closed positions. Compared to conventional dual function hinge constructions, the hinge structure 34 eliminates a variety of separate parts and permits the two interrengageable portions of the overall hinge structure to be molded integrally with the molded plastic access door and bezel structures.

A variety of modifications could be made to the representatively illustrated bezel, access door and hinge assembly without departing from the principles of the present invention. For example, the access door could be provided with a wide variety of alternate shapes, and could be mounted for rotation about a vertical axis instead of a horizontal axis. Similarly, the access door/hinge structure could be used in a variety of applications other than the illustrated computer housing access door application.

Moreover, while each of the two mounting plates 42 and each of the spring plates in the opposing pairs 44,46 thereof has been illustrated as being of a resilient construction, it will be appreciated that one of the mounting plates 42 could be of a nonresilient construction and still permit the desirable snap-on, snap-off attachment of the access door to the bezel, and that one of the spring plates in each opposing pair 44,46 thereof could be of a nonresilient construction, or eliminated, if desired.

The foregoing detailed description is to be clearly understood as being given by way of illustration and example only, the spirit and scope of the present invention being limited solely by the appended claims.

What is claimed is:

1. Electronic apparatus comprising:

a housing having a wall opening therein;

cooperatively interengageable first and second structures respectively carried by said housing and said access door and being operable to:

(1) pivotally interfit sections of said first and second structures on an axis in a manner mounting said access door on said housing for pivotal movement relative thereto about said axis between a closed position in which said access door covers said wall opening, and an open position in which said access door is swung edgewise through said wall opening into the interior of said housing and uncovers said wall opening, and

(2) provide between portions of said first and second structures a sliding engagement which, in response to a manual pivoting of said access door through an initial distance toward either selected one of said closed and open positions, resiliently deflects said portion of said first structure and then causes said portion of said first structure to forcibly pivot said access door through a final distance to, and then releasably retain said access door in, the selected position.

2. The electronic apparatus of claim 1 wherein said electronic apparatus is a computer.

3. The electronic apparatus of claim 2 wherein said computer is a tower type CPU unit.

4. The electronic apparatus of claim 1 wherein:

said housing has an exterior bezel portion, and

said wall opening is formed in said exterior bezel portion.

5. The electronic apparatus of claim 1 wherein:

said first and second structures are respectively formed integrally with said housing and said access door.

6. The electronic apparatus of claim 5 wherein:

said wall opening is formed in a molded plastic wall portion of said housing,

6

said first structure is molded integrally with said wall portion,

said access door is of a molded plastic material, and

said second structure is molded integrally with said access door.

7. The electronic apparatus of claim 1 wherein:

said portions of said first and second structures are offset from the pivotally interfitted sections in a direction transverse to said axis.

8. The electronic apparatus of claim 1 wherein said axis extends generally horizontally.

9. The electronic apparatus of claim 1 wherein:

said first and second structures are operable to removably mount said access door on said housing.

10. The electronic apparatus of claim 9 wherein:

said first and second structures are operable to provide a removable snap-fit attachment of said access door to said housing.

11. A computer system comprising a CPU unit having a microprocessor and a data storage device for storing data that may be retrieved by said microprocessor, said CPU unit further comprising:

a housing having a wall opening therein;

cooperatively interengageable first and second structures respectively carried by said housing and said access door and being operable to:

(1) pivotally interfit sections of said first and second structures on an axis in a manner mounting said access door on said housing for pivotal movement relative thereto about said axis between a closed position in which said access door covers said wall opening, and an open position in which said access door is swung edgewise through said wall opening into the interior of said housing and uncovers said wall opening, and

(2) provide between portions of said first and second structures a sliding engagement which, in response to a manual pivoting of said access door through an initial distance toward either selected one of said closed and open positions, resiliently deflects said portion of said first structure and then causes said portion of said first structure to forcibly pivot said access door through a final distance to, and then releasably retain said access door in, the selected position.

12. The computer system of claim 11 wherein said CPU unit is a tower type CPU unit.

13. The computer system of claim 11 wherein:

said housing has an exterior bezel portion, and

said wall opening is formed in said exterior bezel portion.

14. The computer system of claim 11 wherein:

said first and second structures are respectively formed integrally with said housing and said access door.

15. The computer system of claim 14 wherein:

said wall opening is formed in a molded plastic wall portion of said housing,

said first structure is molded integrally with said wall portion,

said access door is of a molded plastic material, and

said second structure is molded integrally with said access door.

16. The computer system of claim 11 wherein:

said portions of said first and second structures are offset from the pivotally interfitted sections in a direction transverse to said axis.

EXHIBIT C  PAGE 50

6,125,031

7

17. The computer system of claim 11 wherein said axis extends generally horizontally.

18. The computer system of claim 11 wherein:

said first and second structures are operable to removably mount said access door on said housing.

19. The computer system of claim 18 wherein:

said first and second structures are operable to provide a removable snap-fit attachment of said access door to said housing.

20. Electronic apparatus comprising:

a housing having a wall opening therein;

an access door;

first and second interengaged portions of said housing and said access door extending along an axis and supporting said access door for pivotal motion relative to said housing about said axis between closed and open positions in which said access door respectively covers and uncovers said wall opening; and

third and fourth resiliently interengaged portions of said housing and said access door which, in response to a manual movement of said access door through an initial arc toward a selected one of said closed and open positions, function to forcibly move said access door through a final arc to, and then releasably retain said access door in, the selected position,

said third and fourth portions being offset from said first and second portions in a direction transverse to said axis.

21. The electronic apparatus of claim 20 wherein:

said first portion includes a pair of mounting tabs having holes therein, and

said second portion includes a pair of mounting pins rotatable received in said mounting tab holes.

22. The electronic apparatus of claim 21 wherein:

one of said mounting tabs is resiliently deflectable by one of said mounting pins in a manner permitting said mounting pins to be releasably snap-fitted into said holes.

23. The electronic apparatus of claim 20 wherein:

said third portion includes a resilient spring tab, and

said fourth portion includes a cam projection slidingly engaging said spring tab and operative to resiliently deflect it in response to pivotal movement of said access door relative to said housing.

24. The electronic apparatus of claim 22 wherein:

said third portion includes an opposing pair of resilient spring tabs positioned adjacent one of said mounting tabs, and an opposing pair of resilient spring tabs positioned adjacent the other of said mounting tabs, and

said fourth portion includes a spaced pair of cam arm projections each being positioned between a different one of said opposing pairs of resilient spring tabs and having opposite side edge portions slidingly engaging the opposing spring tabs and being positioned to resiliently deflect them in response to rotation of said access door relative to said housing.

25. The electronic apparatus of claim 20 wherein:

a wall portion of said housing is of a molded plastic construction and said first and third portions of said housing are integrally molded with said wall portion, and

said access door is of a molded plastic construction and said second and fourth portions of said access door are integrally molded with the balance of said access door.

8

26. The electronic apparatus of claim 20 wherein said electronic apparatus is a computer.

27. The electronic apparatus of claim 20 wherein:

said access door, when in said open position thereof, is swung edgewise through said wall opening into the interior of said housing.

28. A computer system comprising a CPU unit having a microprocessor and a data storage device for storing data that may be retrieved by said microprocessor, said CPU unit further comprising:

a housing having a wall opening therein;

an access door;

first and second interengaged portions of said housing and said access door extending along an axis and supporting said access door for pivotal motion relative to said housing about said axis between closed and open positions in which said access door respectively covers and uncovers said wall opening; and

third and fourth resiliently interengaged portions of said housing and said access door which, in response to a manual movement of said access door through an initial arc toward a selected one of said closed and open positions, function to forcibly move said access door through a final arc to, and then releasably retain said access door in, the selected position,

said third and fourth portions being offset from said first and second portions in a direction transverse to said axis.

29. The computer system of claim 28 wherein:

said first portion includes a pair of mounting tabs having holes therein, and

said second portion includes a pair of mounting pins rotatably received in said mounting tab holes.

30. The computer system of claim 29 wherein:

one of said mounting tabs is resiliently deflectable by one of said mounting pins in a manner permitting said mounting pins to be releasably snap-fitted into said holes.

31. The computer system of claim 28 wherein:

said third portion includes a resilient spring tab, and

said fourth portion includes a cam projection slidingly engaging said spring tab and operative to resiliently deflect it in response to pivotal movement of said access door relative to said housing.

32. The computer system of claim 30 wherein:

said third portion includes an opposing pair of resilient spring tabs positioned adjacent one of said mounting tabs, and an opposing pair of resilient spring tabs positioned adjacent the other of said mounting tabs, and

said fourth portion includes a spaced pair of cam arm projections each being positioned between a different one of said opposing pairs of resilient spring tabs and having opposite side edge portions slidingly engaging the opposing spring tabs and being positioned to resiliently deflect them in response to rotation of said access door relative to said housing.

33. The computer system of claim 28 wherein:

a wall portion of said housing is of a molded plastic construction and said first and third portions of said housing are integrally molded with said wall portion, and

said access door is of a molded plastic construction and said second third portions of said access door are integrally molded with the balance of said access door.



EXHIBIT __C__ PAGE 51


6,125,031

**9**

34. The computer system of claim 28 wherein:

said access door, when in said open position thereof, is swung edgewise through said wall opening into the interior of said housing.

35. Electronic apparatus comprising:

a housing having a wall opening therein;

an access door secured to said housing for pivotal motion relative thereto, about an axis extending through the interior of said housing in an inwardly spaced relationship with said wall opening, between a closed position in which said access door covers said wall opening, and an open position in which said access door is swung edgewise into the interior off said housing and uncovers said wall opening,

said access door having mounting projections disposed on opposite portions thereof and extending lengthwise outwardly from said opposite portions away from one another along said axis, and side sections extending laterally outwardly therefrom; and

a plurality of resilient members carried by said housing and being engageable by said laterally outwardly extending side sections at locations offset from said mounting projections in a direction transverse to said axis, during manual rotation of said access door through an initial distance toward a selected one of said closed and open positions, in a manner causing said plurality of resilient members to resiliently drive said access door a final distance to said selected position.

**10**

36. The electronic apparatus of claim 35 wherein said plurality of resilient members are operative to resiliently and releasably retain said access door in said selected position.

37. The electronic apparatus of claim 35 wherein said plurality of resilient members include first and second spring plate members extending into the interior of said housing from portions of said housing adjacent opposing side portions of said wall opening.

38. The electronic apparatus of claim 37 wherein:

said housing has a plastic wall portion in which said wall opening is disposed, and

said first and second spring plate members are integral plastic sections of said plastic wall portion.

39. The electronic apparatus of claim 35 wherein said projections have generally pin-like body portions, and said side sections extend laterally outwardly from diametrically opposite locations on said body portions.

40. The electronic apparatus of claim 39 wherein said access door is of a plastic construction and said projections are formed integrally therewith.

41. The electronic apparatus of claim 35 wherein said electronic apparatus is a computer.

42. The electronic apparatus of claim 41 wherein said computer is a tower type CPU unit.

* * * * *

EXHIBIT  C  PAGE 52



US006307740B1

(12) **United States Patent**

Foster et al.

(10) Patent No.:     **US 6,307,740 B1**

(45) Date of Patent:     **Oct. 23, 2001**

(54) **ONE INCH NOTEBOOK COMPUTER**

(75) Inventors: **Mark J. Foster**, Acton; **Michele Bovio**, Boston, both of MA (US)

(73) Assignee: **Compaq Information Technologies Group, L.P.**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/504,526**

(22) Filed: **Feb. 15, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 08/350,366, filed on Dec. 6, 1994.

(51) Int. Cl.[7] ............................ H05K 7/14; H05K 5/02; G06F 1/16

(52) U.S. Cl. ................................... 361/683; 361/680

(58) Field of Search ........................... 361/679–683; 364/708.1; 429/99, 100

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,107,401   4/1992   Youn ................................. 361/393

5,416,730   5/1995   Lookofsky ......................... 364/708.1
5,422,784   6/1995   Wakabara et al. .................. 361/680
5,475,626   12/1995   Vietto ............................. 364/708.1

*Primary Examiner*—Jayprakash N. Gandhi

(74) *Attorney, Agent, or Firm*—Conley, Rose & Tayon, P.C.; Michael F. Heim

(57)     **ABSTRACT**

A portable notebook computer having a thickness of only one inch is obtained by provision of a computer housing containing a keyboard assembly and a motherboard positioned directly below the keyboard assembly, the keyboard assembly and the motherboard thereby defining a region in the enclosure. The other components comprising the computer; i.e. a hard disk drive, a PCMCIA option slot, a trackball assembly, and a DC to DC convertor, are positioned in an adjacent and generally co-planar relationship with this region. A battery housing is mounted externally on the computer housing for supplying electrical power to the computer.

**30 Claims, 11 Drawing Sheets**





FIG. 1

EXHIBIT D PAGE 54



FIG. 2

**U.S. Patent**     Oct. 23, 2001     Sheet 3 of 11     US 6,307,740 B1



FIG. 3



FIG. 4

FIG. 5

U.S. Patent        Oct. 23, 2001        Sheet 5 of 11        US 6,307,740 B1



FIG. 6



FIG. 7b

FIG. 7c



FIG. 7a

EXHIBIT D PAGE 59

U.S. Patent     Oct. 23, 2001     Sheet 7 of 11     US 6,307,740 B1



FIG.8a                    FIG.8b



FIG.9a                    FIG.9b



FIG. 10





FIG. 11

U.S. Patent

Oct. 23, 2001

Sheet 10 of 11

US 6,307,740 B1



FIG. 12

U.S. Patent     Oct. 23, 2001     Sheet 11 of 11     US 6,307,740 B1





FIG.13

US 6,307,740 B1

1

# ONE INCH NOTEBOOK COMPUTER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of Ser. No. 08/350,336 filed Dec. 6, 1994.

## BACKGROUND OF THE INVENTION

The invention relates to computer systems and particularly to portable "notebook" computer form factors.

Users of personal computers have been liberated from the restrictions of desktop-only use with the introduction of portable "notebook" computers. The convenience and transportability of the notebook computer has produced a large and lucrative market for manufacturers of such machines. Portability is the key to the successful transport and use of a notebook computer in many different environments; therefore, notebook computer form factors are an exceedingly important consideration for the computer manufacturer seeking market share in this arena. The goal is to provide as thin and light-weight a machine as possible, while maintaining ease of usability of the machine.

In the past, notebook computer form factors have been limited by the sizes and placement of the necessary components within the computer. The computer designer must judiciously arrange the CPU motherboard, keyboard and keyboard baseplate, hard disk drive, options such as PCM-CIA slots, and the battery to provide the most compact form factor possible. To date, at least some of these components are placed beneath the keyboard baseplate, thereby sacrificing thinness in order to provide a convenient notebook computer length and width. To date, the thinnest notebook computer available is about one and one-half inches thick. It is desirable to provide an even thinner notebook computer form factor for the consumer market.

## SUMMARY OF THE INVENTION

According to the principles of the invention, there is provided a computer having a computer housing and a keyboard assembly in the housing. A motherboard is positioned directly below the keyboard assembly, the keyboard assembly and the motherboard thereby defining a region in the enclosure. The other components comprising the computer are positioned in an adjacent and generally co-planar relationship with this region, and a battery housing is mounted externally on tile computer housing for supplying electrical power to the computer. An exceptionally thin portable computer is thereby provided.

More specifically, a hard disk drive, a PCMCIA option slot, a trackball assembly, and a DC to DC convertor are all located in a position forward of the region and in an adjacent and generally co-planar relationship with the region. The battery housing is movably attached to a rear side of the computer housing for supplying electrical power to the computer. According to this invention, a portable notebook computer is provided which is only one inch thick, and therefore at least 50% thinner than presently available portable notebook computers.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top perspective view of a notebook computer, with its screen top open, embodying the principles of the invention;

FIG. 2 is a top perspective view from the rear of the notebook computer of FIG. 1 with its top closed. The case is exteriorly mounted battery pack is shown in its closed position;

2

FIG. 3 is a top perspective view from the rear of the notebook computer of FIGS. 1–2 with its top closed. The battery pack is illustrated in the open position;

FIG. 4 is a plan view of the computer from below. The under side of the notebook computer of FIG. 1 shows the rotatable and electric mounting of the battery pack.

FIG. 5 is a elevation view of the battery pack housing, removed from its computer mounting, embodying the principles of the invention;

FIG. 6 is a perspective view of the computer of FIG. 1 with its screen top and battery pack removed;

FIGS. 7(a)–7(c) are views of the electrical contact that couples one side of the battery housing to the computer housing;

FIGS. 8(a) and (b) are views of the joint for rotatably coupling the other side of the battery housing to the computer enclosure;

FIG. 9(a) and (b) are views of the mating socket in the computer housing which accepts the joint of FIGS. 8;

FIG. 10 is a perspective view, partly in section, of the keyboard assembly and motherboard within the computer enclosure of FIG. 1 arranged according to the principles of the invention;

FIG. 11 is a perspective view of the layout of additional electrical components arranged within the computer enclosure of FIG. 1 in accordance with the principles of the invention;

FIG. 12 is a perspective view of the computer enclosure of FIG. 1 illustrating the region occupied by the keyboard assembly and motherboard when arranged as shown in FIGS. 10 and 11.

FIG. 13 is a top view of the forward portion of the computer of FIG. 1 with electrical components indicated by dotted lines.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In FIG. 1 there is shown a portable notebook computer 10 embodying the principles of the invention. The notebook computer 10 includes a computer enclosure or computer housing 12, inside which the electronic components 14 (not shown) of the computer 10 reside (e.g. a CPU motherboard on which component chips reside, a hard disk drive, PCM-CIA slot, etc). On the top side of the computer housing 12 is a keyboard 16 for entering data and a trackball 18 used to move a cursor device about a display screen 20. The display screen 20 is rotatably mounted vial. a display screen hinge 22 at its rear edge 24 to the top side 26 of the computer housing 12 at its rear side 28.

On this rear side 28 is mounted a separate battery housing 30 which holds batteries 32 (FIG. 4) for supplying electrical power to the electronic components 14 within the computer housing 12. With the battery housing 30 mounted external to the computer housing 12, it is possible to arrange the electronic components 14 within the computer housing 12 to provide a very thin notebook computer 10.

According to the principles of the invention, the battery housing 30 is movably mounted on the computer housing 12 and dimensioned such that the battery housing 30 can move between a closed position 34 wherein the battery housing 30 covers the rear wall 36 at the rear side 28 of the computer housing 12 (FIG. 2) and an open position 38 wherein the battery housing 30 serves to elevate the rear wall 36 of the computer housing 12 to provide a convenient typing angle when the computer 10 is resting on a support surface 40

US 6,307,740 B1

3

(FIG. 3). Referring now to FIGS. 2 and 3, the battery housing 30 is shown rotatably mounted on the computer housing 12 such that the battery housing 30 rotates between the closed position 34 and the open position 38.

In FIG. 3, it can be seen that on the rear wall 36 of the computer housing 12 are connectors 42 for electrically connecting the computer 10 to the peripheral devices: serial communications lines, parallel printers, and the like. In FIG. 2, when the battery housing 30 is rotated into the closed position 34, it covers the connectors 42, and the bottom sides 44 and 46 of the computer housing 12 and battery housing 30 respectively then provide a continuous flat surface 48. In FIG. 3, when the battery housing 30 is shown rotated into the open position 38, the connectors 42 are exposed for use. Moreover, when rotated into the open position 38, the battery housing 30 serves to elevate the rear side 28 of the computer housing 12 to an angle 50 comfortable for typing on the keyboard 16. A comfortable typing angle 50 is known to be generally between 5 and 10 degrees.

As shown in FIG. 3, the battery housing 30 is an elongated housing having a narrow portion 52 and a wide portion 54. The narrow portion 52 is placed such that it, is generally coextensive with the connectors 42 on the rear wall 36 of the computer housing 12 when the battery housing 30 is mounted on the computer housing 12. The axis of rotation 56 of the battery housing (FIG. 2) is shown to extend through the wide portion 54 of the battery housing 30 so that when the battery housing 30 is rotated into the closed position 34 the narrow portion 52 covers the connectors 42, and when the battery housing 30 is rotated into the open position 38 there is provided above the narrow portion 52 a space 58 through which the connectors 42 are exposed. Preferably, the connectors 42 are positioned centrally on the rear wall 36 of the computer housing 12, and the narrow portion 52 of the battery housing 30 is positioned in the center 60 of the battery housing 30 so that it is coextensive with the connectors 42 when the battery housing 30 is mounted on the computer housing 12.

In addition to being movable when mounted on the computer housing 12, it is convenient, as shown, to have the battery housing 30 removably mounted. Referring specifically to FIG. 5, the battery housing 30 is shown removed from the computer housing 12.

Referring now to FIGS. 4 and 5, the battery housing 30 of FIG. 5 has the narrow portion 52 and two wider end portions 62. In the embodiment shown, a total of six batteries 32 can be held within the battery housing 30. Two batteries 32 reside in adjacent relationship within each wider end portion 62, and two batteries 32 reside in lengthwise relationship within the narrow portion 52.

The wider end portions 62 of the battery housing 30 form opposing inwardly facing surfaces 64. An opening 66 is formed between the opposing inwardly facing surfaces 64, which forms the space 58 through which the connectors 42 are exposed when the battery housing 30 is mounted on the computer housing 12 and rotated into the open position 38 (FIG. 3).

Referring to FIGS. 4 and 6, the rear wall 36 of the computer housing 12 is shaped such that it has a central extended portion 68. The connectors 42 are located on this central extended portion 68. The central extended portion 68 has opposite outwardly facing sides 70. When the battery housing 30 is mounted on the computer housing 12, the central extended portion 68 of the battery housing 12 is located between the wider end portions 62 of the battery housing 30 such that the outwardly facing sides 70 of the battery

4

central extended portion 68 oppose the respective inwardly facing surfaces 64 of the wider end portions 62 of the battery housing 30.

The battery housing 30 includes an electrical contact 72 located at one of the inwardly facing surfaces 64 effective to provide electrical power to the computer 10 during rotational movement of the battery housing 30. When the battery housing 30 is mounted on the computer housing 12, the electrical contact 72 mates with a mating electrical contact 76 located on the respective outwardly facing side 70 of the central extended portion 68 of the computer housing 12. Electrical power is transferred between the batteries 32 and the components 14 within the computer housing 12 via the electrical contact 72 and mating electrical contact 76. Preferably, the electrical contact 72 is rotatable to permit the battery housing 30 to rotate when inserted in the computer housing, while maintaining an electrical connection between the batteries 32 and the electrical contact 76.

Referring to FIGS. 7(a)–7(c), the electrical contact 72 and mating electrical contact 76 are shown in further detail. The electrical contact 72 is a cylindrically shaped member 80 on which several recessed copper contact strips 82 are circumferentially located. These contact strips 82 are electrically connected to the batteries 32 within the battery housing 30. The mating electrical contact 76 located on the computer housing 12 is a U-shaped contact including several copper sliders 84. When the battery housing 30 is mounted on the computer housing 12, the electrical contact 72 rests in the U-shaped contact such that the contact strips 82 electrically contact the sliders 84. Electrical power is then transferred from the batteries 32 through the contact strips 82 to the sliders 84 and on to power regulation and distribution circuitry located within the computer housing 12 which supplies the required voltages to the various components 14 within the computer housing 12. According to the embodiment shown, the batteries 32 are arranged two in series, three in parallel to provide 7.2 Volts at up to 4 Amps.

Referring now to FIGS. 4, 6, 8, and 9, on the opposite inwardly facing surface 64 of the battery housing 30 is shown a joint 88 which mates with a rotatable socket 90 located on the respective outwardly facing side 70 of the central extended portion 68 of the computer housing 12. The socket 90 includes a key or tab 92 which fits into a slot 94 centrally located through the joint 88. Rotation of the battery housing 30 is thus provided via the respective interactions between the rotatable electrical contact 72 and mating electrical contact 76, and between the joint 88 and the rotatable socket 90.

As shown in FIG. 4, on the bottom side 96 of the computer housing 12 two slidably mounted tab covers 98 slide to cover and uncover the mating electrical contact and the rotatable socket 90. In order to remove the battery housing 30 from the computer housing 12, the battery housing 30 is rotated into the open position 38 and the slidable tab covers 98 are slid toward each other to expose the rotatable connections. The open side of the U-shaped contact 100 is exposed, as is an open end of the slot 94. The battery housing 30 can then be lifted from the computer housing 12 so that the cylindrical electrical contact 72 is lifted through the open. end of the U-shaped mating electrical contact 76, and the tab 92 of the joint 88 is lifted out of the slot 94. The battery housing 30 can be re-installed via the opposite motion wherein the cylindrical electrical contact 72 is dropped into the U-shaped mating electrical contact 76 and the tab 92 is placed into the slot 94. Sliding the tab covers 98 away from each other then locks the battery housing 30 to the computer housing 12 and allows rotatable motion of the battery housing 30 relative to the computer housing 12.

US 6,307,740 B1

5

Other rotatable electrical contacts can be employed in place of the rotatable electrical contact 72 and mating electrical contact 76 herein shown while still maintaining rotatable electrical contact according to the principles of the invention. For example, a standard rotatable jack such as a headphone jack could be employed. Or, circular metallic contacts such as circular strips of copper could be located on the face of the cylindrical contact shown rather than circumferentially around it. The mating electrical contact 76 could then be a channel into which the cylindrical electrical contact 72 drops. The circular strips of copper would then mate with an opposing electrical contact on an inner face of the channel. Alternatively, the narrow portion 52 of the battery housing 30 could include straight metal pins extending laterally along its longitudinal axis which mate with cooperating sockets on the computer housing. The sockets would be shaped such that electrical contact is maintained throughout the range of motion of the pins as the battery housing 30 is rotated.

Referring back to FIGS. 2 and 3, on the outwardly facing surface 78 of each of the wider end portions 62 of the battery housing 30 is formed a channel 102 extending in a direction along the axis of rotation 104 of the display screen 20. The shape of the channel 102 complements the shape of the rear edge 24 of the display screen 20 so that the display screen 20 can rotate without interference between the rear edge 24 and the outwardly facing surface 78 of the battery housing 30 when the battery housing 30 is rotated into the closed position 34. As shown in FIG. 2, the rounded rear edge 24 of the display screen 20 rests in the U-shaped channel 102.

Furthermore, as shown in FIG. 3, the portion 105 of the outwardly facing surface 78 of each wider end portion 62 which is located between the channel 102 and the computer housing 12 when the battery housing 30 is rotated into the closed position 34 is radiused so that the battery housing 30 can rotate between the closed position 34 and the open position 38 without interference with the read edge 24 of the display screen 20.

The very thin notebook computer herein described is but one of the many possible advantageous electronic device arrangements which can conceivably be obtained through application of the broad principle of the present invention which provides for the movable attachment of a battery housing to an electronic apparatus.

Furthermore, the very thin notebook computer 10 having a movable battery housing 30 mounted external to the computer housing 12 as presented herein is intended as only one example of this application of the present invention. Many arrangements falling within this computer application of the broad principle are conceivable. For instance, though the battery housing 30 is shown as rotatably mounted on the computer housing 12, the battery housing 30 could be movably mounted on the computer housing 12 by other means; for instance, by a sliding mechanism which would cause the battery housing 30 to slide in a closed position downwards relative to the computer housing 12, to an open position when the computer 10 is in use.

Moreover, though a computer housing 12 with a single central extended portion 68 for mating with a battery housing 30 having a central narrow portion 52 and two wider end portions 62 has been described, the narrow portion 52 could be located at an end of the battery housing 30, or a computer housing 12 with multiple extensions could conceivably mate with a battery housing 30 having multiple wider sections between which the multiple extensions of the computer housing 12 can mate.

6

Then, too, non-rotatable electrical contacts might be used, the battery housing being rendered movable by means other than rotatable electrical contacts. For example, standard mechanical hinges could be employed for rotation, while electrical contact is maintained via flexible wiring.

According to a further aspect of the invention, the placement of the battery housing 30 external to the computer housing 12 is combined with a particular layout of the electronic components 14 within the computer housing 12 to provide the very thin notebook computer 10. Referring now to the assembly views of FIGS. 10–13, located in the computer housing 12 is a generally rectangular keyboard assembly 106, which includes the keyboard 16 and a keyboard baseplate 108. A generally rectangular CPU motherboard 110 having component chips 112 mounted thereon is positioned directly below the keyboard assembly 106. As shown, the CPU motherboard 110 is of generally the same major dimensions as the keyboard assembly 106, the keyboard assembly 106 and motherboard 110 thereby defining a region 'A' within the enclosure. The remaining components 14 within the computer housing 12 reside in adjacent and generally co-planar relationship with this region.

In particular, adjacent to and generally coplanar with the region 'A' are placed a DC to DC converter 114, a hard disk drive 116, a trackball assembly 118 including the trackball 18, and a PCMCIA option slot 120. According to this arrangement, the DC to DC converter 114, the hard disk drive 116, the trackball assembly 118, the PCMCIA option slot 120, and the battery housing 30 all reside adjacent to and generally co-planar with each other and with the region 'A' and in which the keyboard assembly 106 and the motherboard 110 reside, resulting in a substantially thinner computer 10 than that provided by the prior art arrangement, wherein at least one of the hard disk drive 102, PCMCIA 108, or batteries 54 resides below the keyboard.

Referring in addition to FIG. 2, as shown, the height 122 of the computer 10 when the display screen 20 is folded down onto the computer housing 12 is approximately 1.0 inches (FIG. 2). The display screen 20 is shown to be approximately 7.5 mm thick. The computer housing 12 is approximately 18 mm high, with the top wall 128 and bottom wall 130 being approximately 1.2 mm thick. The keyboard assembly 106 has a height 132 of approximately 8.6 mm, and is placed towards the rear side 28 of the computer housing 12, directly above the motherboard 110, which has a width 134 of approximately 1 mm and is placed approximately 2 mm below the keyboard baseplate 108 (136). A 12.5 mm hard disk drive 116, a Dual Type II/Single Type III PCMCIA option slot 120 of less than 13 mm in height, and a trackball assembly 118 of less than 13 mm in height reside forward of, adjacent to, and coplanar with the region 'A'. A computer 10 having a total thickness of one inch results—thereby providing a 33%–70% thinness advantage over prior art notebook computers.

Also, though the embodiment shown presents a layout wherein the hard disk drive 116, trackball assembly 118, and PCMCIA option slot 120 are located in front of the keyboard assembly 106, the respective positions of these components can conceivably be reversed to obtain the same thinness advantage.

It is apparent that, within the scope of the invention, modifications and different arrangements may be made other than as herein disclosed. The present disclosure is merely illustrative, the invention comprehending all variations thereof.

What is claimed is:

EXHIBIT D   PAGE 67

US 6,307,740 B1

7

1. A notebook computer, comprising:
a computer housing with a generally rectangular configuration, including a top side, a bottom, a front side and a rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;
a keyboard assembly mounted on the top side of said computer housing;
a lid including a display mounted therein, said lid being rotatably attached to the top side of said computer housing near the rear side, and covering substantially the entire top side of said housing when closed;
a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing, and wherein at least a portion of said motherboard is positioned underneath the keyboard assembly to define a region bounded on the upper and lower side by the keyboard assembly and the motherboard;
a hard disk drive positioned in said housing in an area outside of said region, and toward the front side of said housing;
a peripheral device positioned in said housing in an area outside of said region, and toward the front side of said housing; and
an input pointing device positioned in said housing in an area outside of said region, and toward the front side of said housing.

2. A notebook computer as in claim 1, wherein said peripheral device comprises a PCMCIA slot.

3. A notebook computer as in claim 1, wherein said input pointing device comprises a trackball and associated control circuitry.

4. A notebook computer as in claim 1, further comprising a battery located in a battery housing, separate from said computer housing, said battery housing being rotatably attached to said computer housing along the rear side of said computer housing.

5. A notebook computer as in claim 4, wherein said battery housing is capable of accommodating two or more batteries.

6. A notebook computer as in claim 5, wherein said battery housing is capable of accommodating four or more batteries.

7. A notebook computer as in claim 4, wherein said battery housing includes a narrow section flanked by two wide sections and said computer housing includes a central extended. portion on the rear side.

8. A notebook computer as in claim 7, wherein said motherboard includes one or more input/output connectors accessible through the extended portion on the rear side of said computer housing, and wherein said battery housing is rotatable about the rear side of said computer housing to expose said input/output connectors in an area defined by said narrow section.

9. A notebook computer as in claim 8, wherein said battery housing rotates about said rear side of said computer housing between an open and a closed position; and
wherein said battery housing covers said input/output connectors when in a closed position, and exposes said input/output connectors when in an open position.

10. A notebook computer as in claim 9, wherein said battery provides a support at the rear side of said computer housing, causing said computer housing to slope at an inclined angle from rear side to front side when the battery housing is in the open position.

11. A notebook computer as in claim 1, wherein said notebook computer has a thickness not substantially greater than one inch when said lid is closed.

8

12. A notebook computer as in claim 1, wherein said motherboard is wholly contained within said computer housing.

13. A notebook computer as in claim 12, wherein said motherboard is positioned directly below said keyboard assembly.

14. An ultra-thin notebook computer, comprising:
a computer housing including a top side, a bottom, a front side, rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;
a lid, including a display, rotatably attached to the top side of said computer housing near the rear side, said lid covering substantially the entire top side of said housing when closed;
a keyboard assembly mounted on the top side of said computer housing;
a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing and mounted completely within said computer housing, and wherein said motherboard is positioned beneath the keyboard assembly to define a region bounded by the keyboard assembly and the motherboard;
a hard disk drive positioned in said housing outside of said region, and in an area on the front side of said housing relative to said region;
a PCMCIA slot positioned in said housing outside of said region, and in an area on the front side of said housing relative to said region; and
an input pointing device and associated control circuitry positioned in said housing outside of said region and in an area on the front side of said housing relative to said region.

15. A notebook computer as in claim 14, further comprising a battery located in a battery housing separate from said computer housing, said battery housing rotatably attaching to said computer housing along the rear side of said computer housing.

16. A notebook computer as in claim 15, wherein said battery housing is capable of accommodating two or more batteries.

17. A notebook computer as in claim 16, wherein said battery housing is capable of accommodating at least four batteries.

18. A notebook computer as in claim 15, wherein said battery housing includes a narrow section positioned between two wide sections, and wherein said motherboard includes one or more input/output connectors exposed on the rear side of said computer housing, and said battery housing is rotatable about the rear side of said computer housing to expose said input/output connectors in an aperture defined by said narrow section.

19. A notebook computer as in claim 18, wherein said battery housing rotates about said rear side of said computer housing between an open and a closed position; and
wherein said battery housing covers said input/output connectors when in a closed position, and exposes said input/output connectors when in an open position.

20. A notebook computer as in claim 14, wherein said notebook computer has a thickness not substantially greater than one inch when the lid is closed.

21. An ultra-thin notebook computer, comprising:
a computer housing including a top side, a bottom, a front side and a rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;
a lid, including a display, rotatably attached to the top side of said computer housing near the rear side, said

US 6,307,740 B1

9

lid covering substantially the entire top side of said housing when closed;

a keyboard and keyboard base plate mounted on the top side of said computer housing;

a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing, and wherein said motherboard is positioned underneath the keyboard base plate to define a region bounded by the keyboard base plate and the motherboard;

a hard disk drive positioned in said housing outside of said region, in an area on the front side of said housing;

a PCMCIA drive positioned in said housing outside of said region, in an area on the front side of said housing;

a pointing device positioned in said housing outside of said region, in an area on the front side of said housing;

a battery located in a battery housing separate from said computer housing, said battery housing rotatably attaching to said computer housing along the rear side of said computer housing;

wherein said battery housing is capable of accommodating two or more batteries.

22. A notebook computer as in claim 21, wherein said battery housing is capable of accommodating four or more batteries.

23. A notebook computer as in claim 21, wherein said battery housing includes a narrow section positioned between two wide sections.

24. A notebook computer as in claim 23, wherein said motherboard includes one or more input/output connectors exposed on the rear side of said computer housing, and wherein said battery housing is rotatable about said rear side of said computer housing between an open and a closed position; and

10

wherein said battery housing covers said input/output connectors when in a closed position, and exposes said input/output connectors when in an open position.

25. A notebook computer as in claim 24, wherein said battery provides a support at the rear side of said computer housing, causing said computer housing to slope at an inclined angle from the rear side to the front side when the battery housing is in the open position.

26. A notebook computer as in claim 22, wherein said notebook computer has a thickness not substantially greater than one inch when said lid is closed.

27. A notebook computer as in claim 26, wherein said display has a surface area substantially greater than the surface area of the keyboard.

28. A notebook computer as in claim 24, wherein said computer housing includes a central extended portion on the rear side defining outwardly facing sides in which a conductive channel is formed; and

wherein said battery housing includes a pair of inwardly facing electrical contacts mounted on said wide sections to mate with said conductive channels when said battery housing is attached to said computer housing.

29. A notebook computer as in claim 28, wherein said electrical contacts comprise; a rotatable socket that includes a tab and a joint with a slot formed therein for receiving said tab.

30. A notebook computer as in claim 29, wherein said conductor channel comprises a U-shaped housing with electrical sliders mounted within said U-shaped housing to mate electrically with said electrical contact.

* * * * *



US006426871B2

(12) **United States Patent**
Foster et al.

(10) Patent No.: **US 6,426,871 B2**
(45) Date of Patent: *Jul. 30, 2002

(54) ONE INCH NOTEBOOK COMPUTER

(75) Inventors: Mark J. Foster, Acton; Michele Bovio, Boston, both of MA (US)

(73) Assignee: Compaq Information Technologies Group, L.P., Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 09/921,215

(22) Filed: Aug. 2, 2001

**Related U.S. Application Data**

(63) Continuation of application No. 09/504,526, filed on Jul. 15, 2000, now Pat. No. 6,307,740, which is a continuation of application No. 08/350,366, filed on Dec. 6, 1994, now abandoned.

(51) Int. Cl.[7] ........................... H05K 7/14; H05K 5/02; G06F 1/16

(52) U.S. Cl. ........................................ 361/683; 361/680

(58) Field of Search .................................. 361/679–683; 429/100

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,107,401 A | 4/1992 | Youn | 361/393 |
| 5,414,673 A | 5/1995 | Lookofsky | 364/708.1 |
| 5,422,784 A | 6/1995 | Wakabara et al. | 361/680 |
| 5,475,626 A | 12/1995 | Viletto | 364/708.1 |
| 6,307,740 B1 * | 10/2001 | Foster et al. | 361/683 |

* cited by examiner

*Primary Examiner*—Jayprakash N. Gandhi
(74) *Attorney, Agent, or Firm*—Conley, Rose & Tayon, P.C.

(57) **ABSTRACT**

A portable notebook computer having a thickness of only one inch is obtained by provision of a computer housing containing a keyboard assembly and a motherboard positioned directly below the keyboard assembly, the keyboard assembly and the motherboard thereby defining a region in the enclosure. The other components comprising the computer; i.e. a hard disk drive, a PCMCIA option slot, a trackball assembly, and a DC to DC convertor, are positioned in an adjacent and generally co-planar relationship with this region. A battery housing is mounted externally on the computer housing for supplying electrical power to the computer.

**25 Claims, 11 Drawing Sheets**



**U.S. Patent**     Jul. 30, 2002     Sheet 1 of 11     US 6,426,871 B2



FIG. 1



FIG. 2



FIG. 3



FIG. 4

FIG. 5

U.S. Patent    Jul. 30, 2002    Sheet 5 of 11    US 6,426,871 B2



FIG. 6



**U.S. Patent**      Jul. 30, 2002      Sheet 7 of 11      US 6,426,871 B2



FIG.8a          FIG.8b

FIG.9a          FIG.9b

EXHIBIT _E_  PAGE_77_



FIG. 10

U.S. Patent     Jul. 30, 2002     Sheet 9 of 11     US 6,426,871 B2



FIG. 11



FIG. 12




US 6,426,871 B2

**1**

# ONE INCH NOTEBOOK COMPUTER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 09/504,526, filed Feb. 15, 2000, now U.S. Pat No. 6,307,740, which was a continuation of U.S. Ser. No. 08/350,366, filed Dec. 6, 1994, now abandoned.

## BACKGROUND OF THE INVENTION

The invention relates to computer systems and particularly to portable "notebook" computer form factors.

Users of personal computers have been liberated from the restrictions of desktop-only use with the introduction of portable "notebook" computers. The convenience and transportability of the notebook computer has produced a large and lucrative market for manufacturers of such machines. Portability is the key to the successful transport and use of a notebook computer in many different environments; therefore, notebook computer form factors are an exceedingly important consideration for the computer manufacturer seeking market share in this arena. The goal is to provide as thin and light-weight a machine as possible, while maintaining ease of usability of the machine.

In the past, notebook computer form factors have been limited by the sizes and placement of the necessary components within the computer. The computer designer must judiciously arrange the CPU motherboard, keyboard and keyboard baseplate, hard disk drive, options such as PCM-CIA slots, and the battery to provide the most compact form factor possible. To date, at least some of these components are placed beneath the keyboard baseplate, thereby sacrificing thinness in order to provide a convenient notebook computer length and width. To date, the thinnest notebook computer available is about one and one-half inches thick. It is desirable to provide an even thinner notebook computer form factor for the consumer market.

## SUMMARY OF THE INVENTION

According to the principles of the invention, there is provided a computer having a computer housing and a keyboard assembly in the housing. A motherboard is positioned directly below the keyboard assembly, the keyboard assembly and the motherboard thereby defining a region in the enclosure. The other components comprising the computer are positioned in an adjacent and generally co-planar relationship with this region, and a battery housing is mounted externally on the computer housing for supplying electrical power to the computer. An exceptionally thin portable computer is thereby provided.

More specifically, a hard disk drive, a PCMCIA option slot, a trackball assembly, and a DC to DC convertor are all located in a position forward of the region and in an adjacent and generally co-planar relationship with the region. The battery housing is movably attached to a rear side of the computer housing for supplying electrical power to the computer. According to this invention, a portable notebook computer is provided which is only one inch thick, and is therefore at least 50% thinner than presently available portable notebook computers.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top perspective view of a notebook computer, with its screen top open, embodying the principles of the invention;

**2**

FIG. 2 is a top perspective view from the rear of the notebook computer of FIG. 1 with its top closed. The exteriorly mounted battery pack is shown in its closed position;

FIG. 3 is a top perspective view from the rear of the notebook computer of FIGS. 1–2 with its top closed. The battery pack is illustrated in the open position;

FIG. 4 is a plan view of the computer from below. The under side of the notebook computer of FIG. 1 shows the rotatable and electric mounting of the battery pack.

FIG. 5 is a elevation view of the battery pack housing, removed from its-computer mounting, embodying the principles of the invention;

FIG. 6 is a perspective view of the computer of FIG. 1 with its screen top and battery pack removed;

FIGS. 7(a)–7(c) are views of the electrical contact that couples one side of the battery housing to the computer housing;

FIGS. 8(a) and (b) are views of the joint for rotatably coupling the other side of the battery housing to the computer enclosure;

FIGS. 9(a) and (b) are views of the mating socket on the computer housing which accepts the joint of FIGS. 8;

FIG. 10 is a perspective view, partly in section, of the keyboard assembly and motherboard within the computer enclosure of FIG. 1 arranged according to the principles of the invention;

FIG. 11 is a perspective view of the layout of additional electrical components arranged within the computer enclosure of FIG. 1 in accordance with the principles of the invention;

FIG. 12 is a perspective view of the computer enclosure of FIG. 1 illustrating the region occupied by the keyboard assembly and motherboard when arranged as shown in FIGS. 10 and 11.

FIG. 13 is a top view of the forward portion of the computer of FIG. 1 with electrical components indicated by dotted lines.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In FIG. 1 there is shown a portable notebook computer 10 embodying the principles of the invention. The notebook computer 10 includes a computer enclosure or computer housing 12, inside which the electronic components 14 (not shown) of the computer 10 reside (e.g. a CPU motherboard on which component chips reside, a hard disk drive, PCM-CIA slot, etc). On the top side of the computer housing 12 is a keyboard 16 for entering data and a trackball 18 used to move a cursor device about a display screen 20. The display screen 20 is rotatably mounted via a display screen hinge 22 at its rear edge 24 to the top side 26 of the computer housing 12 at its rear side 28.

On this rear side 28 is mounted a separate battery housing 30 which holds batteries 32 (FIG. 4) for supplying electrical power to the electronic components 14 within the computer housing 12. With the battery housing 30 mounted external to the computer housing 12, it is possible to arrange the electronic components 14 within the computer housing 12 to provide a very thin notebook computer 10.

According to the principles of the invention, the battery housing 30 is movably mounted on the computer housing 12 and dimensioned such that the battery housing 30 can move between a closed position 34 wherein the battery housing 30

US 6,426,871 B2

3

covers the rear wall 36 at the rear side 28 of the computer housing 12 (FIG. 2) and an open position 38 wherein the battery housing 30 serves to elevate the rear wall 36 of the computer housing 12 to provide a convenient typing angle when the computer 10 is resting on a support surface 40 (FIG. 3). Referring now to FIGS. 2 and 3, the battery housing 30 is shown rotatably mounted on the computer housing 12 such that the battery housing 30 rotates between the closed position 34 and the open position 38.

In FIG. 3, it can be seen that on the rear wall 36 of the computer housing 12 are connectors 42 for electrically connecting the computer 10 to the peripheral devices: serial communications lines, parallel printers, and the like. In FIG. 2, when the battery housing 30 is rotated into the closed position 34, it covers the connectors 42, and the bottom sides 44 and 46 of the computer housing 12 and battery housing 30 respectively then provide a continuous flat surface 48. In FIG. 3, when the battery housing 30 is shown rotated into the open position 38, the connectors 42 are exposed for use. Moreover, when rotated into the open position 38, the battery housing 30 serves to elevate the rear side 28 of the computer housing 12 to an angle 50 comfortable for typing on the keyboard 16. A comfortable typing angle 50 is known to be generally between 5 and 10 degrees.

As shown in FIG. 3, the battery housing 30 is an elongated housing having a narrow portion 52 and a wide portion 54. The narrow portion 52 is placed such that it is, generally coextensive with the connectors 42 on the rear wall 36 of the computer housing 12 when the battery housing 30 is mounted on the computer housing 12. The axis of rotation 56 of the battery housing (FIG. 2) is shown to extend through the wide portion 54 of the battery housing 30 so that when the battery housing 30 is rotated into the closed position 34 the narrow portion 52 covers the connectors 42, and when the battery housing 30 is rotated into the open position 38 there is provided above the portion 52 a space 58 through which the connectors 42 are exposed. Preferably, the connectors 42 are positioned centrally on the rear wall 36 of the computer housing 12, and the narrow portion 52 of the battery housing 30 is positioned in the center 60 of the battery housing 30 so that it is coextensive with the connectors 42 when the battery housing 30 is mounted on the computer housing 12.

In addition to being movable when mounted on the computer housing 12, it is convenient, as shown, to have the battery housing 30 removably mounted. Referring specifically to FIG. 5, the battery housing 30 is shown removed from the computer housing 12.

Referring now to FIGS. 4 and 5, the battery housing 30 of FIG. 5 has the narrow portion 52 and two wider end portions 62. In the embodiment shown, a total of six batteries 32 can be held within the battery housing 30. Two batteries 32 reside in a relationship within each wider end portion 62, and two batteries 32 reside in lengthwise relationship within the narrow portion 52.

The wider end portions 62 of the battery housing 30 form opposing inwardly facing surfaces 64. An opening 66 is formed between the opposing inwardly facing surfaces 64, which forms the space 58 through which the connectors 42 are exposed when the battery housing 30 is mounted on the computer housing 12 and rotated into the open position 38 (FIG. 3).

Referring to FIGS. 4 and 6, the rear wall 36 of the computer housing 12 is shaped such that it has a central extended portion 68. The connectors 42 are located on this central extended portion 68. The central extended portion 68

4

has opposite outwardly facing sides 70. When the battery housing 30 is mounted on the computer housing 12, the central extended portion 68 of the computer housing 12 is located between the wider end portions 62 of the battery housing 30 such that the outwardly facing sides 70 of the central extended portion 68 oppose the respective inwardly facing surfaces 64 of the wider end portions 62 of the battery housing 30.

The battery housing 30 includes an electrical contact 72 located at one of the inwardly facing surfaces 64 effective to provide electrical power to the computer 10 during rotational movement of the battery housing 30. When the battery housing 30 is mounted on the computer housing 12, the electrical contact 72 mates with a mating electrical contact 76 located on the respective outwardly facing side 70 of the central extended portion 68 of the computer housing 12. Electrical power is transferred between the batteries 32 and the components 14 within the computer housing 12 via the electrical contact 72 and mating electrical contact 76. Preferably, the electrical contact 72 is rotatable to permit the battery housing 30 to rotate when inserted in the computer housing, while maintaining an electrical connection between the batteries 32 and the electrical contact 76.

Referring to FIGS. 7(a)–7(c), the electrical contact 72 and mating electrical contact 76 are shown in further detail. The electrical contact 72 is a cylindrically shaped member 80 on which several recessed copper contact strips 82 are circumferentially located. These contact strips 82 are electrically connected to the batteries 32 within the battery housing 30. The mating electrical contact 76 located on the computer housing 12 is a U-shaped contact including several copper sliders 84. When the battery housing 30 is mounted on the computer housing 12, the electrical contact 72 rests in the U-shaped contact such that the contact strips 82 electrically contact the sliders 84. Electrical power is then transferred from the batteries 32 through the contact strips 82 to the sliders 84 and on to power regulation and distribution circuitry located within the computer housing 12 which supplies the required voltages to the various components 14 within the computer housing 12. According to the embodiment shown, the batteries 32 are arranged two in series, three in parallel to provide 7.2 Volts at up to 4 Amps.

Referring now to FIGS. 4, 6, 8, and 9, on the opposite inwardly facing surface 64 of the battery housing 30 is shown a joint 88 which mates with a rotatable socket 90 located on the respective outwardly facing side 70 of the central extended portion 68 of the computer housing 12. The socket 90 includes a key or tab 92 which fits into a slot 94 centrally located through the joint 88. Rotation of the battery housing 30 is thus provided via the respective interactions between the rotatable electrical contact 72 and mating electrical contact 76, and between the joint 88 and the rotatable socket 90.

As shown FIG. 4, on the bottom side 96 of the computer housing 12 two slidably mounted tab covers 98 slide to cover and uncover the mating electrical contact and the rotatable socket 90. In order to remove the battery housing 30 from the computer housing 12, the battery housing 30 is rotated into the open position 38 and the slidable tab covers 98 are slid toward each other to expose the rotatable connections. The open side of the U-shaped contact 100 is exposed, as is an open end of the slot 94. The battery housing 30 can then be lifted from the computer housing 12 so that the cylindrical electrical contact 72 is lifted through the open end of the U-shaped mating electrical contact 76, and the tap 92 of the joint 88 is lifted out of the slot 94. The battery housing 30 can be re-installed via the opposite motion

US 6,426,871 B2

5

6

wherein the cylindrical electrical contact 72 is dropped into the U-shaped mating electrical contact 76 and the tab 92 is placed into the slot 94.

Sliding the tab covers 98 away from each other then locks the battery housing 30 to the computer housing 12 and allows rotatable motion of the battery housing 30 relative to the computer housing 12.

Other rotatable electrical contacts can be employed in place of the rotatable electrical contact 72 and mating electrical contact 76 herein shown while still maintaining rotatable electrical contact according to the principles of the invention. For example, a standard rotatable jack such as a headphone jack could be employed. Or, circular metallic contacts such as circular strips of copper could be located on the face of the cylindrical contact shown rather than cir- cumferentially around it. The mating electrical contact 76 could then be a channel into which the cylindrical electrical contact 72 drops. The circular strips of copper would then mate with an opposing electrical contact on an inner face of the channel. Alternatively, the narrow portion 52 of the battery housing 30 could include straight metal pins extend- ing laterally along its longitudinal axis which mate with cooperating sockets on the computer housing. The sockets would be shaped such that electrical contact is maintained throughout the range of motion of the pins as the battery housing 30 is rotated.

Referring back to FIGS. 2 and 3, on the outwardly facing surface 78 of each of the wider end portions 62 of the battery housing 30 is formed a channel 102 extending in a direction along the axis of rotation 104 of the display screen 20. The shape of the channel 102 complements the shape of the rear edge 24 of the display screen 20 so that the display screen 20 can rotate without interference between the rear edge 24 and the outwardly facing surface 78 of the battery housing 30 when the battery housing 30 is rotated into the closed position 34. As shown in FIG. 2, the rounded rear edge 24 of the display screen 20 rests in the U-shaped channel 102.

Furthermore, as shown in FIG. 3, the portion 106 of the outwardly facing surface 78 of each wider end portion 62 which is located between the channel 102 and the computer housing 12 when the battery housing 30 is rotated into the closed position 34 is radiused so that the battery housing 30 can rotate between the closed position 34 and the open position 38 without interference with the read edge 24 of the display screen 20.

The very thin notebook computer herein described is but one of the many possible advantageous electronic device arrangements which can conceivably be obtained through application of the broad principle of the present invention which provides for the movable attachment of a battery housing to an electronic apparatus.

Furthermore, the very thin notebook computer 10 having a movable battery housing 30 mounted external to the computer housing 12 as presented herein is intended as only one example of this application of the present invention. Many arrangements falling within this computer application of the broad principle are conceivable. For instance, though the battery housing 30 is shown as rotatably mounted on the computer housing 12, the battery housing 30 could be movably mounted on the computer housing 12 by other means; for instance, by a sliding mechanism which would cause the battery housing 30 to slide in a closed position downwards relative to the computer housing 12, to an open position when the computer 10 is in use.

Moreover, though a computer housing 12 with a single central extended portion 68 for mating with a battery hous- ing 30 having a central narrow portion 52 and two wider end portions 62 has been described, the narrow portion 52 could be located at an end of the battery housing 30, or a computer housing 12 with multiple extensions could conceivably mate with a battery housing 30 having multiple wider sections between which the multiple extensions of the computer housing 12 can mate.

Then, too, non-rotatable electrical contacts might be used, the battery housing being rendered movable by means other than rotatable electrical contacts. For example, standard mechanical hinges could be employed for rotation, while electrical contact is maintained via flexible wiring.

According to a further aspect of the invention, the place- ment of the battery housing 30 external to the computer housing 12 is combined with a particular layout of the electronic components 14 within the computer housing 12 to provide the very thin notebook computer 10. Referring now to the assembly views of FIGS. 10–13, located in the computer housing 12 is a generally rectangular keyboard assembly 106, which includes the keyboard 16 and a key- board baseplate 108. A generally rectangular CPU mother- board 110 having component chips 112 mounted thereon is positioned directly below the keyboard assembly 106. As shown, the CPU motherboard 110 is of generally the same major dimensions as the keyboard assembly 106, the key- board assembly 106 and motherboard 110 thereby defining a region 'A' within the enclosure. The remaining compo- nents 14 within the computer housing 12 reside in adjacent and generally co-planar relationship with this region.

In particular, adjacent to and generally coplanar with the region 'A' are placed a DC to DC converter 114, a hard disk drive 116, a trackball assembly 118 including the trackball 18, and a PCMCIA option slot 120. According to this arrangement, the DC to DC converter 114, the hard disk drive 116, the trackball assembly 118, the PCMCIA option slot 120, and the battery housing 30 all reside adjacent to and generally co-planar with each other and with the region 'A' and in which the keyboard assembly 106 and the mother- board 110 reside, resulting in a substantially thinner com- puter 10 than that provided by the prior art arrangement, wherein at least one of the hard disk drive 102, PCMCIA 108, or batteries 54 resides below the keyboard.

Referring in addition to FIG. 2, as shown, the height 122 of the computer 10 when the display screen 20 is folded down onto the computer housing 12 is approximately 1.0 inches (FIG. 2). The display screen 20 is shown to be approximately 7.5 mm thick. The computer housing 12 is approximately 18 mm high, with the top wall 128 and bottom wall 130 being approximately 1.2 mm thick. The keyboard assembly 106 has a height 132 of approximately 8.6 mm, and is placed towards the rear side 28 of the computer housing 12, directly above the motherboard 110, which has a width 134 of approximately 1 mm and is placed approximately 2 mm below the keyboard baseplate 108 (136). A 12.5 mm hard disk drive 116, a Dual Type II/Single Type III PCMCIA option slot 120 of less than 13 mm in height, and a trackball assembly 118 of less than 13 mm in height reside forward of, adjacent to, and coplanar with the region 'A'. A computer 10 having a total thickness of one inch results—thereby providing a 33%–70% thinness advantage over prior art notebook computers.

Also, though the embodiment shown presents a layout wherein the hard disk drive 116, trackball assembly 118, and PCMCIA option slot 120 are located in front of the keyboard assembly 106, the respective positions of these components can conceivably be reversed to obtain the same thinness advantage.

It is apparent that, within the scope of the invention, modifications and different arrangements may be made other

EXHIBIT E PAGE 84

US 6,426,871 B2

**7**

than as herein disclosed. The present disclosure is merely illustrative, the invention comprehending all variations thereof.

What is claimed is:

1. A notebook computer, comprising:
   a computer housing with a generally rectangular configuration, including a top side, a bottom, a front side and a rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;
   a keyboard assembly mounted in the top side of said computer housing;
   a lid including a display mounted therein, said lid being rotatably attached to the top side of said computer housing near the rear side, and covering substantially the entire top side of said housing when closed;
   a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing, and wherein at least a portion of said motherboard is positioned underneath the keyboard assembly to define a region bounded on the upper and lower side by the keyboard assembly and the motherboard;
   a hard disk drive positioned in said housing in an area outside of said region, and toward the front side of said housing; and
   an input pointing device positioned in said housing in an area outside of said region, and toward the front side of said housing.

2. A notebook computer as in claim 1, wherein the input pointing device comprises a trackball device.

3. A notebook computer as in claim 2, wherein the input pointing device extends through the top side of said housing.

4. A notebook computer as in claim 1, further comprising a battery located in a battery housing, separate from said computer housing, said battery housing attaching to said computer housing along the rear side of said computer housing.

5. A notebook computer as in claim 4, wherein said battery housing is capable of accommodating multiple batteries.

6. A notebook computer as in claim 4, wherein said battery housing is capable of pivoting with respect to said computer housing.

7. A notebook computer as in claim 4, wherein said battery housing includes a narrow section flanked by two wide sections and said computer housing includes a central extended portion on the rear side.

8. A notebook computer as in claim 7, wherein said motherboard includes one or more input/output connectors accessible through the extended portion-on the rear side of said computer housing, and wherein said battery housing is rotatable about the rear side of said computer housing to expose said input/output connectors in an area defined by said narrow section.

9. A notebook computer as in claim 8, wherein said battery housing rotates about said rear side of said computer housing between an open and a closed position; and
   wherein said battery housing covers said input/output connectors when in a closed position, and exposes said input/output connectors when in an open position.

10. A notebook computer as in claim 1, wherein said notebook computer has a thickness not substantially greater than one inch when said lid is closed.

11. A notebook computer as in claim 10, wherein said notebook computer has a thickness of one inch or less when said lid is closed.

**8**

12. An ultra-thin notebook computer, comprising:
   a computer housing including a top side, a bottom, a front side, rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;
   a lid, including a display, rotatably attached to the top side of said computer housing near the rear side, said lid covering substantially the entire top side of said housing when closed;
   a keyboard assembly mounted in the top side of said computer housing;
   a motherboard, including component chips mounted thereon, mechanically coupled to the bottom of said computer housing and mounted completely within said computer housing, and wherein said motherboard is positioned beneath the keyboard assembly to define a region bounded by the keyboard assembly and the motherboard;
   a hard disk drive positioned in said housing outside of said region, and in an area on the front side of said housing relative to said region; and
   an input pointing device positioned in said housing in an area outside of said region, and toward the front side of said housing.

13. A notebook computer as in claim 12, further comprising a battery located in a battery housing separate from said computer housing, said battery housing rotatably coupling to said computer housing along the rear side of said computer housing.

14. An ultra-thin notebook computer, comprising:
   a computer housing including a top side, a bottom, a front side and a rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;
   a lid, including a display, rotatably attached to the top side of said computer housing near the rear side, said lid covering substantially the entire top side of said housing when closed;
   a keyboard and keyboard base plate mounted on the top side of said computer housing;
   a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing, and wherein said motherboard is positioned underneath the keyboard base plate to define a region bounded by the keyboard base plate and the motherboard;
   an input pointing device positioned in said housing in an area outside of said region, and toward the front side of said housing; and
   a battery located in a battery housing separate from said computer housing, said battery housing rotatably attaching to said computer housing along the rear side of said computer housing.

15. A notebook computer as in claim 14, wherein said motherboard includes one or more input/output connectors exposed on the rear side of said computer housing, and wherein said battery housing is rotatable about said rear side of said computer housing between an open and a closed position; and
   wherein said battery housing covers said input/output connectors when in a closed position, and exposes said input/output connectors when in an open position.

16. A notebook computer as in claim 14, wherein said notebook computer has a thickness not substantially greater than one inch when said lid is closed.

17. A notebook computer as in claim 14, wherein said display has a surface area substantially greater than the surface area of the keyboard.

US 6,426,871 B2

**9**

18. A notebook computer as in claim 14, wherein said motherboard is wholly contained within said computer housing.

19. A notebook computer as in claim 14, wherein said motherboard is positioned directly below said keyboard assembly.

20. A notebook computer, comprising:

a computer housing including a top side, a bottom, a front side and a rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;

a lid, including a display, rotatably attached to the top side of said computer housing near the rear side, said lid covering substantially the entire top side of said housing when closed;

a keyboard assembly mounted in the top side of said computer housing;

a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing, and wherein said motherboard is positioned beneath the keyboard assembly to define a region bounded by the keyboard assembly and the motherboard;

a drive bay positioned in said housing in an area outside of said region; and

an input pointing device positioned in said housing in an area outside of said region, toward the front side of said housing.

21. A method of manufacturing a portable computer to minimize the thickness of the portable computer, comprising the following acts, performed in any order:

configuring a computer housing to include a top side, a bottom side, a front side and a rear side, with sidewalls extending from the front side to the rear side with a substantially uniform height;

attaching a lid to the top side of the computer housing near the rear side, said lid including a display that rotates to a closed position to cover substantially the entire top side of said computer housing;

mounting a motherboard, with circuitry mounted thereon, within the computer housing near the bottom side;

**10**

mounting a keyboard in an aperture in the top side of the computer housing, thereby defining a region bounded on the upper side by the keyboard and on the bottom side by the motherboard; and

arranging all drive bays outside of said region to thereby minimize the distance between the keyboard and the motherboard.

22. A method as in claim 21, further comprising the act of positioning an input pointing device outside of said region to thereby minimize the distance between the keyboard and the motherboard.

23. A method of designing a portable computer to minimize the height of the portable computer, comprising the comprising the following acts, performed in any order:

configuring a computer housing to include a top side, a bottom side, a front side and a rear side, with sidewalls extending from the front side to the rear side with a substantially uniform height;

attaching a lid to the top side of the computer housing near the rear side, said lid including a display that rotates to a closed positioned to cover substantially the entire top side of said computer housing;

positioning a motherboard, with circuitry mounted thereon, within the computer housing near the bottom side;

placing a keyboard in an aperture in the top side of the computer housing, thereby defining a region bounded on the upper side by the keyboard and on the bottom side by the motherboard; and

arranging all drive bays outside of said region to thereby minimize the distance between the keyboard and the motherboard.

24. A method as in claim 23, further comprising the act of arranging an input pointing device outside of said region to thereby minimize the distance between the keyboard and the motherboard.

25. A method as in claim 24, wherein the input pointing device is positioned on the top side of the computer housing, toward the front side of said region.

*     *     *     *     *



US006609211B2

(12) **United States Patent**

Atkinson

(10) Patent No.: **US 6,609,211 B2**
(45) Date of Patent: **Aug. 19, 2003**

(54) **UTILIZATION-BASED POWER MANAGEMENT OF A CLOCKED DEVICE**

(75) Inventor: **Lee Warren Atkinson**, Houston, TX (US)

(73) Assignee: **Hewlett-Packard Development Company, L.P.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/224,147**

(22) Filed: **Aug. 20, 2002**

(65) **Prior Publication Data**

US 2002/0194515 A1 Dec. 19, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/818,981, filed on Mar. 27, 2001, now Pat. No. 6,438,697, which is a continuation of application No. 09/480,101, filed on Jan. 10, 2000, now Pat. No. 6,233,671, which is a continuation of application No. 08/166,609, filed on Dec. 13, 1993, now Pat. No. 6,029,249, which is a continuation of application No. 08/473,655, filed on Jun. 7, 1995, now Pat. No. 5,625,826, which is a continuation of application No. 07/809,301, filed on Dec. 17, 1991, now abandoned.

(51) Int. Cl.[7] ............................................... G06F 1/32
(52) U.S. Cl. ..................................... 713/323; 713/322
(58) Field of Search ................................. 713/320–323, 713/501, 600, 300; 361/323, 683; 340/636; 307/60

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,085,449 A | 4/1978 | Walsh et al. |
| 4,317,181 A | 2/1982 | Teza et al. |
| 4,417,320 A | 11/1983 | Ei |
| 4,531,826 A | 7/1985 | Stoughton et al. |
| 4,670,837 A | 6/1987 | Sheets |
| 4,698,748 A | 10/1987 | Juzswik et al. |
| 4,819,164 A | 4/1989 | Branson |
| 4,980,836 A | 12/1990 | Carter et al. |
| 5,072,376 A | * 12/1991 | Ellsworth |
| 5,125,088 A | 6/1992 | Culley |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0451661 | 10/1991 |
| JP | 2151950 | 8/1990 |

OTHER PUBLICATIONS

Intel Corp., *386 SL Microprocessor Superset, System Design Guide*, Chapter 14 "System and Power Management," pp. 14-1 to 14–23, 1990.

Intel Corp., *396 SL Microprocessor Superset, Programmers Reference Manual*, Chapter 6 "Systems and Power Management," pp. 6–1 to 6–50; 10–4 to 10–7, 1990.

Technique for Monitoring a Computer System's Activity for the Purpose of Power Management of a DOS–Compatible System, IBM Technical Disclosure Bulletin, vol. 33, No. 4, Sep. 1990, pp. 474–477.

*Primary Examiner*—Gopal C. Ray

(57) **ABSTRACT**

A battery powered computer system determines when the system is not in use by monitoring various events associated with the operation of the system. The system preferably monitors the number of cache read misses and write operations, i.e., the cache hit rate, and reduces the system clock frequency when the cache hit rate rises above a certain level. When the cache hit rate is above a certain level, then it can be assumed that the processor is executing a tight loop, such as when the processor is waiting for a key to be pressed and then the frequency can be reduced without affecting system performance. Alternatively, the apparatus monitors the occurrence of memory page misses, I/O write cycles or other events to determine the level of activity of the computer system.

**16 Claims, 4 Drawing Sheets**





EXHIBIT _F_ PAGE _87_

US 6,609,211 B2
Page 2

| U.S. PATENT DOCUMENTS | | | |
|---|---|---|---|
| 5,142,684 | A | 8/1992 | Perry et al. |
| 5,153,535 | A | 10/1992 | Fairbanks et al. |
| 5,163,143 | A | 11/1992 | Culley et al. |
| 5,167,024 | A | 11/1992 | Smith et al. |
| 5,218,704 | A | 6/1993 | Watts, Jr. et al. |
| 5,239,641 | A | 8/1993 | Horst |
| 5,239,652 | A * | 8/1993 | Seibert et al. |
| 5,487,181 | A | 1/1996 | Dailey et al. |
| 5,504,908 | A | 4/1996 | Ikeda |
| 5,544,082 | A * | 8/1996 | Garcia-Duarte et al. |
| 5,655,127 | A | 8/1997 | Rabe et al. |
| 5,740,417 | A | 4/1998 | Kennedy et al. |
| 5,784,598 | A | 7/1998 | Griffith |
| 5,991,883 | A | 11/1999 | Atkinson |
| 6,076,158 | A | 6/2000 | Sites et al. |
| 6,230,279 | B1 | 5/2001 | Dewa et al. |

* cited by examiner



*FIG. 1*



*FIG. 2*



FIG. 3

EXHIBIT F PAGE 91



FIG. 4

EXHIBIT __F__ PAGE __92__

US 6,609,211 B2

1

## UTILIZATION-BASED POWER MANAGEMENT OF A CLOCKED DEVICE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 09/818,981, filed Mar. 27, 2001, which is a continuation Ser. No. 697, which is a continuation U.S. application Ser. No. 09/480,101, filed Jan. 10, 2000, now U.S. Pat. No. 6,233, 671, which is a continuation U.S. application Ser. No. 08/166,609, filed Dec. 13, 1993, now U.S. Pat. No. 6,029, 249, which is a continuation of U.S. application Ser. No. 08/473,655, filed Jun. 7, 1995, now U.S. Pat. No. 5,625,826, which is a file wrapper continuation of U.S. application Ser. No. 07/809,301, filed Dec. 17, 1991, now abandoned, which are incorporated herein by reference.

### STATEMENTS REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

### REFERENCE TO A MICROFICHE APPENDIX

Not applicable.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to battery powered computer systems, and more particularly, to circuits and methods for reducing the power consumption of the computer system.

2. Description of the Related Art

Portable computer systems are rapidly developing the capabilities of conventional desktop or floor mounted personal computer systems. Hard disk units are being integrated into portable computers because of the large amounts of information being processed and the large size of many application programs. A floppy disk unit is integrated in the vast majority of portable computers, even if a hard disk unit is installed, to allow loading of information and use of applications requiring key disks, and also to allow use of diagnostic programs. Modems have been integrated into portable computers for some time to allow communications and information transfer between the user and a remote location, for example, the home office. The displays in portable computer systems are becoming much more elaborate and readable. The pixel count on the standard liquid crystal displays (LCD's) utilized is increasing, as is the viewing angle. The use of backlighting allows use of LCD's in low light environments and improves the contrast ratio of the display. More complex circuitry is being installed in portable computers to support these improved peripheral devices and to support the increased speeds and capabilities of the microprocessors utilized in portable computer systems.

The various peripheral devices and high speed circuitry mentioned above consume large amounts of power when operating. This has resulted in problems in portable computer systems because these systems are generally desired to be used in locations where alternating current is not available. This has made it very difficult to provide all the possible functionality available and yet have an acceptable battery life when the portable computer system is battery powered. Using CMOS components helped reduce the power consumption of the circuitry, but even the use of CMOS components is insufficient at the clock speeds and performance levels of available circuitry. Therefore a

2

dilemma arises whether to provide lesser functionality with longer battery life or greater functionality with lesser battery life or even no battery operation.

Various alternatives were tried to resolve the problem. For example, the International Business Machines (IBM) Corporation PC Convertible included a switch which the user could press to place the computer system in a standby mode. However, the PC convertible was relatively simple, with a low level of functionality as compared to what is currently available, and the requirement of a user action to reduce power consumption limited its use to circumstances where the user remembered to depress the switch. Blanking the display after a period of keyboard inactivity saved power as well as prolonged the life of the display and was widely utilized. A hard disk unit was developed which reduced the power used by the controlling electronics by utilizing only certain portions of the track for servo information and turning off the read channel circuitry until just before a servo burst was expected. Additionally, a programmable value could be provided to the hard disk unit so that after a given inactivity interval defined by this value, the hard disk unit was allowed to spin down and all but some interface circuitry was shut down. While these alternatives did provide some relief, they were not complete solutions to satisfactorily resolve the dilemma, and design tradeoffs still were forced to occur.

U.S. Pat. No. 4,980,836 to Carter et al. discloses an apparatus for reducing power consumption in computer systems. The apparatus monitors the address bus to determine when selected peripheral devices have not been accessed for a preset amount of time. When the preset amount of time has passed, the system powers itself down and disables the system clock, placing the system in a standby mode. The system clock could be stopped in this invention because the preferred embodiment of this invention used a static CMOS processor and chip set. If there was sufficient energy in the batteries, the system could be awakened by the user depressing a standby switch. Computer systems which do not use a static CMOS processor or chip set generally reduce the clock frequency when a preset amount of time of address bus inactivity has passed. Reducing the clock frequency during inactive periods reduces power consumption during this time. However, the frequency of peripheral device accesses is not a completely reliable indicator of inactivity of a computer system. Thus, in some instances the system clocking signal may be reduced in frequency or disabled during a period of high computer system activity. Therefore, a method is needed whereby other elements or events of the computer system can be monitored to more reliably determine the activity level of the computer system so that the system clock can properly be adjusted to reduce power consumption.

### BRIEF SUMMARY OF THE INVENTION

A battery powered computer system according to the present invention determines when the system is not in use by monitoring various events associated with the operation of the computer system. In the preferred embodiment, the system monitors the number of cache read misses and write operations, i.e., the cache hit rate, and reduces the system clock frequency when the cache hit rate rises above a certain level. When the cache read hit rate is above a certain level, then it can be assumed that the processor is executing a tight loop, such as when the processor is waiting for a key to be pressed. In an alternate embodiment of the invention, the system monitors other events in addition to, or instead of, the cache read hit rate, such as the occurrence of page hits or

US 6,609,211 B2

3

input/output (I/O) write cycles, to determine the level of activity of the computer system.

The invention according to the preferred embodiment includes a frequency switching circuit, an event counter, and a periodic timer. The event counter is preferably used to measure the activity of the cache read misses and write operations and may also optionally be used to count the number of page misses and memory or I/O writes as desired. The event counter includes an overflow or carry line which prevents any further incrementing of the counter once the maximum number of counts is reached to prevent the counter from overflowing. The periodic timer instructs the CPU via a system interrupt to periodically monitor and compare the contents of the event counter. Every event increments the counter and, the more events, the more processor activity that is presumed. When the periodic timer issues a system interrupt, the CPU reads the contents of the counter and compares the event activity with a predetermined value. If the number of events is higher than the predetermined value, then the processor switches the operating frequency of the system to a high frequency if the system is not already operating at this high frequency. A lower event count causes the frequency switching circuit to switch to a lower frequency to conserve power if the system is not already operating at this low frequency.

The invention allows the battery powered operating period of a computer system to be greatly extended without requiring any input from the user and without any noticeable loss in processing power. This allows a battery powered computer system to have advanced capabilities and functionality while still having a satisfactory battery operating interval.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWINGS

A better understanding of the invention can be obtained when the following detailed description of the preferred embodiment is considered in conjunction with the following drawing in which:

FIG. 1 is a schematic block diagram of a computer system incorporating the present invention;

FIG. 2 is a more detailed schematic diagram of a portion of the computer system of FIG. 1;

FIG. 3 is a schematic diagram of a portion of the computer system of FIG. 1 according to an alternate embodiment of the invention; and

FIG. 4 is a flowchart diagram of a sequence for controlling the operation of the computer system of FIG. 1 according to the present invention.

DETAILED DESCRIPTION OF THE
INVENTION

Referring now to FIG. 1, a computer system C according to the preferred embodiment of the invention is shown. The computer system C is preferably based on the 386 SL chip set produced by Intel Corporation (Intel). The 386 SL chip set comprises two chips, a 386 SL CPU chip (CPU chip) 20 and a 82360 SL chip 22. The CPU chip 20 includes an 80386 SX microprocessor, a memory controller, a cache controller, a bus controller, clock control circuitry, and power management circuitry. The 82360 SL chip 22 includes a programmable interrupt controller (PIC), direct memory access (DMA) controller, a memory mapper, various ports, a real time clock (RTC) and power management circuitry. For more information on the 386 SL chip set, please see the Intel

4

386 SL Microprocessor Superset System Design Guide 1990 edition; the 386 SL Microprocessor Superset Programmers Reference Manual, 1990 edition; and the 386 SL Microprocessor Superset Data Book; all published by Intel.

An oscillator 24 is connected to the CPU chip 20. The oscillator preferably operates at 20 Megahertz (MHz) and provides a 20 MHz clocking signal 25 to the CPU chip 20. Main memory 26, cache memory 28 and a math coprocessor (MCP) 30 are also preferably coupled to the CPU chip 20. The math coprocessor 30 is preferably a 387 SX coprocessor produced by Intel. The cache memory is preferably operated as a write-through cache memory. A video graphics array (VGA) controller 32 is coupled to the CPU chip 20. Serial port buffers 36 and a parallel port 38 are coupled to the 82360 SL chip 22.

The CPU chip 20 and the 82360 SL chip 22 are each connected to an I/O bus 40 based on the industry standard architecture (ISA). However, other bus architectures are also contemplated. The ISA bus 40 is connected through a transceiver 42 to a peripheral interface (PI) bus 44. The VGA chip 32 is connected to the ISA bus 40. The ISA bus 40 may include a plurality of ISA bus expansion slots 46 if the present invention is used in a desktop computer system. The slots 46 are generally omitted in portable computers. The ISA bus 40 is connected through a transceiver 48 to a hard disk 50. Various logic is coupled to the PI bus 44, including an external real time clock 54, a floppy disk controller 56, a keyboard controller 58 and BIOS EPROM 60. The floppy disk controller 56 and keyboard controller 58 control operation of a floppy disk unit and keyboard, respectively (both not shown). The BIOS EPROM holds the basis input/output (I/O) system software as well as system-specific initialization and configuration software. This is an exemplary computer system and other designs and architectures could be utilized.

The CPU chip 20 includes an active high input referred to as the TURBO input (not shown). When the TURBO input receives a logic high signal, the CPU chip 20 enters "turbo mode," and the microprocessor executes at a clock speed defined by a bit field in a register in the CPU chip 20 referred to as the CPUWRMODE register (not shown). When the TURBO input receives a logic low signal, the CPU chip 20 enters "de-turbo mode" and executes at a reduced clock speed of ½ or ¼ as defined by a bit in a register. The CPUWRMODE register operates in conjunction with the power management circuitry inside the CPU chip 20 to control the frequency of the clocking signal 25 provided to the microprocessor. In the preferred embodiment, the turbo input receives a logic high value, and thus the CPUWRMODE register determines the frequency of the clocking signal 25 provided to the microprocessor.

Bits 5 and 4 of the CPUWRMODE register determine the speed with which the microprocessor clock operates. When bits 5 and 4 of the CPUWRMODE register are each set to 0, then the clock speed is the speed of the signal received by the oscillator 24, preferably 20 MHz. When bits 5 and 4 of the CPUWRMODE register are set to 0 and 1 respectively, the clock speed provided to the microprocessor is one half of the frequency of the signal received from the oscillator 24, i.e., 10 MHz. When bits 5 and 4 of the CPUWRMODE register are 1 and 0 respectively, the clock speed provided to the microprocessor is one fourth of the frequency of the signal received from the oscillator 24, i.e., 5 MHz. When bits 5 and 4 of the CPUWRMODE register each have a logic 1 value, then the clock speed provided to the CPU is one eighth the frequency of the signal received from the oscillator 24, i.e. 2.5 MHz.

US 6,609,211 B2

5

The computer system C also includes activity monitor logic 70 according to the present invention which is coupled to the CPU chip 20. The activity monitor logic 70 receives signals from the CPU chip 20 as well as signals provided from the CPU chip 20 to the main memory 26. The activity monitor logic 70 monitors events associated with the microprocessor to determine the activity level of the system. In the preferred embodiment, the activity monitor logic 70 monitors the number of cache read misses and write operations during preset periods of time, and the CPU chip 20 reduces the system clock frequency when the cache hit rate rises above a certain level. When the cache read hit rate is above a certain level, then it can be assumed that the processor is executing a tight loop, such as when the processor is waiting for a key to be pressed. In this instance, the system clock frequency can be reduced to reduce power consumption without affecting system performance. In an alternate embodiment of the invention, the activity monitor logic 70 monitors other events such as page misses of memory and I/O write operations, among others. It is contemplated that the various types of events may be counted either individually or in combination.

Referring now to FIG. 2, the activity monitor logic 70 according to the preferred embodiment of the invention is shown. In the description that follows a signal name followed by an asterisk indicates that the signal is asserted when it has a logic low level. The activity monitor logic 70 receives column address strobe (CAS*) signals provided from the CPU chip 20 to the main memory 26. The CAS* signals are essentially memory select signals that are used in paged memory systems. When a cache read hit occurs, the requested data can be provided directly from the cache memory 28 to the microprocessor, and no CAS* signals are asserted by the CPU chip 20. Also, since the cache memory is operated as a write-through cache, each write operation, whether it be a write hit or write miss, requires a memory cycle to the main memory 26. Therefore, the CAS* signals are asserted on all write operations in the preferred embodiment. Thus, the CAS* signals are used to determine when cache read misses and write operations occur, i.e., when main memory cycles occur.

In the preferred embodiment, the CPU chip 20 generates eight CAS* signals. The CAS* signals are provided to eight inputs of a nine input NAND gate 102, in effect ORing these signals together. The output of the NAND gate 102 is provided to an input of a two input AND gate 103. A signal referred to as REFREQ output from the 82360 SL chip 22 is preferably provided to the other input of the AND gate 103, which is an inverted input. The REFREQ signal indicates, when asserted high, that a memory refresh operation is occurring. The inverted REFREQ signal is ANDed with the output of the NAND gate 102 to prevent memory refresh operations from being counted as cache read miss or write operations.

The output of the AND gate 103 is a signal referred to as CACHE_MISS, which is provided to the clock input of a 17 bit counter 104 referred to as the CAS* counter. The CACHE_MISS signal is therefore asserted when a main memory cycle occurs, which is whenever a cache read miss or a write operation occurs. The CAS* counter 104 is incremented each time the CACHE_MISS signal is asserted. The CAS* counter 104 outputs a signal referred to as CARRY which is provided through an inverter 106 to the seventh input of the NAND gate 102. The CARRY signal is asserted when the maximum number of counts is reached by the counter 104, which is $2^{17}$. When the CARRY signal is asserted, the CACHE_MISS signal is prevented from

6

changing state and thus further counting by the counter 104 is disabled. The CAS* counter 104 provides data signals 1–16 to the inputs of a 16 bit flip-flop 108. Data signal 0 output from the CAS* counter is preferably left unconnected. The outputs of the flip-flop 108 are coupled to data bus signals referred to as DATA<0:15>, which are coupled to the CPU chip 20.

Address signals, a write/read (W/R) signal and a memory/input output (M/IO) signal are output from the CPU chip 20 and provided to decode logic 110 in the activity monitor logic 70. The decode logic 110 outputs a signal referred to as RD_COUNT which is provided to a clock input of the flip-flop 108. The RD_COUNT signal is also provided through an inverter 111 to an inverted clear input of the counter 104 and to an inverted enable input of the flip-flop 108. Therefore, when the CPU chip 20 desires to read the counter 104, it outputs the appropriate address, the W/R signal and the M/IO signal to the decode logic 110, which then asserts the RD_COUNT signal to the counter 104 and the flip-flop 108. The asserted RD_COUNT signal enables the flip-flop 108 to latch in data from the counter 104 and transmit the data to the CPU chip 20 and simultaneously operates to clear the contents of the counter 104.

In an alternate embodiment, memory page misses and/or I/O write operations may also be counted. Memory page miss operations with the preferred microprocessor are determined by determining if any of the 4 row address strobe or RAS* signals are asserted low during non-refresh cycles. The asserted RAS* signals are indicative of page miss operations. As shown in FIG. 3, the RAS* signals are provided from the CPU chip 20 to the inputs of a four input NAND gate 120. The output of the NAND gate 120 is the page miss indication, which is referred to as the PAGE_MISS signal. The I/O write indication is accomplished in the following manner. The W/R signal is connected to an input of a two input AND gate 124. The other input of the AND gate 124 is inverted and receives the M/IO signal. The output of the AND gate 124 generates a signal referred to as IOW which indicates, when asserted high, that an I/O write operation is occurring.

The PAGE_MISS and IOW signals are connected to inputs of a three input OR gate 126. The eight CAS* signals are connected to the input of an eight input NAND gate 125 whose output is connected to an input of the OR gate 126. The output of the OR gate 126 is connected to an input of a three input AND gate 128. A second input of the AND gate 128 receives the inverted CARRY signal. The third input of the AND gate 128 receives the REFREQ signal. The output of the AND gate 128 is provided to the clock input of the counter 104. Therefore, during memory refresh operations or when the CARRY signal is asserted, the output of the AND gate 128 is negated low, and thus the counter 104 does not count at these times.

In this embodiment, cache read miss and write operations, page miss operations, and I/O write operations are all monitored as events. It is noted that any one of these events can be monitored either individually or in combination. In yet another alternate embodiment, each signal can be provided to separate counters arranged like the counter 104, and the outputs of the separate counters can be used to determine system activity.

The 82360 SL chip 22 includes an interrupt timer (not shown) which is used to generate time of day interrupts to the microprocessor approximately 18.2 times per second. The interrupt routine invoked by the timer is also used according to the preferred embodiment of the invention to

US 6,609,211 B2

7

8

periodically adjust the frequency of the clocking signal 25 received by the microprocessor, as is explained below.

Referring now to FIG. 3, a portion of the software routine that is executed when the time of day interrupt routine is invoked is shown. It is understood that the time of day interrupt routine may perform other operations than those shown. When the time of day interrupt signal is asserted, the CPU chip 20 reads the CAS* counter 104 in step 202. The counter 104 is also cleared in step 202. In an alternative embodiment, the separate counters providing the CAS* count, the memory page miss count, and the I/O write count are read in step 202. In step 204, the microprocessor reads bits 5 and 4 of the CPUWRMODE register to determine if the clock signal provided to the CPU chip 20 is operating at a fast or slow frequency. In the preferred embodiment, the microprocessor only writes either values 0,0 or 1,0 to bits 5 and 4, respectively, of the CPUWRMODE register, thus providing the clocking signal 25 at either full frequency or one quarter frequency to the microprocessor. The CPUWR-MODE register is programmed depending on the cache read hit rate as determined by the CAS* counter 104 in relation to certain comparison values. Thus, in this embodiment, the power management logic toggles between a full clock speed or fast speed, preferably 20 MHz, and a one quarter frequency clock speed or slow speed, preferably 5 MHz. However, it is noted that all four clock speed frequencies may be utilized.

If the clocking signal 25 provided to the CPU is determined to be operating at the slow speed in step 204, then in step 206 the microprocessor determines if the CAS* count value received from the CAS* counter 104 is greater than a fast comparison value stored inside the CPU chip 20. Alternatively, a function based on the three separate count values could be evaluated. If the CAS* count value exceeds the fast comparison value in step 206, then in step 208 the power management logic in the CPU chip 20 speeds up the clock speed, and the routine completes. If the CAS* count value is not greater than the fast comparison value in step 206, then the interrupt routine completes.

If the clocking signal 25 provided to the microprocessor is determined to be operating at the fast speed in step 204, then control proceeds to step 212 where the microprocessor determines whether the CAS* count value is less than a slow comparison value stored in the CPU chip 20. If the CAS* count value is less than the slow comparison value in step 212, then the power management logic in the CPU chip 20 slows down the clocking signal 25 provided to the microprocessor in step 214 to one quarter speed, and the routine completes. If the CAS* count value is not less than the slow comparison value in step 212, then the routine completes.

The fast and slow comparison values are preferably programmable inside the CPU chip 20. In the preferred embodiment, the fast and slow comparison values are the same value. In an alternate embodiment, the slow comparison value is proportionally less that the fast value, i.e., one fourth less to reflect a true hit/miss ratio. In addition, since the comparison values can be user-adjusted inside the CPU chip 20, the values could be derived from characterization of common user applications.

As described above, the preferred embodiment utilizes the CPU chip 20 in "turbo mode" and uses software to perform the activity comparisons and speed changes. In an alternative embodiment, additional registers can be used to contain the comparison values and an additional timer can be used to define the comparison interval. Hardware comparators are

configured to perform the comparison logic described above at the appropriate time and change the state of the TURBO input based on the comparison to speed up or slow down the CPU chip 20 as appropriate.

Thus, the computer system according to the present invention monitors various power consumption related events, indicates certain changes to the user and enters an inactivity state upon an appropriate period of time after monitored system devices have been used.

The foregoing disclosure and description of the invention are illustrative and explanatory thereof, and various changes in the components, circuit elements, or flowcharts may be made without departing from the spirit of the invention.

I claim:

1. A method of power management, comprising the steps of:

measuring hardware activity of a clocked device; and

determining utilization of the clocked device based on the hardware activity of the clocked device over a period of time; and

adjusting the clocked device from a first power consumption mode to a second power consumption mode based on the utilization of the clocked device.

2. The method of claim 1, the adjusting step comprising the step of:

reducing the clocked device from the first power consumption mode to the second clocked consumption mode.

3. The method of claim 1, the adjusting step comprising the step of:

increasing the clocked device from the first power consumption mode to the second power consumption mode.

4. The method of claim 1, wherein the first power consumption mode and the second power consumption mode are two of a plurality of selectable power consumption modes.

5. The method of claim 1, wherein the adjusting step is performed during active times of the clocked device.

6. The method of claim 1, wherein the hardware activity indicates inactive times of the clocked device.

7. The method of claim 1, the measuring step comprising the step of:

monitoring the hardware activity of the clocked device using an activity counter.

8. The method of claim 7, the determining step comprising the steps of:

reading an activity count of the activity counter; and

comparing the activity count to a value.

9. The method of claim 8, further comprising the step of:

selectively adjusting the clocked device from a first power consumption mode to a second power consumption mode based on the comparing step.

10. A power management system, comprising:

a means for measuring hardware activity of a clocked device; and

a means for determining utilization of the clocked device based on the hardware activity of the clocked device over a period of time; and

a means for adjusting the clocked device from a first power consumption mode to a second power consumption mode based on the utilization of the clocked device.

11. A computer system, comprising:

a clocked device;

US 6,609,211 B2

9

a means for measuring hardware activity of the clocked device;

a means for determining utilization of the clocked device based on the hardware activity of the clocked device over a period of time; and

a means for adjusting the clocked device from a first power consumption mode to a second power consumption mode based on the utilization of the clocked device.

12. The system of claim 11, the means for adjusting comprising:

a means for adjusting the clocked device from a first clock frequency to a second clock frequency based on the utilization of the clocked device.

13. The system of claim 11, the means for determining comprising:

10

a means for maintaining a count proportional to the activity of the clocked device.

14. The system of claim 11, the means for adjusting comprising:

a means for adjusting a performance state of the clocked device based on the utilization of the clocked device.

15. The system of claim 11, the means for determining comprising:

a means for determining an average utilization of the clocked device.

16. The system of claim 11, wherein the clocked device comprises a processor.

* * * * *

EXHIBIT ___F___ PAGE___97___

AO 120 (3/85)

| TO:<br><br>**Commissioner of Patents and Trademarks**<br>**Washington, D.C. 20231** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION REGARDING A PATENT** |
|---|---|

<div align="center">

In compliance with the Act of July 19, 1952 (66 Stat. 814; 35 U.S.C. 290) you are hereby advised
that a court action has been filed on the following patent(s) in the U.S. District Court:

</div>

| DOCKET NO.<br>04CV613 JM(AJB) | DATE FILED<br>03-24-04 | U.S. DISTRICT COURT<br>United States District Court, Southern District of California |
|---|---|---|
| PLAINTIFF<br><br>Hewlett-Packard Devlepment Company,L.P. | | DEFENDANT<br><br>Gateway, Inc. |

| PATENT NO. | DATE OF PATENT | PATENTEE |
|---|---|---|
| 1 4,942,606 | 07-17-90 | Compaq Computer Corporation |
| 2 5,570,107 | 10-29-96 | Compaq Computer Corporation |
| 3 6,125,031 | 09-26-00 | Compaq Computer Corporation |
| 4 6,307,740 B1 | 10-23-01 | Compaq Information Technologies Group, L.P. |
| 5 6,426,871 B2<br>6 6,609,211 B2 | 07-30-02<br>08-19-03 | Compaq Information Technologies Group, L.P.<br>Compaq Information Technologies Group, L.P. |

<div align="center">

In the above-entitled case, the following patent(s) have been included:

</div>

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment   ☐ Answer   ☐ Cross Bill   ☐ Other Pleading | | |
|---|---|---|---|
| PATENT NO. | DATE OF PATENT | PATENTEE | |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

<div align="center">

In the above-entitled case, the following decision has been rendered or judgment issued:

</div>

| DECISION/JUDGMENT | | |
|---|---|---|
| | | |
| CLERK | (BY) DEPUTY CLERK | DATE |

Copy 1 - Upon initiation of action, mail this copy to Commissioner   Copy 3 - Upon termination of action, mail this copy to Commissioner

# CIVIL COVER SHEET

JS 44 (Rev. 3/99)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Hewlett-Packard Development Company, L.P.

**(b)** County of Residence of First Listed Plaintiff  Houston County, TX
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

John Allcock, Cathy Ann Bencivengo,
John E. Giust, Barry K. Shelton
Gray Cary Ware & Freidenrich
401 B Street, Suite 2000, San Diego, CA 92101
(619) 699-3616

## DEFENDANTS

Gateway, Inc.

**FILED**

**MAR 2 4 2004**

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

**CLERK, U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
**BY                                DEPUTY**

'04 CV 00613 JM   (AJB)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R. R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☒ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS -Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

35:0271 (P)

This is an action for patent infringement under 35 USC Section 100 et seq. Plaintiff seeks injunctive relief and damages.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Unspecified

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY

(see instructions):

JUDGE                           DOCKET NUMBER

DATE
March 24, 2004

SIGNATURE OF ATTORNEY OF RECORD
Cathy Ann Bencivengo

**FOR OFFICE USE ONLY**
RECEIPT #  102185   AMOUNT  150-AS   APPLYING IFP                JUDGE                    MAG. JUDGE
American LegalNet, Inc.   www.USCourtForms.com

