USDC SCAN INDEX SHEET

RYC 11/17/04 11:11

3:04-CV-00613 HEWLETT PACKARD V. GATEWAY INC

*46*

*DECL.*

JOHN ALLCOCK (Bar No. 098895)
CATHY ANN BENCIVENGO (Bar No. 138791)
JAMES SARNECKY (Bar No. 202465)
BRENT YAMASHITA (Bar No. 206890)
DAVID WIGGINS (Bar No. 222856)
**GRAY CARY WARE & FREIDENRICH LLP**
401 B Street, Suite 2000
San Diego, CA 92101-4240
Tel: (619) 699-2700
Fax: (619) 699-2701

Attorneys for Plaintiff and Counterclaim Defendant HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P.

FILED
NOV 16 2004
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P.,<br>Plaintiff,<br>v.<br>GATEWAY, INC.,<br>Defendant.<br><br>GATEWAY, INC.<br>Counterclaim-Plaintiff,<br>v.<br>HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., HEWLETT-PACKARD COMPANY, and COMPAQ INFORMATION TECHNOLOGIES GROUP, L.P.,<br>Counterclaim-Defendants. | CV NO. 04 CV00613-B (LSP)<br><br>**DECLARATION OF RONALD S. BADER IN SUPPORT OF HP'S OPENING CLAIM CONSTRUCTION BRIEF AS TO HP'S PATENTS**<br><br>Date: November 29, 2004<br>Time: 9:00 a.m.<br>Judge: Hon. Rudi M. Brewster<br>Courtroom 2, Fourth Floor |



46

11/16/2004 TUE 14:17 [TX/RX NO 7914]

I, Ronald S. Bader declare:

1) I make this declaration based on my own personal knowledge, except where the context indicates otherwise, and as to such exceptions, I state they are based on my best information and belief, formed after such inquiry as is reasonable under the circumstances. I would testify in accordance with this Declaration if called as a witness in this cause.

2) MY BACKGROUND

I Ronald S. Bader am a person skilled in the fields of electronic product design and development, Interdisciplinary Systems Engineering, Electronics Engineering and Engineering Science. My educational and professional background are more fully presented in my CV, a copy of which is attached herewith as Exhibit 1.

2.1) I have earned the following relevant degrees:

Associate in Applied Science with a major in Electronics Technology - City University of New York, New York City Community College 1973

Bachelor of Science in Engineering Science with Highest Honors - City University of New York, Richmond College 1975

Master of Science in Engineering with a dual major in Electronics Engineering

and Computer Science - University of California, Berkeley 1977

2.2) Presently, and for the last twenty three plus years I have been an independent contractor and the owner of Bader Engineering in which capacity I have designed, developed, analyzed, simulated and reverse engineered numerous products and systems for clients in the electronic product, medical equipment, computer, and automatic test equipment industries. I have also provided forensic consulting and expert witness services to the legal community for several cases in computer and other high technology product related matters. Prior to founding my consulting firm Bader Engineering, I worked as a founding employee of a high tech startup company, Compression Labs, Incorporated at which I held various titles and positions during my employment including Chief Engineer, Project Engineer, Project Leader, and Manager, Design Engineering.

2.3) I am a co-inventor of the following patented inventions:

U.S. Patent No. 5,563,450 entitled Spring Grounding Clip for Computer Peripheral Card.

U.S. Patent No. 4,410,916 entitled Dual Mode Facsimile Coding System and Method.

U.S Patent No. 4,288,782 entitled High Speed Character Matcher and Method.

2.4) I am currently, and have in the past been affiliated with several professional organizations, which are listed in my CV.

2.5) Over the course of the past twenty seven plus years I have worked on numerous projects involving the design and/or development of both analog and digital electronics, software, firmware, electro-mechanical and electro-optical subsystems, chassis, enclosures and other mechanical aspects of microcomputer, microprocessor, microcontroller based products/equipment as well as other types of devices. I have also worked on a number of projects involving the development and analysis of thermal models, the solution of thermal issues in various types of electronic products/equipment, and the analysis, modeling and simulation of electronic circuits and systems for among other purposes the solution of signal integrity and electrical noise problems.

3) SCOPE OF PRESENT ASSIGNMENT

I have been retained by the law firm of Gray Cary Ware & Freidenrich LLP to a) review U.S. Patent Numbers 6,125,031 ("the '031 patent"), 6,307,740 B1 ("the '740 patent") and 6,426,871 B2 ("the '871 patent") in light of their prosecution histories and my training, knowledge and experience as an interdisciplinary systems engineer and designer / developer of electronic products, and provide my opinions as to what the claims meant to one of ordinary skill in the art at the time of issuance of each of the respective patents, and more specifically at this time, what certain key terms which I have been asked to define ("key terms") meant to one of ordinary skill in the art at the time of issuance of the respective patents and b) to provide additional research, review of

documents, inspection of products, consultation, and testimony, yet to be defined, as deemed necessary from time to time during the course of this matter.

4) In the course of my review, I have reviewed the '031, '740, and '871 patents, their prosecution histories, and their cited prior art. During the course of my review, I also consulted several dictionaries and thesauruses to review the plain and ordinary definitions of a number of words used in the various claims at issue, as well as those of the synonyms I chose to use in defining the key terms and phrases defined herein and have cited those references where appropriate throughout this document.

5) MEANING OF KEY TERMS

After reviewing the '031, '740, and '871 patents and their prosecution histories, I am of the opinion that the key terms and phrases in these patents which I have been asked to define the meanings of, when taken in light of the respective patent specifications and prosecution histories, are used in their plain and ordinary sense as understood by one of ordinary skill in the art, and do not have any special meaning.

I reserve the right to supplement or modify the construction of any word, term or phrase, whether or not presently construed in the event that I become aware of additional information that in my opinion justifies my doing so.

Unless noted, any defined word, term or phrase is intended to be defined the same for each appearance in the claims of the patent in which they are being defined.

Based upon my interpretation of the key terms and phrases I have been asked to define in light of the respective patent prosecution histories, I have set forth below 1) the elements of Claims containing the key terms and phrases I have been asked to define. 2) my interpretation of these key terms and phrases, and 3) the intrinsic evidence and other facts that support my definitions of these key terms and phrases. This information is laid out in the following format:

The elements of the claims containing the **key terms and/or phrases** I have been asked to define are presented, in order and exactly as they read in the '031, '740, and '871 patents. **(with the key terms and phrases printed in bold)**

> Below the associated claim element that contains the key term or phrase, I have provided my interpretation of the key term or phrase. (Presented in indented format)
>
> > *Below my interpretation of the key term or phrase, I have provided the intrinsic evidence and/or other facts that support my definitions of the*

*specific key term and phrase. (Presented twice indented and in italics).*

6) U.S PATENT NO. 6,125,031, CLAIMS

The following sections pertain to the key terms and phrases which I have been asked to define in the '031 Patent.

7) It is my opinion that an individual with a Bachelors degree in Electrical Engineering, Mechanical Engineering or Industrial Design with three to five years of professional involvement in the area of design and development of electronic equipment packaging at the time of issuance of the '031 patent would be the standard by which one should define one of ordinary skill in the art with respect to the art taught in the '031 patent. It is this definition I will use to define one of ordinary skill the art in the sections to follow which pertain to the '031 patent.

8) U.S PATENT NO. 6,125,031, CLAIM 1:

1. Electronic apparatus comprising:

a **housing** having a wall opening therein;

The term "housing" means the case or enclosure.

*The above definition of the term "housing" is the plain and ordinary meaning as understood by one of ordinary skill in the art.*

*This definition is furthermore intrinsically supported in the specification of the '031 patent in Column 1, lines 9-12 where it states "The present invention generally relates to electronic apparatus and, in a preferred embodiment thereof, more particularly relates to mounting apparatus for computer housing access doors." The specification further supports this definition, in addition to other places, in Figures 2, and 3 which illustrate in partially phantomed perspective view, item 24 that is described in the specification at Column 3, lines 8-10 as: "As illustrated in FIGS. 2 and 3, the CPU unit 12 has a generally rectangular housing portion 24 with a vertical front side portion being defined by a molded plastic bezel structure 26." This definition is further supported by one of the plain and ordinary English language dictionary definitions for housing which reads: " Something that covers, protects, or supports, especially: 1. A frame, bracket, or box for holding or protecting a mechanical part: a wheel housing."*[1]

cooperatively interengageable first and second structures respectively carried by said housing and said access door and being operable to:

(1) pivotally interfit sections of said first and second structures on an axis in a manner mounting said access door on said housing for pivotal movement relative thereto about said axis between a closed position in which said access door covers said wall opening, and an open position in which said access door is **swung edgewise through said wall opening into the interior of said housing** and uncovers said wall opening.

The phrase **"swung edgewise through said wall opening into the interior of said housing"** means the thin dimension of the door enters through the wall opening into the inside of the enclosure.

*The above definition of the phrase **"swung edgewise through said wall opening into the interior of said housing"** is the plain and ordinary meaning as understood by one of ordinary skill in the art in light of the patent specification.*

*This definition is supported in the specification of the '031 patent as follows.*

[1] Source: The American Heritage® Dictionary of the English Language, Fourth Edition, Copyright © 2000

*An access door 32 is identified in the preferred embodiment at Column 3, lines 14-16 which reads "TO selectively cover and uncover the opening 28, a horizontally elongated molded plastic access door 32 is provided."*

*The access door identified as item 32, taken in conjunction with "Figures 2, 2A, 3 and 3A which illustrate item 32, in both the closed and open position as described in the BRIEF DESCRIPTION OF THE DRAWINGS at Column 2, lines 36-42, which states:*

*"FIG. 2 is a partially phantomed perspective view of a bottom front side portion of the CPU unit with its illustrated access door in its closed orientation;[2]*

*FIG. 2A is a rear side perspective view of the front housing bezel portion shown in FIG. 2, with the access door closed;"[2] and Column 2, lines 45-50 which reads "FIG. 3 is a partially phantomed perspective view similar to that in FIG. 2, but with the access door pivoted upwardly to its open orientation;[2]*

*FIG. 3A is a rear side perspective view of the bezel portion similar to that*

---

by Houghton Mifflin Company.

[2] Underlining added in this section for emphasis.

*in FIG. 2A, but with the access door opened; ".*

*It is clearly seen by comparison of the aforementioned figures that the thin dimension or edge of the door enters through the wall opening into the inside of the enclosure, and as illustrated in Fig. 3, a portion of the door remains outside the housing when the access door is pivoted upwardly to its open orientation.*

*This above definition is further supported in the specification of the '031 patent at Column 4, lines 51-53 which states: " A suitable abutment (not shown) between the opened door and the bezel prevents the door from being pivoted rearwardly past its open position."*

*Thus, the door shown in Figures 3, in the open position with a portion thereof still outside the housing, cannot be swung any further to a position in which it is completely inside housing.*

*This fact would also be obvious to one of ordinary skill in the art, as a design which allowed the door to swing entirely inside the housing would make it difficult for the operator to get a finger grip on the door to*

*move it from the open position toward the closed position, making such a design impractical.*

and

(2) provide between portions of said first and second structures a sliding engagement which, in response to a manual pivoting of said access door through an initial distance toward either selected one of said closed and open positions, **resiliently deflects said portion of said first structure**

The phrase **"resiliently deflects said portion of said first structure"** means displaces the portion of the first structure such that the portion of the first structure returns to its normal shape or position when the deflecting force is removed,

*The above definition of the phrase* ***"resiliently deflects said portion of said first structure"*** *is the plain and ordinary meaning as understood by one of ordinary skill in the art in light of the patent specification.*

*This definition is supported in the specification of the '031 patent*

*as follows.*

*Figures 2B, 5 and 6 show a structure identified as item 34a which includes portions identified as items 44 and 46 in Figures 5, 6, 7A and 7B.*

*Item 34a of the preferred embodiment is described in the specification at Column 3, lines 38-46 as: "Each of the specially designed hinge structures 34 of the present invention is positioned at opposite ends of the housing wall opening 28 and includes two simple and inexpensive releasably interengageable molded plastic portions--a first portion 34a molded onto the rear side of the bezel structure 26 adjacent the opposite ends of the wall opening 28 (see FIGS. 2B and 5), and a second portion 34b molded onto the opposite end tabs 40 of the access door 32 (see FIGS. 2B and 4)."*

*The specification further describes item 34a at Column 3, lines 47-52 as " Turning now to FIGS. 5 and 6, each of the hinge portions 34a formed integrally with the bezel structure 26 projects inwardly beyond the front side of the bezel structure 26 and includes a horizontally elongated resilient mounting plate 42 positioned between horizontally elongated resilient top and bottom spring plates 44 and 46."*

*Figures 5, 6, 7A and 7B show portions of item 34a in the preferred embodiment identified as items 44 and 46 which are described at Column 3, lines 47-52 as: "Turning now to FIGS. 5 and 6, each of the hinge portions 34a formed integrally with the bezel structure 26 projects inwardly beyond the front side of the bezel structure 26 and includes a horizontally elongated resilient mounting plate 42 positioned between horizontally elongated resilient top and bottom spring plates 44 and 46."*

*From the aforementioned figures and the descriptions of these items within the '031 specification one of ordinary skill in the art would understand item 34a in the preferred embodiment to be the "first structure" of Claim 1, and items 44 and 46 in the preferred embodiment to be the "portion of said first structure" of Claim 1.*

*Referring now to Figures 7A and 7B, which are described at Column 2, lines 59-63 as: "FIGS. 7A and 7B are cross-sectional views through a portion of the assembled hinge structure, taken along line 7--7 of FIG. 6, and sequentially illustrate the operation of the hinge structure as the mounted access door is pivoted from its closed position to its open*

*position.", the specification states at Column 4 lines 39-51 that "The access door 32 may, however, be forcibly pivoted from its closed position to its open position by manually pushing upwardly on the bottom side edge 36a of the front door panel 36 (see FIG. 2). This causes the cam arms 52 to be pivoted to and somewhat past their dotted line FIG. 7A upright orientations at which point the opposing spring plate pairs 44,46 have been moved to their fully deflected dotted line positions shown in FIG. 7 and then snap back to their FIG. 7B solid line positions as indicated by the arrows 66 in FIG. 7B. This, in turn, pivots the cam arms 52 through a final distance to their solid line FIG. 7B position, as indicated by the arrow 68, to open the door and resiliently retain it in its open position."*[2]

*At Column 4, lines 57-63, the specification states that "When the access door 32 is subsequently closed, the spring plate pairs 44,46 are resiliently deflected outwardly and yieldingly resist an initial counterclockwise rotation of the cam arms 52 (as viewed in FIG. 7B), and then snap back to their original positions and pivotally drive the door to and then resiliently retain it in its closed orientation."*[2].

*The specification goes on to state in Column 5, lines 8-11 that " A*

*variety of modifications could be made to the representatively illustrated bezel, access door and hinge assembly without departing from the principles of the present invention."*

*Thus, based on the teachings of the '031 patent, one of ordinary skill in the art would understand that the phrase **"resiliently deflects said portion of said first structure"** means displaces the portion of the first structure (item 44,46) such that the portion of the first structure returns to its normal shape or position when the deflecting force is removed.*

and then causes said portion of said first structure to **forcibly pivot** said access door through a final distance to, and then releasably retain said access door in, the selected position.

The phrase " **forcibly pivot** " means apply a force which causes pivoting of.

*The above definition of the phrase " **forcibly pivot** " is the plain and ordinary meaning as understood by one of ordinary skill in the art. A plain and ordinary English language definition of the word forcibly is:*

*effected by force.*[3] *A plain and ordinary English language definition of the word force is: strength or energy exerted or brought to bear.*[3] *Thus, the plain and ordinary meaning as understood by one of ordinary skill in the art of the phrase* ***"forcibly pivot"*** *would be apply a force which causes pivoting of.*

*This definition is intrinsically supported in the ABSTRACT of the '031 patent in the last four lines which read: "When the door is manually pivoted through an initial arc toward a selected one of its closed and open positions, the spring tabs are deflected and function to automatically drive the door through a final arc to its selected position."*[2]

*Further support for this definition is provided in the '031 specification at the following locations:*

*Column 1, lines 60-67 states: "In addition to pivotally supporting the access door on the housing, the hinge structure also automatically functions, in response to a manual movement of the access door through an initial distance toward a selected one of its closed and open positions,*

[3] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not available.

*to forcibly move the access door through a final distance to, and then releasably retain the access door in, the selected position."*[2].

*Column 2, lines 20-29 states: "When the access door is manually pivoted an initial distance away from either of its closed and open positions towards its other position, the cam arms initially deflect the spring plates in each opposed pair thereof away from one another until the cam arms are rotated to over-center positions relative to the resiliently deflected spring plates. At this point the deflected spring plates automatically drive the access door a final distance to its new position while snapping back to their original undeflected orientations to releasably retain the pivoted access door in its new position."*[2]

*Column 4, lines 39-63 states: "The access door 32 may, however, be forcibly pivoted from its closed position to its open position by manually pushing upwardly on the bottom side edge 36a of the front door panel 36 (see FIG. 2). This causes the cam arms 52 to be pivoted to and somewhat past their dotted line FIG. 7A upright orientations at which point the opposing spring plates pairs 44,46 have been moved to their fully*

---

[4] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not

*deflected dotted line positions shown in FIG. 7 and then snap back to their FIG. 7B solid line positions as indicated by the arrows 66 in FIG. 7B. This, in turn, pivots the cam arms 52 through a final distance to their solid line FIG. 7B position, as indicated by the arrow 68, to open the door and resiliently retain it in its open position. A suitable abutment (not shown) between the opened door and the bezel prevents the door from being pivoted rearwardly past its open position. With the door resiliently held in its open position by the interengagement between the cam arms 52 and the opposing spring plate pairs 44 and 46, the cam arms 52 are in upwardly and rearwardly canted orientations as shown in FIG. 7B. When the access door 32 is subsequently closed, the spring plate pairs 44,46 are resiliently deflected outwardly and yieldingly resist an initial counterclockwise rotation of the cam arms 52 (as viewed in FIG. 7B), and then snap back to their original positions and pivotally drive the door to and then resiliently retain it in its closed orientation."*[2]

9) U.S PATENT NO. 6,125,031, CLAIM 20:

20. Electronic apparatus comprising:

a housing having a wall opening therein;

---

available.

an access door;

first and second interengaged portions of said housing and said access door extending along an axis and supporting said access door for pivotal motion relative to said housing about said axis between closed and open positions in which said access door respectively covers and uncovers said wall opening; and

third and fourth resiliently interengaged portions of said housing and said access door which, in response to a manual movement of said access door through an initial **arc** toward a selected one of said closed and open positions,

The term "**arc**" means a curve or deviation from a straight line in a smooth and continuous fashion.

*The above definition of the term " **arc** " is the plain and ordinary meaning as understood by one of ordinary skill in the art in light of the patent specification. A plain and ordinary English language definition of the term " **arc** " is: A portion of a curved line; as, the arc of a circle or of an ellipse,[5] and a plain and ordinary English language definition of the word curve is: A line that deviates from straightness in a smooth,*

[5] Source: Websrers' Revised Unabridged Dictionary, ©1996, 1998 MICRA, Inc.

*continuous fashion.*[6]

*Column 5, lines 8-11 states that " A variety of modifications could be made to the representatively illustrated bezel, access door and hinge assembly without departing from the principles of the present invention.".*

*Therefore it is appropriate when envisioning possible implementations of the art taught in the '031 patent, to interpret the term* ***"arc"*** *in it's broadest plain and ordinary English language sense. Thus the most appropriate plain and ordinary English language definition of the term "* ***arc*** *" is a curve or deviation from a straight line in a smooth and continuous fashion.*

function to **forcibly move** said access door through a final arc to, and then releasably retain said access door in, the selected position,

said third and fourth portions being offset from said first and second portions in a direction transverse to said axis.

The phrase " **forcibly move** " means apply a force which causes movement of.

[6] Source: The American Heritage®Dictionary of the English Language, Fourth Edition Copyright ©2000

*The above definition of the phrase* ***"forcibly move"*** *is the plain and ordinary meaning as understood by one of ordinary skill in the art.*

*As stated previously, a plain and ordinary English language definition of the term forcibly is: effected by force.*[7]*, and a plain and ordinary English language definition of the term force is: strength or energy exerted or brought to bear.*[8]

*A plain and ordinary English language definition of the term move is: To change in position from one point to another*[9]*.*

*Thus, the plain and ordinary meaning as understood by one of ordinary skill in the art of the phrase* ***"forcibly move"*** *would be apply a force which causes movement of.*

*This definition is intrinsically supported in the ABSTRACT of the*

---

by Houghton Mifflin Company.

[7] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not available.

[8] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not available.

*'031 patent in the last four lines which read: "When the door is manually pivoted through an initial arc toward a selected one of its closed and open positions, the spring tabs are deflected and function to automatically drive the door through a final arc to its selected position."*[2]

*Further support for this definition is provided in the '031 specification at the following locations:*

*Column 1, lines 60-67 states:" In addition to pivotally supporting the access door on the housing, the hinge structure also automatically functions, in response to a manual movement of the access door through an initial distance toward a selected one of its closed and open positions, to forcibly move the access door through a final distance to, and then releasably retain the access door in, the selected position."*[2]

*Column 2, lines 20-29 states: "When the access door is manually pivoted an initial distance away from either of its closed and open positions towards its other position, the cam arms initially deflect the spring plates in each opposed pair thereof away from one another until*

[9] Source: The American Heritage®Dictionary of the English Language, Fourth Edition Copyright ©2000

*the cam arms are rotated to over-center positions relative to the resiliently deflected spring plates. At this point the deflected spring plates automatically drive the access door a final distance to its new position while snapping back to their original undeflected orientations to releasably retain the pivoted access door in its new position."*[2]

Column 4, lines 39-63 states: *"The access door 32 may, however, be forcibly pivoted from its closed position to its open position by manually pushing upwardly on the bottom side edge 36a of the front door panel 36 (see FIG. 2). This causes the cam arms 52 to be pivoted to and somewhat past their dotted line FIG. 7A upright orientations at which point the opposing spring plate pairs 44,46 have been moved to their fully deflected dotted line positions shown in FIG. 7 and then snap back to their FIG. 7B solid line positions as indicated by the arrows 66 in FIG. 7B. This, in turn, pivots the cam arms 52 through a final distance to their solid line FIG. 7B position, as indicated by the arrow 68, to open the door and resiliently retain it in its open position. A suitable abutment (not shown) between the opened door and the bezel prevents the door from being pivoted rearwardly past its open position. With the door resiliently held in*

by Houghton Mifflin Company.

*its open position by the interengagement between the cam arms 52 and the opposing spring plate pairs 44 and 46, the cam arms 52 are in upwardly and rearwardly canted orientations as shown in FIG. 7B. When the access door 32 is subsequently closed, the spring plate pairs 44,46 are resiliently deflected outwardly and yieldingly resist an initial counterclockwise rotation of the cam arms 52 (as viewed in FIG. 7B), and then snap back to their original positions and pivotally drive the door to and then resiliently retain it in its closed orientation."*[2]

10) U.S PATENT NO. 6,307,740 B1 CLAIMS

The following sections pertain to the key terms and phrases which I have been asked to define in the '740 Patent.

11) It is my opinion that an individual with a Bachelors degree in Electrical Engineering or Mechanical Engineering with five to seven years of interdisciplinary professional experience in microprocessor based electronic product design and development at the time of issuance of the '740 patent would be the standard by which one should define a person of ordinary skill in the art with respect to the art taught in the '740 patent. It is this definition I will use to define one of ordinary skill in the art in the sections to follow which pertain to the '740 patent.

12) U.S PATENT NO. 6,307,740 B1, CLAIM 1:

1. A notebook computer, comprising:

a computer housing with a generally rectangular configuration, including a top **side**, a bottom, a front side and a rear side, and sidewalls extending from the front side to the rear side with a substantially uniform height;

The term **"side"** in the context of this element of this claim means any of the substantially vertical or horizontal members that form the envelope of the enclosure.

*Several plain and ordinary English language definitions of the term **"side"** are: Any outer portion of a thing considered apart from, and yet in relation to, the rest; as, the upper side of a sphere; also, any part or position viewed as opposite to or contrasted with another; as, this or that side.*[2.10] *Another plain and ordinary English language definition of the term **"side"** is: an aspect or part of something contrasted with some other real or implied aspect or part.* [2.11]

[10] Source: Webster's Revised Unabridged Dictionary, © 1996, 1998 MICRA, Inc.

*The word "side" is used in several different ways in the '740 patent and its prosecution history (to describe three dimensional members of the housing, to describe the position of two different things relative to one another, to describe a place with respect to a centerline of division, and to describe two opposing views of the same object), and the intended meaning in each instance must be determined from consideration of the context in which the word is used. The word "side" will therefore be redefined accordingly in this document when appropriate.*

*The above definition of the term* ***"side"*** *(any of the substantially vertical or horizontal members that form the envelope of the enclosure) is the plain and ordinary meaning as understood by one of ordinary skill in the art that is applicable for the context in which the term* ***"side"*** *is used in this element of this claim when viewed in light of the '740 specification.*

*This definition of the term* ***"side"*** *as used in the context of this element of this claim is intrinsically supported in the specification of the "740 patent in numerous places as will be discussed next.*

---

[11] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not

*Column 2, lines 46-51 of the '740 patent states: "On the top side of the computer housing 12 is a keyboard 16 for entering data and a trackball 18 used to move a cursor device about a display screen 20. The display screen 20 is rotatably mounted viaL [sic] a display screen hinge 22 at its rear edge 24 to the top side 26 of the computer housing 12 at its rear side 28."*[2]

*Some of the plain and ordinary English language definitions of the word **"on"** are: Used to indicate position above and supported by or in contact with*[12]*; and Used to indicate attachment to or suspension from*[12].

*The trackball assembly item 118 can be seen in contact with, attached to, and suspended from the top **"side"** of the computer housing in Figures 1, 6, 11 and 13.*

*Since the trackball assembly is a three dimensional object that is mostly contained within the housing of the laptop computer, it would be obvious to one of ordinary skill in the art that the trackball assembly is*

---

available.

[12] Source: The American Heritage® Dictionary of the English Language, Fourth Edition Copyright ©2000 by Houghton Mifflin Company.

*attached to and suspended from the upper three dimensional horizontal member of the housing rather than attached to and suspended from the upper outer surface of the housing.*

*The display screen 20 can be seen rotatably mounted via a display screen hinge 22 at its rear edge 24 to the top side 26 of the computer housing 12 in Figures 1, 2, and 3.*

*It can be seen in the aforementioned figures that the hinge portion 22 on the top side of the housing is a three dimensional structure, and it would be obvious to one of ordinary skill in the art that <u>the display screen is attached to this three dimensional member of the housing, not a top outer surface.</u>*

*Column 1, lines 52-55 of the specification states: "The battery housing is movably attached to a rear side of the computer housing for supplying electrical power to the computer."*

*Further on at Column 2, lines 52-55 it is stated: " On this rear side 28 is mounted a separate battery housing 30 which holds batteries 32*

*(FIG. 4) for supplying electrical power to the electronic components 14 within the computer housing 12."*

*Further on in the specification at Column 3, line 59 through Column 4, line 3 it is stated: " Referring to FIGS. 4 and 6, the rear wall 36 of the computer housing 12 is shaped such that it has a central extended portion 68. The connectors 42 are located on this central extended portion 68. The central extended portion 68 has opposite outwardly facing sides 70. When the battery housing 30 is mounted on the computer housing 12, the central extended portion 68 of the computer housing 12 is located between the wider end portions 62 of the battery housing 30 such that the outwardly facing sides 70 of the central extended portion 68 oppose the respective inwardly facing surfaces 64 of the wider end portions 62 of the battery housing 30."*

*It can be seen in Figure 6 that rather than being attached to a rear facing surface, the battery housing is mounted to the three dimensional outwardly facing sides 70, of the central extended portion 68, which is an integral part of the three dimensional rear side of the computer housing.*

*It should also be noted that the author of the '740 patent makes an effort to distinguish the three dimensional outwardly facing sides 70 of the central extended portion 68 from the inwardly facing surfaces 64 of the battery housing 30 in Column 3, line 63 through Column 4, line 3 of the specification quoted above.*

*Column 4, lines 7-13 states: " When the battery housing 30 is mounted on the computer housing 12, the electrical contact 72 mates with a mating electrical contact 76 located on the respective outwardly facing side 70 of the central extended portion 68 of the computer housing 12. Electrical power is transferred between the batteries 32 and the components 14 within the computer housing 12 via the electrical contact 72 and mating electrical contact 76."*

*This further indicates to one of ordinary skill in the art that the electrical contact 76 which is located on the outwardly facing side 70 physically extends and passes through the three dimensional member 70 to carry electrical current from the outside of the housing to the components on the inside of the housing, and therefore the side 70 is not just a two dimensional outer surface.*

*Column 4, lines 37-47 states: " Referring now to FIGS. 4, 6, 8, and 9, on the opposite inwardly facing surface 64 of the battery housing 30 is shown a joint 88 which mates with a rotatable socket 90 located on the respective outwardly facing side 70 of the central extended portion 68 of the computer housing 12. The socket 90 includes a key or tab 92 which fits into a slot 94 centrally located through the joint 88. Rotation of the battery housing 30 is thus provided via the respective interactions between the rotatable electrical contact 72 and mating electrical contact 76, and between the joint 88 and the rotatable socket 90."*

*Looking at the structure of the rotatable socket 90 in Figure 9a, the above teachings further indicates to a person of ordinary skill in the art that the outwardly facing side 70 is a three dimensional structure not a two dimensional outer surface, because a structure such as the one shown in Figure 9a could not be mounted in any practical way, on a two dimensional surface in a rotatable fashion. The fact that the outwardly facing side 70 is a three dimensional structure not a two dimensional outer surface is further supported and even more clearly shown in perspective views of Figures 10, 11 and 12.*

a keyboard assembly mounted **on the top side** of said computer housing;

the phrase **"top side"** means the substantially horizontal member that forms the upper portion of the envelope of the enclosure.

*The term **"side"** as used in the context of this element of this claim has been defined above as any of the substantially vertical or horizontal members that form the envelope of the enclosure. A plain and ordinary English language definition of the term **"top"** is: of, relating to, or being at the top: UPPERMOST[13]. Therefore based in part upon the same reasoning previously given for the appropriate definition of the term **"side"** previously, the phrase **"top side"** means the substantially horizontal member that forms the upper portion of the envelope of the enclosure.*

The phrase **"on the top side"** means above, and supported by or in contact with the substantially horizontal member that forms the upper portion of the envelope of the enclosure.

*The phrase **"top side"** as used in the context of this element of this claim has been defined above to mean the substantially horizontal member that forms the upper portion of the envelope of the enclosure.*

*Two of the plain and ordinary English language definitions of the term **"on"** are: Used to indicate position above and supported by or in contact with; Used to indicate attachment to or suspension from.*[14]

*Therefore based in part upon the same reasoning given previously for the appropriate definition of the phrase **"top side"**, the phrase **"on the top side"** means above, and supported by or in contact with the substantially horizontal member that forms the upper portion of the envelope of the enclosure.*

a lid including a display mounted therein, said lid being rotatably **attached to the top side** of said computer housing near the rear side, and covering substantially the entire top side of said housing when closed;

---

[14] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not available.

The phrase "**attached to the top side**" means fastened to the substantially horizontal member that forms the upper portion of the envelope of the enclosure.

*The phrase "**top side**" as used in the context of this claim has been defined above as the substantially horizontal member that forms the upper portion of the envelope of the enclosure. A plain and ordinary English language definition of the term "**attached**" is: To fasten, secure, or join.*[15]

*Therefore based in part upon the same reasoning given previously for the appropriate definition of the phrase "**top side**", the phrase "**attached to the top side**" means fastened to the substantially horizontal member that forms the upper portion of the envelope of the enclosure.*

a motherboard, including component chips mounted thereon, attached to the bottom of said computer housing, and wherein at least a portion of said motherboard is positioned underneath the keyboard assembly to define a **region** bounded on the **upper and lower side** by the keyboard assembly and the motherboard;

[14] Source: The American Heritage® Dictionary of the English Language, Fourth Edition Copyright ©2000 by Houghton Mifflin Company.

The phrase "**upper and lower side**" means two positions viewed as opposite to or contrasted with each other with respect to a vertical axis.

*A plain and ordinary English language definition of the term* ***"upper"*** *is: Higher in place, position, or rank*[16].

*A plain and ordinary English language definition of the term* ***"lower"*** *is: Below another in rank, position, or authority.*[17]

*In the context of this element of this claim the most appropriate definition for the word* ***"side"*** *is: Any outer portion of a thing considered apart from, and yet in relation to, the rest; as, the upper side of a sphere; also, any part or position viewed as opposite to or contrasted with another; as, this or that side.*[2,18]

*Thus, the plain and ordinary English language meaning of the phrase "upper and lower side" would be: two positions viewed as opposite*

---

[15] Source: Merriam-Webster Online Dictionary at www.m-w.com/cgi-bin/dictionary Copyright date not available.
[16] The American Heritage®Dictionary of the English Language, Fourth Edition Copyright ©2000 by Houghton Mifflin Company.
[17] The American Heritage®Dictionary of the English Language, Fourth Edition Copyright ©2000 by Houghton Mifflin Company.

*to or contrasted with each other with respect to a vertical axis*

The term "**region**" means space enclosed by the area of overlap between the keyboard assembly on the upper side and the motherboard on the lower side where the sides of the space enclosed are perpendicular to the substantially horizontal surfaces of the keyboard assembly and motherboard.

*The definition of the term "**region**" as defined above is supported by the plain and ordinary English language definition of the word region, taken in conjunction with the teachings of the '740 patent. A plain and ordinary English language definition of the word "**region**" is: A large, usually continuous segment of a surface or space; area.*[19].

*Column 6, lines 6-36 states: "According to a further aspect of the invention, the placement of the battery housing 30 external to the computer housing 12 is combined with a particular layout of the electronic components 14 within the computer housing 12 to provide the very thin notebook computer 10. Referring now to the assembly views of*

[18] Source: Webster's Revised Unabridged Dictionary, © 1996, 1998 MICRA, Inc.
[19] The American Heritage®Dictionary of the English Language, Fourth Edition Copyright ©2000 by Houghton Mifflin Company.

*FIGS. 10-13, located in the computer housing 12 is a generally rectangular keyboard assembly 106, which includes the keyboard 16 and a keyboard baseplate 108. A generally rectangular CPU motherboard 110 having component chips 112 mounted thereon is positioned directly below the keyboard assembly 106.* <u>*As shown*</u>[2]*, the CPU motherboard 110 is of generally the same major dimensions as the keyboard assembly 106, the keyboard assembly 106 and motherboard 110 thereby defining a region `A` within the enclosure. The remaining components 14 within the computer housing 12 reside in adjacent and generally co-planar relationship with this region.*

*In particular, adjacent to and generally coplanar with the region `A` are placed a DC to DC converter 114, a hard disk drive 116, a trackball assembly 118 including the trackball 18, and a PCMCIA option slot 120. According to this arrangement, the DC to DC converter 114, the hard disk drive 116, the trackball assembly 118, the PCMCIA option slot 120, and the battery housing 30 all reside adjacent to and generally co-planar with each other and with the region `A` and in which the keyboard assembly 106 and the motherboard 110 reside, resulting in a substantially thinner computer 10 than that provided by the prior art arrangement, wherein at*

*least one of the hard disk drive 102, PCMCIA 108, or batteries 54 resides below the keyboard."*

*Figures 10, and 11 of the '740 patent are described at Column 2, lines 21-28 as follows:*

*" FIG. 10 is a perspective view, partly in section, of the keyboard assembly and motherboard within the computer enclosure of FIG. 1 arranged according to the principles of the invention;*

*FIG. 11 is a perspective view of the layout of additional electrical components arranged within the computer enclosure of FIG. 1 in accordance with the principles of the invention;"*

*These two figures show, among other aspects of the preferred embodiment, the motherboard 110 with component chips 112 mounted thereon, in relationship to the keyboard assembly 106.*

*Figure 12 is described at Column 2, lines 29-32 as:*

*"FIG. 12 is a perspective view of the computer enclosure of FIG. 1 illustrating the region occupied by the keyboard assembly and*

*motherboard when arranged as shown in FIGS. 10 and 11. "*

*This figure illustrates the three dimensional "region" 'A' space formed by the keyboard assembly on the upper side and the motherboard on the lower side in the preferred embodiment. In this embodiment of the '740 patent the keyboard assembly and motherboard are of approximately the same major dimensions, and positioned one above the other. One can see in Figure 12 the vertical sidewalls of the three dimensional region 'A' space defined by the boundary of the overlapping areas of the keyboard assembly 106 and motherboard 110 in the XY space, in this preferred embodiment.*

*Column 6, lines 56-65 go on to state that:*

*"Also, though the embodiment shown presents a layout wherein the hard disk drive 116, trackball assembly 118, and PCMCIA option slot 120 are located in front of the keyboard assembly 106, the respective positions of these components can conceivably be reversed to obtain the same thinness advantage.*

*<u>It is apparent that, within the scope of the invention, modifications and</u>*

*different arrangements may be made other than as herein disclosed. The present disclosure is merely illustrative, the invention comprehending all variations thereof."*[2]

*It is clear from the above that modifications to the size, shape, and arrangement of components were envisioned in the '740 patent. It would be obvious to one of ordinary skill in the art that the essence of what is being taught here is that to keep the thickness of the computer to a minimum, one cannot place other components or peripherals under the keyboard assembly/motherboard stack. Such other components or peripherals must be placed within a vertically coplanar position to, and outside of the space defined by the area of overlap created between the keyboard assembly and motherboard.*

*It would also be obvious to one of ordinary skill in that art, that as components continued to become more highly integrated, the size of the motherboard could potentially be decreased, and for example the motherboard might no longer have to extend across the entire width of the computer case. In such a scenario, it would be understood by one of ordinary skill in the art that the keep out region 'A' would correspondingly*

*also be reduced to the volume of overlap between the keyboard assembly and reduced size motherboard. Under such a scenario, it would be understood that other components or peripherals could potentially be placed under the keyboard assembly in the area outside of the overlap region (which was given back by the reduced size motherboard), without increasing the height of the enclosure or deviating from the teachings of the '740 patent.*

an input pointing device **positioned in said housing** in an area outside of said region, and toward the front side of said housing.

The phrase " **positioned in said housing** " means put in place so as to include or incorporate at least a portion of within the housing.

*The above definition is the correct and appropriate one for "positioned in said housing" in light of the '740 patent specification based upon consideration of the following facts:*

*A plain and ordinary English language definition of the term*

***"positioned"** is: To put in place or position.*[20]

*A portion of the SUMMARY OF THE INVENTION at Column 1, lines 38-52 of the '740 patent states:*

*"According to the principles of the invention, there is provided a computer having a computer housing and a keyboard assembly in the housing. A motherboard is positioned directly below the keyboard assembly, the keyboard assembly and the motherboard thereby defining a region in the enclosure. The other components comprising the computer are positioned in an adjacent and generally co-planar relationship with this region, and a battery housing is mounted externally on tile computer housing for supplying electrical power to the computer. An exceptionally thin portable computer is thereby provided.*

*More specifically, a hard disk drive, a PCMCIA option slot, a trackball assembly, and a DC to DC convertor are all located in a position forward of the region and in an adjacent and generally co-planar relationship with the region.".*

---

[20] The American Heritage®Dictionary of the English Language, Fourth Edition Copyright ©2000 by Houghton Mifflin Company.

*Column 6, lines 10-36 states:*

*"Referring now to the assembly views of FIGS. 10-13, located in the computer housing 12 is a generally rectangular keyboard assembly 106, which includes the keyboard 16 and a keyboard baseplate 108. A generally rectangular CPU motherboard 110 having component chips 112 mounted thereon is positioned directly below the keyboard assembly 106. As shown[2], the CPU motherboard 110 is of generally the same major dimensions as the keyboard assembly 106, the keyboard assembly 106 and motherboard 110 thereby defining a region `A` within the enclosure. The remaining components 14 within the computer housing 12 reside in adjacent and generally co-planar relationship with this region.*

*In particular, adjacent to and generally coplanar with the region `A` are placed a DC to DC converter 114, a hard disk drive 116, a trackball assembly 118 including the trackball 18, and a PCMCIA option slot 120. According to this arrangement, the DC to DC converter 114, the hard disk drive 116, the trackball assembly 118, the PCMCIA option slot 120, and the battery housing 30 all reside adjacent to and generally co-planar with each other and with the region `A` and in which the keyboard assembly*

*106 and the motherboard 110 reside, resulting in a substantially thinner computer 10 than that provided by the prior art arrangement, wherein at least one of the hard disk drive 102, PCMCIA 108, or batteries 54 resides below the keyboard.".*

*Figures 1, 6, 11 and 13 show a trackball assembly 118 which includes a trackball 18 that must extend at least partially outside of the housing so that the user can roll it to move the mouse pointer on the screen and utilize the trackball as a pointing device.*

*One of ordinary skill in the art would have known that a trackball assembly was an input pointing device and that a portion of the trackball must remain outside of the housing in order for a user to effectively access it and use it as a pointing device.*

*Since a portion of the input pointing device in the preferred embodiment of the '740 patent remains outside of the housing, only a portion of the input pointing device in the case of the preferred embodiment is positioned inside the housing.*

Thus defining the phrase **"positioned in said housing "** to mean put in place so as to include or incorporate at least a portion of within the housing, in light of the '740 patent specification is correct and appropriate.

13) U.S PATENT NO. 6,307,740 B1, CLAIM 2:

2. A notebook computer as in claim 1, wherein said peripheral device comprises a **PCMCIA** slot.

The term **"PCMCIA"** is an Acronym for Personal Computer Memory Card International Association.[21]

The above definition of the term " **PCMCIA** " is well known in the electronics industry and is the plain and ordinary meaning as understood by one of ordinary skill in the art.

14) U.S PATENT NO. 6,426,871 B2 CLAIMS

The following sections pertain to the key terms and phrases which I have been asked to define in the '871 Patent.

[21] Source: Microsoft Computer Dictionary, Fifth Edition © 2002

15) It is my opinion that an individual with a Bachelors degree in Electrical Engineering or Mechanical Engineering with five to seven years of interdisciplinary professional experience in microprocessor based electronic product design and development at the time of issuance of the '871 patent would be the standard by which one should define a person of ordinary skill in the art with respect to the art taught in the '871 patent. It is this definition I will use to define one of ordinary skill in the art in the sections to follow which pertain to the '871 patent.

16) The constructions provided for any word, term, or phrase which exists in the claims of both the '871 and '740 patents, should be considered to be the same as set forth in the sections of this document covering the '740 patent, and the support for these words, terms or phrases is to be considered parallel to that given for the corresponding word, term or phrase that was provided in the sections of this document covering the '740 patent.

17) U.S PATENT NO. 6,426,871 B2, CLAIM 20

a **drive bay** positioned in said housing in an area outside of said region; and

The phrase "**drive bay**" means section or compartment that is set off for the specific purpose of containing a hard disk drive, floppy disk drive, optical disk

drive, or other similar form factor device

*The above definition of the term "**drive bay**" is the plain and ordinary meaning as understood by one of ordinary skill in the art. Plain and ordinary English language definitions of the word "**bay**" which can be easily found are:*

*3. A section or compartment, as in a service station, barn, or aircraft, that is set off for a specific purpose: a cargo bay; an engine bay.*[22]

*5. Computer Science. A drive bay.*[23]

Executed on Oct. 29, 2004 in Boulder Creek, CA.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Ronald S. Bader

Ronald S. Bader
Engineering Consultant
Bader Engineering

[22] Source: The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company.
[23] Source: The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company.

**Silicon Valley Expert Witness Group, Inc.**
**Consultant Curriculum Vitae**

# Ronald S. Bader

## Expertise

- Medical Electronics
- Interdisciplinary Engineering
- Electronic Product and Circuit Design
- Real Time Applications Programming
- Data Compression
- Control Systems
- Electronic System Power Distribution
- Printed Circuit Board Design
- Speech Recognition and Synthesis
- DVD Player technology
- Signal Integrity for High Speed Digital Circuits

## Professional Summary

Mr. Bader has over twenty-six years of extremely broad based experience in the analysis, design, and development of multi-disciplinary electronic systems. Since 1981, as an engineering consultant, and from 1977-1981 as a founding employee of a high tech startup he has designed, developed and brought to fruition numerous electronic systems, printed circuit board designs, software, firmware, control systems and other devices. His primary focus areas include computer-related technology; medical electronics product development; data communications products, including data compression and power management; electromechanical design and ATE (Automatic Test Equipment) product development; and Signal integrity simulation and modeling for high speed digital circuits. Mr. Bader is an experienced legal consultant.

## Employment History

From: 1981 Bader Engineering
To: Present
Position: Owner & Principal Consultant

Below is a summary of Bader Engineering's design and development projects:

*Computer and Related Projects:*

- Designed two generations of ATX form factor PC motherboards for the Crusoe family of proprietary low power Pentium Pro class

microprocessors. These boards were targeted for use as BIOS development and hardware evaluation platforms for the Crusoe microprocessors and Acer Labs M1535 Southbridge-SuperI/O ASIC. The boards were designed as software development platforms, and as demonstration boards for the IC technology.

- Provided the board level hardware design for a silicon verification / software development platform for a PCMCIA format RSA Public Key encryption / decryption token. Subsequently reduced this technology to a low cost, high volume PCMCIA form, fit, and functionally equivalent product.
- Performed system level performance testing of a Computer Aided Engineering (CAE) workstation to evaluate the validity of the manufacturer's performance claims for their major competitor.

*Medical Product Developments & Related Projects:*

- Headed up development of the real time control systems for three surgical lasers, including:
    - 100W $CO_2$ laser for Neurosurgery
    - Tunable Wavelength Dye laser for Ophthalmic surgery
    - Cu Vapor laser for Dermatology

  This work included safety and control system specification, safety and failure mode analysis, hardware and software tradeoff analysis, architecture and design of hardware/firmware that incorporated extensive self-test capabilities.
- Isolated and achieved a significant reduction of Electro-Magnetic Interference (EMI) in a YAG Ophthalmic laser which caused an intermittent reset of its control system, and a halt in production of the product.
- Developed the controller board, user interface board, instrumentation and control sections of a 100 Watt RF energy generator board, and the AC power subsystem for a coronary tissue ablation device. Work included initial system architecture and hardware specification development, detailed circuit design, the development of software interface specifications, system integration and documentation of two prototype systems.
- Developed the Control system specifications, performed personnel recruitment and technical team building, and provided the safety and failure mode analysis for a Smart Angioplasty Laser system. This system utilized real time UV spectral analysis to analyze the condition of a coronary artery, and controlled vaporization of plaque based upon

the results of the analysis.

- Major technical contributor in the development and productization of the Automator™, a medical device designed to automate the Ilizarov technique for auto-regeneration of human bone, nerve, and soft tissue. Performed design reviews and failure mode analysis of the preliminary conceptual design, then made major design and architectural contributions to achieve a miniaturized battery powered product, which is extremely power efficient, significantly safer and more reliable than the preliminary design first reviewed. Drafted Engineering and Failure Mode Analysis reports, which were submitted, and contributed to a record 91 day 510K approval of the device by the FDA.
- Specified, system engineered, and executed the detailed electrical, electronics, and real time firmware design for a prototype electronically controlled catheter balloon inflation device. Carried out integration of the electrical and electronic subsystems with the mechanical system specified for design by a third party vendor.
- Specified, architected, and performed electronics and firmware design in "C" for the instrumentation and control of a catheter irrigation pump used in an Intra-uterine imaging system. Drafted Engineering and Failure Mode Analysis reports in support of FDA Safe Medical Device Act requirements.

*Data Compression, Communications Products and Other Related Projects:*

- Designed and developed the Common Equipment portion of a 10-GBps hot swappable and fully redundant IP/ATM Switch. This included the study and recommendations for available back plane technologies to transport approximately 5600 high-speed signals between system modules across a 24" x 17" back plane. Project also included:
    - Architecture of power management system and hot swap interface design among mixed technology signal families
    - XTK signal integrity modeling and simulation to determine layout constraints for containment of cross talk, and development of optimal termination schemes for a plurality of signal technologies
    - Provided consultation on thermal model development for empirical analysis and verification of system cooling and venting requirements
    - Provided analysis of system power and cooling requirements
    - Developed a power distribution system

- Defined and implemented the communication firmware for data acquisition and control of a Computed Tomography (CT) system. Troubleshot and recommended circuit modifications to the fiber optic communications circuitry to improve the robustness of the design. This system is used to inspect large physical structures such as jet turbines and rocket engines for hidden defects in a high EMI environment.
- Assisted in the isolation and resolution of a 0.5 to 30 PPM error rate problem on a dedicated Virtual Private Network (VPN) communications board level product.
- Re-designed a non-functional Internet packet inspection board after the initial prototype designed elsewhere failed to meet the client's required speed and functional requirements. This work required: circuit and timing analysis of the initial design; implementation of architectural/circuit design changes to a complex board which contained two Intel IXP1200 Network Processors, a custom SDRAM fabric, several large Xilinx FPGAs, and a multitude of power supplies/voltage domains. Provided schematic capture; printed circuit board (PCB) engineering of a twenty layer high speed PCB including stackup and split power plane partitioning specification, definition of PCB design layout rules, generation of netlist, supporting files and documentation package for printed circuit board design house, and oversight/checking of the PCB board design to insure strict adherence to the layout rules.

*ATE (Automatic Test Equipment) Product Developments & Related Projects:*

- Simulated in PSPICE and engineered a fault-free hot plug Midplane for a telecommunication system tester which provides bulk call generation and emulates various aspects of a modern switched telephone network. Provided system engineering consultation with respect to the mechanical, thermal and power subsystem design of the product. Built an industrial/mechanical design team, evaluated and oversaw vendors for controlled impedance printed circuit board layout and manufacturing, the development of a high power DC Battery Emulator and Ring Generator power supply, and a multi-layer power distribution busbar system. Responsible for all signal integrity aspects of the product. Specified printed circuit board stackups, design rules, and controlled impedance requirements. Oversaw layout of the 17"x 24" twenty two layer Midplane, and the Midplane interface sections of all circuit boards designed for use within the system. Specified and oversaw the design of a custom multi-layer busbar system for high current distribution of multiple voltages within the system.
- Designed the pattern generators and fault analysis subsystems for three

**Silicon Valley Expert Witness Group, Inc.**
**Consultant Curriculum Vitae**

- generations of integrated circuit dynamic test/burn-in ovens. These multi-processor subsystems consist of approximately 2400 16-pin equivalent LSI and MSI ECL, TTL & NMOS ICs, 50K of assembly language firmware per board, and include over 97% self test capability.
- Analyzed communication throughput requirements and designed a custom VME bus extension scheme to meet those requirements for a VLSI Dynamic Test/Burn In system. The architecture implemented enables a 68020 VME based control computer to broadcast Gigabytes of software and test vectors to four test subsystems simultaneously over approximately twenty feet of flat ribbon cable.
- Modeled, simulated, and designed a back plane for a dual head, 960 pin Ultra Large Scale Integrated (ULSI) Circuit Tester. This twelve layer controlled impedance circuit board is responsible for the interface of all intra- and inter-cabinet signals and is designed to support 125 MHz ECLinPSE logic with rise times of less than 400 Pico seconds.
- Analyzed and modified the design of a client's IC tester subsystem consisting of approximately 700 16-pin equivalents LSI and MSI ICs, and 28K of assembly language firmware.
- Interfaced with a client's remote R&D divisions to assess, and help turn around a multi-division multi-technology IC tester project. Led system integration and functional testing to insure that the first article worked flawlessly prior to shipment to the client's Beta site customer.
- Provided interim Systems Engineering for a high speed/performance single board integrated circuit tester targeted toward the FLASH and Non-volatile memory market. Analyzed and estimated power and real estate requirements. Performed a comparative study of all available Field Programmable Gate Array (FPGA) and Complex Programmable Logic Devices (CPLD) architectures and their development environments. Determined the best devices for use in the design of the RISC processor's master controller interface logic to achieve the multiple design constraints of high speed, small size, low power, high reliability, and short time to market.

*Arcade Games and Related Projects:*

- Assisted client in brainstorming implementation concepts for new electromechanical redemption arcade games. Worked closely with an associated vendor to produce electro-mechanical track, pendulum, and rotating drum target and display systems for these games. Designed pulse width modulated (PWM) and stepper motor driver circuitry for the above mechanisms.
- Designed the electronics for series of electromechanical redemption

arcade games.

- Designed a universal controller board, which replaced all of the unique control and display system designs for a client's well-established line of electromechanical redemption arcade games.
- Architected the communications protocol, and designed the hardware for a Progressive Jackpot Display System, which communicates with and links a cluster of Redemption Arcade Games.
- Architected and designed a microprocessor based Cluster Controller that coordinates the activities of up to twelve Redemption Arcade Games over serial communications ports. This device allows the arcade operator to optionally place the games in a competitive play mode in which players at each game compete directly against each other.

*Other Unrelated Projects:*

- Provided an independent third party analysis for a client's new Semiconductor Process Gas Delivery Control System hardware design. Reviewed this process critical control system design from a standpoint of design integrity, reliability, manufacturability and intrinsic safety in a hazardous and electrically noisy industrial environment. Provided detailed functional, timing, failure mode, and fanout analysis for the design.
- Implemented manufacturing test firmware for an Electronic Ballot counting machine, which simplified and significantly reduced the time required to test the product and isolate system failures on the production line.
- Co-architected a prototype system for monitoring and automated control of energy usage, order processing, management reporting, and restocking of supplies for a nationwide 24 hour a day fast food restaurant chain environment to reduce energy consumption and waste while maximizing customer satisfaction.
- Designed and coded a one hundred thousand line FORTRAN program which implemented a two-dimensional hydrodynamic / thermodynamic model of the Hudson River.

From: 1977 Compression Laboratories, Inc.
To: 1981
Position: Manager, Design Engineering

Prior to founding Bader Engineering in 1981, Mr. Bader worked as a founding employee of Compression Labs, Inc., a world leader in Data Compression systems and Video Teleconferencing products. At CLI he held various titles as Manager, Design Engineering; Chief Engineer; and

Project Engineer. Achievements include:

- Development of a microprocessor based store and forward facsimile compressor/expander that emulated both transmit and receive fax machines, compressed fax images in real time on the average by a 50:1 ratio, stored the compressed images on a floppy drive for delayed transmission, and later transmitted compressed images to a remote unit which expanded the data off line and reproduced the images on a local fax machine.
- Specified, managed the development of, and assisted with the debug and test of a Data General Mini-computer based Communications Channel Emulator. This system simulated a sub-second per page Xerographic resolution laser scanner, a T1 communications channel with algorithmically programmable error rate injection capability, and a sub-second per page Laser printer.
- Architected, modeled, designed, and integrated a highly pipelined system utilizing several custom designed parallel board level processors for real time compression/expansion of facsimile traffic at a rate of one second per page. This system provided average compression ratios of 50:1 for typical business mail.

## Litigation Support Experience

| | |
|---|---|
| Date: | 2003 - 2004 |
| Type of Matter: | Class Action suit involving the design or manufacture of consumer DVD players |
| Law Firm: | Heller Ehrman White & McAuliffe LLP |
| Case Name: | Donald Scafuri, et al v. Sony Electronics, Inc., et al |
| Services Provided: | Provided expert witness services for defendant's law firm. Mr. Bader was designated an expert in this case and testified at deposition. Services provided included: |

- Provided theoretical analysis of defendant's product design's based upon product schematics and other documentation
- Assisted defendant's counsel in the assimilation of technical knowledge
- Provided laboratory testing and troubleshooting of representative product models including several units provided by the plaintiffs that they claim produce a number of symptoms which all result from a common defect
- Documented findings of theoretical analysis, testing and troubleshooting in a one hundred and five page expert report

**Silicon Valley Expert Witness Group, Inc.**
**Consultant Curriculum Vitae**

- Participated in depositions of plaintiff's technical experts
- Provided approximately six hours of deposition testimony
- Provided a Certification in Support of Defendant's Surreply to Motion for Class Certification.

Disposition: Class Certification was denied

Date: 2003 - present
Type of Matter: Pre-litigation consulting services in a matter involving the potential infringement of a CD ROM Decoder chip patent.
Law Firm: Fish & Neave
Case Name: Undisclosed
Services Provided: providing pre-litigation consulting services for the law firm of a potential plaintiff. Services provided included:

- Provided review of potential plaintiff's patent file and interpretation of claims.
- Provided review of publicly available documentation pertaining to products suspected of infringing patent.
- Assisted potential plaintiff's counsel in the assimilation of technical knowledge
- Assisted potential plaintiff's counsel with an evaluation of the likelihood of infringement by the potential defendant's products based upon the publicly available information

Disposition: Ongoing

Date: 2001-2003
Type of Matter: Patent Infringement, involving the design of Personal Computers
Law Firm: Robins, Kaplan, Miller & Cerisi
Case Name: Tulip Computers International B. V. v. Dell Computer Corporation
Services Provided: Provided expert witness and consulting services on a case for the plaintiff's law firm. Mr. Bader was designated an expert in this case and testified at deposition and during a focus group conducted by plaintiff's law firm. Services provided included:

- Reviewed defendant's products and documentation with respect to infringement of plaintiff's patent
- Reviewed prior art and case evidence in consideration of alleged patent invalidity arguments put forth by defendant
- Provided expert reports, and an Affidavit
- Assisted plaintiff's counsel in the assimilation of technical knowledge
- Assisted plaintiff's counsel with preparation for deposition of

defendant's technical expert

- Provided eight hours of deposition testimony
- Provided testimony at a pre-trial focus group
- Attended five days of trial prepared to testify and assisted plaintiff's counsel with preparation for cross examination of defendant's technical experts

Disposition: The suit was settled after five days of trial in Federal Circuit Court with Dell paying Tulip $49.5M thereby making Mr. Bader's testimony as a rebuttal witness scheduled for the following day of trial unnecessary.

Date: 1990
Type of Matter: Patent Infringement, Ultra-Sonic Positioning Control System
Law Firm: Keker, Brockett & Van Nest, and Limbach, Limbach & Sutton
Case Name: AGTEK vs. SPECTRA-PHYSICS
Services Provided: Provided technical consulting for plaintiff's law firms. Mr. Bader did not testify as the case was settled in favor of his client. Services provided included:

- Reverse engineering and documentation of defendant's electronics and software systems
- Assisted counsel in the assimilation of technical knowledge, and the development of case strategy
- Participated in depositions of defendant's experts

Disposition: The suit was settled on terms favorable to plaintiff.

## Patents

| Patent Number | Date Issued | Title |
|---|---|---|
| 5,563,450 | 1996 | Spring Grounding Clip For Computer Peripheral Card |
| 4,410,916 | 1983 | Dual Mode Facsimile Coding System And Method |
| 4,288,782 | 1981 | High Speed Character Matcher And Method |

## Education

| | |
|---|---|
| University of California, Berkeley | MS, Engineering (dual major Electronics Engineering and Computer Science) |
| City University of New York | BS, Engineering Sciences (with Highest Honors) |
| City University of New York | AAS, Electronics Technology |

Silicon Valley Expert Witness Group, Inc.
Consultant Curriculum Vitae

## Professional Associations and Achievements

- Presently a Senior Member, Member of the Board, and a past President, Member and Chairman of the Board of the Professional and Technical Consultants Association (PATCA)
- Past Member of the Board of Governors, Affiliation of Professional Consulting Organizations
- Past Member of the Board of the Computer Software Industry Association
- Honorary Certified Member of the National Bureau of Certified Management Consultants
- Senior Member of the Institute of Electrical and Electronics Engineers (IEEE)
- Member of the IEEE National Consultants Network
- Member and past Vice-Chairman of the IEEE Silicon Valley Consultants Network
- Recipient of the IEEE Outstanding Leadership and Service Award 1974-1975
- Recipient of the Professional & Technical Consultants Association Exceptional Service Award 1988 & 1989

---

For more information please contact:

**Silicon Valley Expert Witness Group, Inc.**
2570 W. El Camino Real, Suite 650
Mountain View, CA 94040
Tel: 650-917-0700
Fax: 650-917-0701
Email: info@svewg.com